859 A.2d 364

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. AMBROSE A. HARRIS, DEFENDANT–APPELLANT.

Argued March 2, 2004—Decided October 19, 2004.

400

*Robert Francis Gold* and *Michael A. Priarone,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Gold, Mr. Priarone* and *James N. Barletti,* of counsel and on the briefs).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

In 1996, a jury convicted Ambrose Harris of capital murder and sentenced him to death. We affirmed the conviction and sentence, *State v. Harris,* 156 *N.J.* 122, 716 *A.*2d 458 (1998) (*Harris I* ), and in a subsequent proceeding, found defendant's capital sentence not disproportionate when compared to sentences imposed in similar cases. *State v. Harris,* 165 *N.J.* 303, 757 *A.*2d 221 (2000) (*Harris II* ). Now, four years later, we review defendant's multiple claims of ineffective assistance of counsel and assorted other challenges to the validity of his conviction and sentence.

## I.

## A.

Review of an application for post-conviction relief in a capital case, eight years after the defendant's trial and sentencing, is a daunting task under any set of circumstances. It is made more difficult in this instance due to the conduct of the PCR trial court. That conduct requires us to determine initially whether we can place any confidence in the PCR court's findings and conclusions.

We explain. Ordinarily our review would be based on the findings and conclusions of the PCR trial court. *R.* 3:22–11; *R.* 2:2–1(a)(3). However, certain written and in-court statements of that court complicate our review. We will not recount those statements in detail here, except to note their thrust. The PCR court expressed a belief that defendant would not ever face the death penalty, no matter what the court did:

> [S]ince 1976, the date the United States Supreme Court reassessed its death penalty views,[ ] not a single New Jersey defendant has been executed notwithstanding the fact that 51 persons had been sentenced to death by trial juries to date.[ ] If that history of the non-employment of capital punishment in New Jersey—no executions in 33 years[ ]—is to be any guide, *this court entertains substantial doubt that this defendant, despite the depravity of his crime, will ever be called upon to finally pay his richly-deserved penalty.* (*Cf., inter alia,* the 14–year odyssey of Edgar Smith as in *New Jersey v. Edgar Smith,* 27 *N.J.* 43 [433, 142 *A.*2d 890] (1958) and its own rich history of marathon appeals and petition involving more than 20 justices and judges, including his 1971 jackpot decision in the Federal District Court which suddenly divined his confession to be "involuntary," followed by his almost pre-ordained return to transgression.)[ ]

> Rather, given the remarkable fervor with which the instant matter has been approached thus far by the publicly-funded PCR counsel, we can easily anticipate another, and another and yet another application or review of some kind. *Such application, when combined with the general aversion to put psychopathic killers to death regardless of the consummate depravity exhibited by their crimes and notwithstanding that from any angle of analysis, defendant has already been deemed, to adopt the quaint coinage of our [New Jersey Supreme] Court, "death-worthy," will no doubt operate to preserve the defendant's life well into senior-citizen status.* Civilized society can only hope that defendant's existence will, until his demise, be defined within a cubicle demarcated by steel bars, concrete block and razor wire.

> [ (Footnotes omitted)(emphasis added).]

The balance of the court's statements contain what only can be described as outrageous, sarcastic, and pejorative comments about this State's death penalty system and this Court's capital jurisprudence, including gratuitous personal attacks against current and former members of the Court.[1] The court's statements reveal a disdain for defendant and a preordained view that its role in our capital-sentencing system is meaningless. The nature of its comments raise a *Caldwell*-like issue, namely whether we can affirm a post-conviction relief determination upholding a capital sentence "when [a PCR court seems] to believe that responsibility for determining the appropriateness of a death sentence rests not with [it] but with the appellate court which later reviews the case." *Caldwell v. Mississippi*, 472 *U.S.* 320, 323, 105 *S.Ct.* 2633, 2636, 86 *L.Ed.*2d 231, 235–36 (1985).

In *Caldwell, supra,* the capital defendant's attorney asked the jury to "confront both the gravity and the responsibility of calling for another's death." 472 *U.S.* at 324, 105 *S.Ct.* at 2637, 86 *L.Ed.*2d at 236. In response, the prosecutor urged the jurors not to see themselves as the determiners of the defendant's sentence because a death sentence would be reviewed for appropriateness by the state supreme court. *Id.* at 325–26, 105 *S.Ct.* at 2637–38, 86 *L.Ed.*2d at 237. The United States Supreme Court "conclude[d] that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere." *Id.* at 328–29, 105 *S.Ct.* at 2639, 86 *L.Ed.*2d at 239. Acknowledging "the qualitative difference of death from all other punishments [as] require[ing] a correspondingly greater degree of scrutiny of the capital sentencing determination," the Supreme Court observed

---

[1] The PCR court's decision is not published. We find the comments of the PCR court, which we now address, to be wholly devoid of any function in the judicial discourse of our death penalty jurisprudence. Hence, we will not quote any other portion of the PCR court's oral or written statements that inform our present analysis, as we conclude that such statements deserve no place in the published decisions of this State.

that "many of the limits that [it] ha[d] placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion." *Id.* at 329, 105 *S.Ct.* at 2639, 86 *L.Ed.*2d at 239.

The Supreme Court continued:

[T]his Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State. . . . Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an "awesome responsibility" has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case.

[*Id.* at 329–330, 105 *S.Ct.* at 2640, 86 *L.Ed.*2d at 240 (internal quotation marks omitted).]

The Supreme Court vacated the defendant's death sentence, because "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death." *Id.* at 341, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 247.

We have applied *Caldwell* on several occasions in circumstances where, for example, a prosecutor or court makes an inappropriate statement to a jury, or where a misleading verdict sheet weakens or subverts the requirement of enhanced "reliability in the [sentencer's] determination that death is the appropriate punishment in a specific case." *Id.* at 330, 105 *S.Ct.* at 2640, 86 *L.Ed.*2d at 240. *See, e.g., State v. Nelson,* 173 *N.J.* 417, 457–60, 803 *A.*2d 1 (2002)(Nelson II) (applying *Caldwell* to special verdict sheet); *State v. Josephs,* 174 *N.J.* 44, 107, 803 *A.*2d 1074 (2002) (finding *Caldwell* violation may exist when prosecutor's "remarks to the jury on the death penalty improperly described the role assigned to them under state law"); *State v. Koskovich,* 168 *N.J.* 448, 536, 776 *A.*2d 144 (2001) (rejecting argument that prosecutor's comments "had the capacity to dispel the jury's sense of responsibility"); *State v. Marshall,* 123 *N.J.* 1, 247, 586 *A.*2d 85 (1991) (noting applicability of *Caldwell* to jury instructions); *State v. Rose,* 112 *N.J.* 454, 511, 548 *A.*2d 1058 (1988)(same); *State v. Bey,* 112 *N.J.*

123, 162, 548 *A*.2d 887 (1988) (observing that "in its charge to the jury in the sentencing phases of a capital trial, a trial court must be careful not to dilute the jury's sense of responsibility for determining appropriateness of the death penalty"). *See also Moore v. State*, 771 *N.E.*2d 46, 53 (Ind.2002) (applying *Caldwell* analysis in evaluating statements of sentencing judge).

*Caldwell* states that the Eighth Amendment's demand for heightened reliability in capital sentencing forbids the State from trying to diminish the sentencer's sense of its "awesome responsibility." The decision does not directly or explicitly place Eighth Amendment duties on a state trial court adjudicating a capital defendant's post-conviction petition. Nevertheless, it is beyond doubt that members of the judiciary, charged with the function of ensuring the fairness and integrity of the capital-sentencing process, also must view their responsibility as "awesome." Courts evaluating direct review appeals, proportionality review claims, and post-conviction petitions do not determine a capital defendant's sentence, but nonetheless play an indispensable role in "determining [the] appropriateness of [a] death [sentence]," *ibid.,* in light of a defendant's legal rights.

█ Thus, although we do not rely directly on *Caldwell* in addressing the PCR court's transgressions, we find that *Caldwell* provides support for our decision to nullify the PCR court's findings and conclusions. That said, we ground our nullification of the PCR court's determinations in this matter in our State Constitution's protection against cruel and unusual punishment, *N.J. Const.* art. I, ¶ 12, and specifically, on the role that the post-conviction review proceeding is expected to play in assuring meaningful appellate review in our capital-sentencing scheme.

We have stated that a meaningful post-conviction review proceeding is essential to the state constitutionality of our capital sentencing process. *State v. Martini*, 144 *N.J.* 603, 613, 677 *A.*2d 1106 (1996). In *Gregg v. Georgia*, the United States Supreme Court held that the Eighth Amendment requires that a capital sentencing jury be "given guidance regarding factors about the

crime and the defendant" that are relevant to an individualized sentencing determination, 428 *U.S.* 153, 192, 96 *S.Ct.* 2909, 2934, 49 *L.Ed.*2d 859, 885 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), and that "the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously," *id.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 887. In *Martini, supra,* in rejecting the efforts of a capitally-sentenced offender to forego post-conviction review, we explained that in New Jersey, the post-conviction proceeding is a necessary element of "meaningful appellate review":

> Unless we regard as meaningless the procedures for post-conviction relief set forth in our Rules of Court ..., we would undoubtedly be required to appoint standby counsel for defendant in order to perform a "meaningful appellate review" of his death sentence. Because the issues potentially raised in a PCR petition are so varied and important, "*[f]rom our state perspective, finality is achieved [only] when our courts grant or deny post-conviction relief.*" [*State v. Preciose,* 129 *N.J.* 451, 475, 609 *A.*2d 1280 (1992)]. This is because when "meritorious issues are presented, our interest in affording defendants access to both state post-conviction and federal habeas review outweighs our interest in finality.... Simply put, considerations of finality and procedural enforcement count for little when a defendant's life or liberty hangs in the balance." *Id.* at 475-76, 609 *A.*2d 1280. [144 *N.J.* at 613, 677 *A.*2d 1106 (emphasis added) (parallel citations omitted).]

In performing their function to secure the necessary reliability of a capital sentence, PCR courts must not minimize their own "awesome responsibility" in the process. A court deciding whether the constitutional rights of a capitally sentenced offender have been safeguarded must not perceive its role as futile or meaningless because the ultimate fate of the defendant rests elsewhere, such as with this Court or the Legislature (indeed, the PCR court stated its belief that the Legislature will commute Harris's sentence).

The comments of the PCR court here demonstrated a diminished sense of its unique responsibility in our capital-sentencing process. The court essentially concluded that, even though defendant "richly-deserved" the death penalty, the sanction never would be imposed in New Jersey. Apparently, the trial court believed that the process required by the "heightened need for reliability in the determination that death is the appropriate punishment in a

specific case" was a waste of both time and money. *Caldwell, supra,* 472 *U.S.* at 323, 105 *S.Ct.* at 2636–37, 86 *L.Ed.*2d at 236 (internal quotation marks omitted); *see also Martini, supra,* 144 *N.J.* at 613, 677 *A.*2d 1106. In the context of the court's comments, its assurances of its ability to adjudicate fairly ring hollow. They cannot undo the PCR court's vehement disapproval of our capital-sentencing system, or the jabs taken at our capital-sentencing process and those involved in it, including the attorneys, this Court, and the federal courts attempting to guarantee defendant's constitutional rights. In short, "[b]ecause we cannot say that [the statements of the PCR court, both in open court and in its decision in this matter,] had no effect on [its] decision, that decision does not meet the standard of reliability ... require[d]," *Caldwell, supra,* 472 *U.S.* at 341, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 247, and therefore the PCR court has failed in the performance of its necessary role in assuring defendant meaningful post-conviction review of his capital sentence. *See Martini, supra,* 144 *N.J.* at 613, 677 *A.*2d 1106.

### B.

We are left, then, with the question of remedy for this problem brought about entirely by the PCR court in a case already eight years old. The court's statements, and the bias, flippancy, and disdain they portray, constrain us to afford no weight to any of its findings or conclusions. It does not follow, however, that this proceeding must be redone, causing considerable expense and further delay in the resolution of this matter.

Under established rules of appellate review, we are not bound by and give no deference to the legal conclusions of the PCR court. *Toll Bros., Inc. v. Township of W. Windsor* 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002) (noting that questions of law are subject to *de novo* review). Typically, "[w]e give deference to the trial court's factual findings ... 'when supported by adequate, substantial and credible evidence.' " *Id.* at 549, 803 *A.*2d 53 (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65

*N.J.* 474, 484, 323 *A.*2d 495 (1974)). And for mixed questions of law and fact, we give deference, under *Rova Farms,* to the supported factual findings of the trial court, but review *de novo* the lower court's application of any legal rules to such factual findings. *State v. Marshall,* 148 *N.J.* 89, 185, 690 *A.*2d 1 (1997) (*Marshall III* ). In this case, however, the PCR court's comments call into question not only its legal conclusions, which we would review *de novo* in any case, but its factual findings as well, to which we normally would defer.

We have two options. One would be to remand the matter to a different trial court for further PCR proceedings. *E.g., State v. Rue,* 175 *N.J.* 1, 19, 811 *A.*2d 425 (2002) (affirming Appellate Division's reversal and remand for new PCR hearing, and assigning remand to different trial judge). On remand, the PCR court could generate a new record and render fresh factual findings and legal conclusions. The other would be to determine whether our discretionary jurisdiction permits *de novo* review of the present record.

Article VI, section 5, paragraph 3 of the 1947 Constitution authorizes the Court to "exercise such original jurisdiction as may be necessary to the complete determination of any cause on review." *N.J. Const.* art. VI, § 5, ¶ 3. Our Court Rules confer the same power on our appellate courts. *R.* 2:10–5. We have noted that "[t]he framers of the 1947 Constitution clearly intended that the Supreme Court carry out its appellate review function by undertaking a thorough and comprehensive consideration of each case." *State v. Loftin,* 157 *N.J.* 253, 282, 724 *A.*2d 129 (1999) (*Loftin II* ) (noting particular applicability and breadth of that constitutional authority in respect of capital causes). *See N.J. Const.* art. VI, §· V, ¶ 1(c) (directing that appeals may be taken to Supreme Court: in capital cases); *see also* Joseph H. Rodriguez et al., *Proportionality Review in New Jersey: An Indispensable Safeguard in the Capital Sentencing Process,* 15 *Rutgers L.J.* 399, 422 (1984) (concluding that "the 1947 constitutional convention

delegates [intended] that the supreme court would have the power to review fully all aspects of all capital cases").

■ The Constitution authorizes the "exercise [of] such original jurisdiction as *may* be necessary to the complete determination of any cause on review," *N.J. Const.* art. VI, § 5, ¶ 3 (emphasis added), but it falls short of informing when or under what conditions the exercise of such powers "*may* be necessary." *Ibid.* (emphasis added). To the extent that our ability to invoke our original jurisdiction is permissive, it is correspondingly discretionary.

In *State v. Johnson,* 42 *N.J.* 146, 159, 199 *A.*2d 809 (1964), we interpreted the predecessor to *Rule* 2:10–5, former *R.R.* 1:5–4(b), which like *Rule* 2:10–5 contained an "expression of permissive, but non-compulsory, power" to review the factual findings of lower courts.[2] We determined that with such permissive power, "[t]he deference which appellate courts must accord ... [factual findings] should be determined by consideration of policy and practicality." *Ibid.* (internal quotation marks omitted). As we stated: "What remains to be answered is the question, when does 'may' become 'should'?" *Id.* at 159–60, 199 *A.*2d 809 (quoting *Russo v. United States Trucking Corp.,* 26 *N.J.* 430, 441, 140 *A.*2d 206 (1958)). We concluded that an appellate tribunal may make new factual findings if the findings of the trial court instill a "feeling of 'wrongness.'" *Id.* at 162, 199 *A.*2d 809. Further,

> [w]hile this feeling of 'wrongness' is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can

---

[2] Like *Rule* 2:10–5, *R.R.* 1:5–4(a) tracked the language of Article VI, section 5, paragraph 3 of the 1947 Constitution. However, the predecessor contained an additional subsection, *R.R.* 1:5–4(b), which provided:

> On a review of any cause, criminal or civil, involving issues of fact not determined by the verdict of a jury, new or amended findings of fact *may* be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.
>
> [ (Emphasis added).]

Former *R.R.* 1:5–4(b) would have applied to the PCR court's fact determinations, as the PCR hearing was a non-jury proceeding.

well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made.

[*Ibid.* (citations omitted).]

We refined the *Johnson* standard a few years later in *State v. Yough*, 49 *N.J.* 587, 231 *A.*2d 598 (1967):

There is no question as to the power of this Court to make new fact-findings on the basis of the record before it.... While the power is not generally invoked to displace ordinary fact-findings by the trial judge who saw and heard the witnesses, it will be invoked in those situations where the sound administration of justice calls for appellate "intervention and correction." *State v. Johnson, supra*, 42 *N.J.* at p. 162 [199 *A.*2d 809]. We consider this to be such a situation, particularly since here the findings were not exclusively factual but were intertwined with legal implications drawn by the trial judge from the opinion in *Miranda*.

[*Yough, supra*, 49 *N.J.* at 596, 231 *A.*2d 598 (citation omitted).]

In *Yough*, we "carefully examined the oral testimony along with the written exhibits" and reversed the trial court's suppression of the defendant's confession. *Id.* at 601, 231 *A.*2d 598. *Cf. Bey, supra*, 112 *N.J.* at 140–41, 548 *A.*2d 887 (invoking original jurisdiction to uphold suppression of two confessions where record was at least five years old and remand would "not illuminate the record or serve any other useful purpose"). *See also Patton v. North Jersey Dist. Water Supply Comm'n*, 93 *N.J.* 180, 188, 459 *A.*2d 1177 (1983) ("exercis[ing] ... our original jurisdiction under *R.* 2:10–5, ... since the findings rest[ed] on an undisputed record and not on matters of credibility, demeanor or personal view of the premises").

A pertinent analogy to the present case may be found in *State v. Sugar*, 108 *N.J.* 151, 159, 527 *A.*2d 1377 (1987), where we determined that the trial court's misapplication of the law "may have contributed to an unduly narrow consideration and erroneous legal assessment of all the evidence presented." Again we noted the ordinary course of action would be "to remand th[e] case to the trial court for it to redetermine the matter under the correct, clarified standard." *Ibid.* We perceived, however, that the case was not "a usual case," but was a murder prosecution that had been delayed several times to appeal constitutional and legal issues. *Ibid.* "Moreover, the evidence presented d[id] not pose

issues of credibility or require the subjective and intuitive evaluations of a trial court that would otherwise dictate a remand. . . . In th[o]se extraordinary circumstances, we believe[d] it appropriate to exercise our original jurisdiction." *Id.* at 159–60, 527 *A*.2d 1377. On our *de novo* review of the record, *id.* at 160–66, 527 *A*.2d 1377, we reversed the trial court's suppression of evidence pursuant to the inevitable-discovery rule. *Id.* at 165–66, 527 *A*.2d 1377.

In the circumstances of this appeal, we find that we can conduct a *de novo* review of both the factual findings and legal conclusions of the PCR court. Defendant's claims are of ineffective assistance of counsel (IAC). Assessing IAC claims involves matters of fact, but the ultimate determination is one of law and, as already noted, "[a] trial court's interpretations of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty v. Tp. Committee,* 140 *N.J.* 366, 378, 658 *A*.2d 1230 (1995); *see also Thomas v. State,* 120 *Nev.* 37, 83 *P*.3d 818, 822–23 (2004) (stating that "[a] claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review."); *State v. Hubbard,* 267 *Neb.* 316, 673 *N.W*.2d 567, 574 (2004) (same principle); *Johnson v. State,* 673 *N.W*.2d 144, 148 (Minn.2004) (same); *State v. Davis,* 318 *Mont.* 459, 81 *P*.3d 484, 486 (2003) (same). Thus, our invocation of original jurisdiction is appropriate here where "the findings were not exclusively factual but were intertwined with legal implications drawn by the [PCR] judge." *Yough, supra,* 49 *N.J.* at 596, 231 *A*.2d 598.

We appreciate that in the course of our review certain factual determinations will be necessary to assess defendant's claims. However, as each claim is addressed individually, we shall ensure that our resolution of the claim is based on objective evidence in the record, and not on any credibility determination made by the PCR court. We note specifically that where defendant's PCR claims conflict with the testimony of his trial counsel, defendant has not based his challenge on the truthfulness of counsel, but instead on whether counsel's action or tactic was reasonable. In

such circumstances, we conclude that we comfortably may exercise our discretion to invoke our original jurisdiction. *See, e.g., Sugar, supra,* 108 *N.J.* at 159, 527 *A.*2d 1377 (finding exercise of original jurisdiction appropriate where "evidence presented d[id] not pose issues of credibility or require substantive and intuitive evaluations of a trial court"); *Patton, supra,* 93 *N.J.* at 188, 459 *A.*2d 1177 (opining "exercise of our original jurisdiction [proper] . . . since the findings rest[ed] on an undisputed record and not on matters of credibility, demeanor or personal view of the premises"). Furthermore, many aspects of the present record—*e.g.,* transcripts, institutional records, the absence of affidavits submitted by the defense—bear on and assist in the performance of an objective evaluation of the issues. *See, e.g., Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 601, 379 *A.*2d 225 (1977) (disregarding trial court's findings in respect of remittitur because such were "wholly unsupported by a statement of factual bases or objective elements of any kind"); *id.* at 602, 602–04, 379 *A.*2d 225 (comparing "actual record" of case to trial court's factual findings in reversing grant of remittitur).

We add the following. PCR "is New Jersey's analogue to the federal writ of habeas corpus." *State v. Milne,* 178 *N.J.* 486, 491, 842 *A.*2d 140 (2004); *see also State v. McQuaid,* 147 *N.J.* 464, 482, 688 *A.*2d 584 (1997) (expressing congruence of PCR and federal writ of habeas corpus). Like the federal writ of habeas corpus, which is controlled by statute, 28 *U.S.C.A.* §§ 2241–55, PCR is created by *Rules* 3:22–1 to –12. A court of appeals reviews the legal conclusions of a district court on a petition for writ of habeas corpus *de novo. Mickens–Thomas v. Vaughn,* 355 *F.*3d 294, 303 (3d Cir.2004); *Hakeem v. Beyer,* 990 *F.*2d 750, 758 (3d Cir.1993). A court of appeals also reviews *de novo* aspects of a district court decision that present mixed questions of law and fact. *McCandless v. Vaughn,* 172 *F.*3d 255, 265 (3d Cir.1999). And, although "[t]he factual findings underpinning the[ ] legal conclusions are reviewed for clear error," *Burkett v. Fulcomer,* 951 *F.*2d 1431, 1438 (3d Cir.1991), credibility determinations are given greater deference unlike the evaluation of the documentary record. *U.S. v. Igbon-*

*wa,* 120 *F.*3d 437, 441 (3d Cir.1997). Indeed, where a district court does not hold an evidentiary hearing in respect of a habeas corpus petition, the court of appeals may exercise *de novo* review over the factual inferences drawn from the documentary record by the district court. *Zettlemoyer v. Fulcomer,* 923 *F.*2d 284, 291 n. 5 (3d Cir.1991), *cert. denied,* 502 *U.S.* 902, 112 *S.Ct.* 280, 116 *L.Ed.*2d 232 (1991). Thus, our decision to conduct a *de novo* review of both the factual findings and legal conclusions of the PCR court is within our appellate authority and, further, is consistent with the practices followed in federal habeas review. And, although normally in both forms of review a trial court's credibility findings would be entitled to deference, we note that here there are no issues that turn on credibility. Accordingly, we invoke our original jurisdiction in the review of this matter.

In conclusion, we hold that the PCR court demonstrated a diminished sense of responsibility in this capital proceeding, and repeatedly stated its belief, on the record and in writings, that defendant's sentence would never be carried out. Although the State points out that the PCR court read all the relevant documents, rendered five written opinions, and conducted an evidentiary hearing, among other things, we cannot conclude that by merely performing those tasks, the PCR court rendered its findings and conclusions with any sense of the proper respect for its responsibility and role in our capital sentencing-system. We hold that the PCR court's findings and conclusions are null and void as a result of its injudicious performance. However, in light of the nature of both the claims of error and the record before us, we further determine that we may exercise our discretion to review the PCR court's factual findings *de novo* without remand.

## II.

### A.

#### Background and Procedural History

The facts of this case have been set forth extensively in our previous decisions in *Harris I, supra,* 156 *N.J.* at 134–41, 716 *A.*2d

458, and *Harris II, supra,* 165 *N.J.* at 307–14, 757 *A.2d* 221. We summarize them now, noting the evidence presented at both the guilt and penalty phases of defendant's trial only to the extent relevant to assessing his claims for post-conviction relief.

On December 17, 1992, Kristin Huggins (Huggins), a twenty-two year old artist who lived with her parents in Bucks County, Pennsylvania, drove into downtown Trenton to paint a mural at an establishment known as the Trenton Club. According to the State's evidence, defendant, assisted by Gloria Dunn (Dunn), carjacked, robbed, raped, and murdered Huggins before she could discharge her task. When she did not return home that day, her parents reported her missing. Police found Huggins's red Toyota sports car the following day, but could not find her. The news media reported Huggins's disappearance, as well as a reward offer of $25,000 for information about her whereabouts.

On December 30, 1992, Dunn began conversing about Huggins's disappearance with the security guard at her apartment building in the Kingsbury Tower Complex. The guard, Joseph Golden, also was employed as a detective with the Trenton Police Department. He made a mental note about Dunn's mention of defendant's name during their conversations and throughout January 1993, he attempted to draw Dunn into disclosing any knowledge about Huggins's disappearance, by, among other things, reminding her of the reward money.

That same month, the police investigation had turned its focus on defendant. Two young men from defendant's neighborhood, Brian Goss and Covvie Scott, came forward to tell police that they had observed defendant driving a red Toyota sports car with Pennsylvania plates on December 17, 1992. On January 13, 1993, defendant's nephew, Tariq Ayers, told the police that on December 17, 1992, he saw defendant with a red two-door sports car, and that defendant boasted he had hijacked it and "knocked off some white girl." A security camera and bank records also showed that defendant attempted to withdraw $400 from Huggins's account on December 17, 1992.

Meanwhile, Detective Golden continued to seek information from Dunn, who showed signs of having knowledge about Huggins's disappearance. She initially claimed that her sister, a psychic, had drawn a map indicating Huggins's whereabouts. But, on February 18, 1993, she located Huggins's body for police, admitting that she was with defendant when he murdered Huggins. Dunn gave several statements to the police over the next year-and-a-half that often contained different details. She did not mention that defendant sexually assaulted Huggins until September 1994.

On June 8, 1994, the grand jury indicted defendant for purposeful-or-knowing murder by his own conduct, felony murder, first-degree kidnapping, first-degree robbery, first-degree aggravated sexual assault, second-degree possession of a handgun for an unlawful purpose, and multiple theft offenses. Three weeks later, the Mercer County Prosecutor's Office served defendant with a notice of capital aggravating factors, alleging that he murdered Huggins in the course of a felony, contrary to *N.J.S.A.* 2C:11–3c(4)(g), and for the purpose of escaping detection, contrary to *N.J.S.A.* 2C:11–3c(4)(f).

Defendant filed several pre-trial motions, including one for a change in venue or empanelment of a foreign jury because of the "massive pretrial publicity in the Trenton area" concerning his case. *Harris I, supra,* 156 *N.J.* at 135, 716 *A.2d* 458. The trial court denied defendant's request for a change of venue, but granted the motion to empanel a foreign jury, specifying Hunterdon County residents as the pool of potential jurors. After granting leave to appeal, the Appellate Division determined that Hunterdon County was an inappropriate choice because of its small minority population, and as a result, on remand, the trial court ordered that jurors would be chosen from Burlington County.

During jury selection, defendant made several motions "relating principally to the court's termination of attorney-conducted *voir dire,* the court's limitation on inquiry into the racial attitudes of

prospective jurors, and death qualification." *Harris I*, 156 *N.J.* at 136, 716 *A.*2d 458. The trial court denied those motions, but the Appellate Division granted defendant's interlocutory appeal. Ultimately, the Appellate Division affirmed. However, after one member of the panel "expressed concern at oral argument about the scope of the *voir dire* on racial bias," *ibid.*, the trial court questioned potential jurors more thoroughly about their racial attitudes. The guilt phase of the trial began on January 10, 1996.

## B.

### The Homicide and Guilt–Phase Trial

As we remarked in our earlier decision, "Dunn's testimony provided the only direct evidence linking defendant" to Huggins's murder. *Harris I, supra,* 156 *N.J.* at 136, 716 *A.*2d 458. The jury could have found the following factual account from her testimony and the State's other evidence.

Dunn and defendant met in September 1992 while waiting at the City of Trenton's welfare agency. During a phone conversation at around the time of Thanksgiving that year, defendant proposed robbing a luncheonette in downtown Trenton. Dunn agreed. They met at 8:00 a.m. on December 17, 1992, at the corner of Market and South Broad streets, to execute the robbery and proceeded toward downtown Trenton, defendant riding his bicycle and Dunn walking. Defendant showed Dunn the gun he was carrying and stated that he wanted to carjack somebody to obtain a car. Dunn asked defendant what he planned to do with the person he would carjack, and defendant replied that if the victim was black, he would tie her up and leave her somewhere, but that he would kill a white victim.

As they passed the Trenton Club, defendant saw a young woman drive her red sports car into the club's parking lot. He stated to Dunn: "[T]here's the car, I'm going to get that bitch." Defendant rode his bike to the rear of the parking lot, out of Dunn's sight, and carjacked and kidnapped Kristin Huggins. He drove the car back to Dunn, with Huggins in the front seat, and

ordered Dunn at gunpoint to get into the car. Huggins sat on Dunn's lap and pleaded for her safety.

Defendant drove to and parked under the Southard Street Bridge. He ordered Huggins to open the front trunk and to get in it, worrying that any onlooker would be suspicious of two black people driving with a white woman. Defendant then drove back to the Trenton Club to retrieve his bicycle. After hiding the bike, defendant became frustrated with the noise Huggins was making from the trunk. He told Dunn that he "should have popped that bitch" earlier.

Harris then drove the car back to, and parked under, the Southard Street Bridge. Defendant and Dunn exited the car, and he opened the trunk. Dunn helped Huggins, trembling with fear, out of the trunk. Defendant then ordered Huggins to get into the car's front seat and to take off her clothes. Ignoring Huggins's crying and her pleas, defendant anally raped her and returned her to the trunk. Then, in a change of mind, defendant decided instead to kill her. As Dunn was helping her out of the trunk, defendant shot Huggins in the back of her head. He dragged Huggins's body a short distance from the car and placed a mattress over her.

Defendant and Dunn then drove to his mother's house on Cortlandt Street in Trenton to obtain a shovel to use to bury Huggins. Upon returning to the deserted area under the bridge, Harris shot Huggins again, this time in the face, to ensure that she was dead. He dug a shallow grave and threw her body in it. Rummaging through her belongings, he took approximately thirty dollars in cash and an ATM card from her art bag. After unsuccessfully attempting to sell Huggins's car in New York and Trenton, defendant abandoned it at a construction site behind Mercer Community College, smearing mud throughout its interior to hide fingerprints.

During the guilt phase, defense counsel worked to undermine Dunn's credibility. Although the defense essentially conceded felony murder, robbery, and kidnapping, counsel argued that the

evidence did not corroborate Dunn's testimony with regard to the sexual assault and whether defendant was actually the trigger-person. The defense emphasized Dunn's twenty-month delay in reporting that rape was involved, the many inconsistencies among her versions of events, her motivation for reward money, her failure to help Huggins, her plea bargain with the State, and her character problems, which included prior drug dealing. Counsel also attacked the police investigation for prematurely ruling out other possible suspects, such as the neighborhood drug users and dealers who testified against defendant.

The State's case supported Dunn's testimony. Underwear stains and rectal swabs taken from Huggins's body tested positive for a substance found only in seminal fluid. Other evidence placed the murder weapon in defendant's possession before and after Huggins's disappearance. A ballistics expert testified that the bullets found in Huggins's body came from the gun that authorities found on Harris when he was arrested on unrelated charges, ten days after her disappearance. Harris's nephew, Tariq, who testified that defendant bragged about "knock[ing] off some white girl," also stated that he bought that gun for his own use, but then gave it to defendant before December 17, 1992. Also in line with Dunn's testimony, as well as relevant to the other charges, the police discovered Huggins's hair and coat fibers in the trunk of her car, and more fibers were found on a shovel retrieved from defendant's residence.

## C.

### Penalty Phase

Defendant submitted 180 mitigating circumstances to the jury under the heading of the "childhood of Ambrose Harris." The related evidence was limited to defendant's life from his birth, on May 9, 1952, to October 1965, when he was thirteen years old. The defense limited the scope of its mitigation case to prevent the State from presenting criminal and Department of Corrections records that depict defendant as a violent and dangerous menace.

Defendant presented his mitigation case through Sheila Fairchild, a forensic social worker who compiled his social history, as well as through Dr. Ronald Gruen, a child psychologist, and Dr. Daniel Greenfield, a psychiatrist.

Fairchild's investigation yielded records from the public schools that defendant attended, the Child Guidance Clinic in Trenton (Guidance Clinic), and from the State's psychiatric hospital in Trenton. She also interviewed defendant, his mother, father, brother, half-sister, grandmother, a former teacher, and a psychiatrist who treated defendant in his youth. Fairchild twice interviewed defendant's mother, Mattie Williams (Mattie), but she refused to cooperate any further with Fairchild and defendant's counsel. As the State emphasized on cross-examination, Fairchild's social history of defendant included statements only from defendant, his mother, and his brother.

Fairchild described defendant as having a miserable childhood, due mainly to an abusive and unconcerned mother who wished she never had children. Mattie physically fought with defendant's father, described as a drinker who abandoned his wife and two small children when defendant was three years old. Records from the Guidance Center explicitly confirmed that Mattie was a neglectful, unhappy mother. Social workers described her as "apathetic" about her son's problems, as "somewhat annoyed and unresponsive" when defendant tried to embrace her, and as perceiving her son mainly as a burden.

Defendant told Fairchild that he was physically abused by his mother, and his step-father, Walter Williams. He stated that his mother would beat him with an ironing cord or strap, and records confirmed that Mattie did physically beat her sons. Defendant's brother told Fairchild that he and defendant actually would "jump in to take each other's lick," which, according to Fairchild, expressed a "cavalier attitude about [abuse, which is] not uncommon for children who are abused."

Based on his review of defendant's childhood records and Fairchild's findings, Dr. Gruen agreed that defendant was born into a

"chaotic and dysfunctional home," with a destructive and disinterested mother. Gruen testified that the abusive, neglectful, and infantilizing treatment by his mother, produced in defendant "tremendous ambivalence and then rage against women." The child psychologist believed that the public school system ignored defendant's special needs and that the psychiatric hospital incorrectly diagnosed him multiple times. Doctors at the psychiatric hospital originally diagnosed defendant as having merely an adjustment disorder, and then, after his release and subsequent return to the institution, as psychotic, with childhood schizophrenia. Gruen disagreed with both diagnoses, testifying that defendant had a "severe conduct disorder" by the time he reached thirteen years old. In his opinion, defendant should have been placed in a residential treatment center for emotionally disturbed children.

Dr. Greenfield, who also reviewed defendant's records and Fairchild's findings, agreed with Gruen's diagnosis of Harris as a child. As to the neglect and violence of defendant's parents, Greenfield stated that defendant's formative years were "terrible" and that he should have been removed from the "squalor" of his "toxic environment" at home. Greenfield testified that "[if] I were trying to write a book about how not to raise a child during those years, I would do everything that was done to him. I would not be supportive, I would be abusive, I would be inconsistent. Sometimes infantilizing and sometimes not."

The State did not present new evidence at the penalty phase to support the escape-detection and felony-murder aggravating factors. Instead, it sought to weaken defendant's mitigation case by questioning whether Fairchild presented a fair and balanced social history, based on her evidence, and by underscoring that the defense did not give Gruen and Greenfield the opportunity to conduct a mental examination of defendant.

The jury concluded that the State proved both aggravating factors beyond a reasonable doubt, and that the evidence supported the defense's consolidated mitigating factor. It also found

that the aggravating factors outweighed the mitigating factor beyond a reasonable doubt. The defendant was sentenced to death.

## D.

### Post–Conviction Hearing

Defendant filed a verified petition for post-conviction relief on February 23, 2001, primarily alleging that he received ineffective assistance of counsel at both the guilt and penalty phases of his trial. In May 2001, he moved to recuse the trial judge and to interview the jurors who determined his guilt and sentence. The record does not indicate the precise reasons, but the judge transferred the matter to another trial judge, who presided over the post-conviction hearing. On April 25, 2002, that judge issued an opinion denying defendant's motion to conduct post-verdict juror interviews. On June 18, 2002, this court denied defendant's motion for leave to appeal the trial court's decision on that issue.

On June 4, 2002, the PCR court heard oral argument on the scope of the evidentiary hearing, including whether testimony would be allowed on certain claims and which proffered witnesses would testify. The court held that the State's attorney who prosecuted defendant, William Zarling (Zarling), would testify, as well as defendant's trial counsel, John Call (Call) and Thomas Scully[3] (Scully). The court precluded testimony from David Glazer, Esq., proffered by defendant as an expert in capital defense, although it did admit and consider Glazer's credentials, affidavit and written opinion. It also did not permit the proffered testimony of other witnesses, including Gloria Dunn, Detective Golden, Tariq Ayers, Sheila Fairchild, and two attorneys who represented defendant prior to Call and Scully.

---

[3] We note that after defendant's trial, Thomas Scully was confirmed as a Superior Court judge.

The PCR court held the initial evidentiary hearing on August 6 and 7, 2002. On the first day of testimony, defendant moved to amend his petition in light of the United States Supreme Court's recently decided case, *Atkins v. Virginia,* which held that the Eighth Amendment prohibits states from executing offenders with mental retardation. 536 *U.S.* 304, 122 *S.Ct.* 2242, 153 *L.Ed.*2d 335 (2002). Defendant asserted that he has both mental retardation and mental illness, which bar his execution. The PCR court agreed to consider defendant's claim of mental retardation and the materials submitted in support of that contention, but determined to hear testimony only from a court-appointed expert. Accordingly, the court heard from Dr. Marc Friedman, a state-employed psychologist with expertise in mental retardation.

On October 14, 2002, defense counsel moved to recuse the trial court from consideration of his PCR petition and to amend his petition in light of *Ring v. Arizona,* 536 *U.S.* 584, 122 *S.Ct.* 2428, 153 *L.Ed.*2d 556 (2002). The PCR court denied both those motions. The court also denied defendant's petition for post-conviction relief, including his *Atkins* claim. Defendant now appeals to this Court as of right. *R.* 2:2–1(a)(3).

## III.

### A. Standard of Review

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution provide defendant with the right to receive the effective assistance of counsel. In *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987), we adopted the test set forth in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984) as the standard that would be used to evaluate claims alleging ineffective assistance of counsel. *Strickland's* two-pronged test requires that,

[a] reviewing court first must determine whether counsel's performance "fell below an objective standard of reasonableness," *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and second, whether there exists a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

The first prong is satisfied by a showing that counsel's acts or omissions fell "outside the wide range of professionally competent assistance" considered in light of all the circumstances of the case. *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

\* \* \*

The second prong is satisfied by a defendant showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached. *Ibid.*

[*State v. Chew,* 179 *N.J.* 186, 203–04, 844 *A.*2d 487 (2004)].

## B. Deficiency Prong

In respect of the deficiency analysis, *Strickland* instructs reviewing courts to be "highly deferential," *supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694, and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (quoting *Michel v. Louisiana,* 350 *U.S.* 91, 101, 76 *S.Ct.* 158, 164, 100 *L.Ed.* 83, 93 (1955)). In *State v. Davis,* that *Strickland* standard was held applicable to a capital trial. 116 *N.J.* 341, 356–57, 561 *A.*2d 1082 (1989). In finding the *Strickland* standard to be appropriately demanding for the guilt phase of a capital proceeding, the Court expressed the expectation the "capital defense counsel ... have an expertise regarding the special considerations present in capital cases." *Id.* at 356, 561 *A.*2d 1082.

In respect of the capital sentencing phase, *Strickland* explicitly states that the same ineffective assistance standards apply. *Supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The standards require some adjustment, however, to properly assess reasonableness in the context of the goals in a penalty

phase proceeding. There, "the preparation and investigation for penalty phase ... focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life." *Marshall v. Hendricks,* 307 *F.*3d 36, 103 (3d Cir.2002) (*Marshall VI* ).

### C. Prejudice Prong

To demonstrate prejudice caused by the deficient performance of counsel during the guilt phase of a capital proceeding, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. To prove prejudice during a penalty phase, however, "a capital defendant does not need to show that the result ... would have been different." *State v. DiFrisco,* 174 *N.J.* 195, 219, 804 *A.*2d 507 (2002) (*DiFrisco III* ). The prejudice test employed for evaluating penalty phase IAC claims "require[s] courts to determine *whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially.*" *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1 (emphasis added). Confidence in the outcome is key. The "reasonable probability" that deliberations would have been affected substantially means that there exists "a probability sufficient to undermine confidence in the outcome." *DiFrisco III, supra,* 174 *N.J.* at 220, 804 *A.*2d 507 (quoting *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1).

The aforesaid standards guide us in evaluating defendant's claims of ineffective assistance of counsel.

### IV.

### IAC Claims: Guilt Phase

We consider first the several claims of ineffective assistance defendant asserts regarding the guilt phase of his trial. To the extent possible, related claims are combined.

## A. Letter Written to Gloria Dunn

Defendant argues that his counsel should have moved to suppress a letter that he had written to Gloria Dunn while he was in prison. He presents a two-fold argument. First, he contends that Detective Golden violated his Sixth Amendment right to counsel by urging Dunn to elicit a letter from him after an attorney from the Public Defender's Office already had consulted with him in connection with a weapons possession charge. Second, he argues that his Fifth Amendment rights were violated because he was not given *Miranda* warnings prior to his writing to Dunn. He contends that such warning was necessary because he was in custody when he wrote the letter, and the detective's elicitation of it constituted interrogation.

### 1. Background

Ten days after Huggins disappeared, defendant was arrested on an unrelated weapons possession charge. At the time defendant was charged, and during Dunn's conversations with Golden, the police did not know that the weapon defendant was charged with possessing was the one used in Huggins's murder. After he was arraigned, the Public Defender's Office assigned Amira Rahman, Esq., to represent him on the weapons charge. According to defendant, during a January 15, 1993 visit with him in prison, Rahman informed him that he had become a suspect in Huggins's disappearance.

We turn to the eliciting of the letter and defendant's Sixth Amendment claim. As noted earlier, Detective Golden, a part-time security guard at Dunn's apartment complex, conversed with Dunn when she arrived at and left her building. In late December 1992, after Dunn mentioned defendant, Golden sought to learn something about Harris, or about Huggins's disappearance. Sometime between December 30, 1992 and January 21, 1993, Golden asked Dunn directly if she had heard from Harris and reminded her of the reward for information about Huggins's whereabouts.

On January 21, 1993, when Harris was already a suspect, Golden and another detective went to the apartment complex to talk with Dunn. She indicated a preference to speak with them at the police station and so their discussion took place there. Dunn told them that she knew about Huggins's disappearance only through the newspapers, but she later volunteered that her sister was a psychic and had a map that showed the location of Huggins's body. Later, Golden drove Dunn home and, that evening, Dunn approached Golden with a letter that she had written, addressed to "Abu," which she said referred to defendant. In it, Dunn stated that she supported him and that the police would not find "the white girl." Golden became convinced that Dunn had been in communication with Harris and had useful information. He suggested that she revise the letter because he thought its wording was too specific and he was concerned that it might be perceived by Harris as a warning.

A week later, Dunn approached Golden with a revised letter, more general in tone. According to Golden, when Dunn asked if she should send it, he said that she should if she felt like it. Apparently, she did, and it provoked a response.

On February 17, 1993, Dunn brought Golden the response written by defendant. The letter, dated "2–12–93," is significant from defendant's perspective because jurors could tell from it that he was incarcerated. And, although it does not contain a confession, he contends it prejudiced him because it bolstered the testimony of Dunn who was not a credible witness. The letter includes the following passages:

> Peace and Power Baby Sis. I am still staying strong and fighting on the front line. I am presently in receipt of your missive (with no date). I was very glad to hear from you. But before I get into this kite, my mom told me to tell you to call her sometimes . . . I need you to team-up with my cousin Yvone Pinkey from the Miller Homes, do you understand? Mom will clue you in on what you need to know. As well as Yvone. Watch yourself whenever you talk to anyone over the telephone, because there wired for sound.

> Listen up, whenever you write to me in the future, never use your name and/or address. Use a fake return name and address. Never refer to yourself in any of your letters by name. Just pick out a name and fake address. By the way, I am

mailing you my letters under other inmates name. Because pigs be certainly reading mail that I receive and/or send under my name. Pigs haven't anything on me with that white female that's been in all the newspapers. So, they're trying to frame me up on fake rape charges. I'll get back with you on this after you talk to my mom & Yvone.

Maintaining Order

Abu

At the PCR hearing Call testified that "he did not believe there was a sufficient factual or legal basis upon which to make [a Sixth or Fifth Amendment suppression] motion[ ]." Defense counsel did move, however, to exclude the letter from evidence, arguing that jurors would be able to discern that Harris was incarcerated when he wrote it, and that its potential prejudicial harm outweighed its probative value. Nonetheless, the trial court admitted the letter and it was read to the jury. Moreover, the prosecutor referred during summation to Harris's instruction to Dunn to "never use your name and address" in any correspondences.

### 2. Analysis and Conclusion

Defendant's arguments of ineffective assistance of counsel in respect of his letter lack merit because there were neither Sixth nor Fifth Amendment grounds for counsel to have moved for suppression of the document.

Defendant's Sixth Amendment right to counsel is "offense specific" in its attachment. *Texas v. Cobb*, 532 *U.S.* 162, 164, 121 *S.Ct.* 1335, 1338, 149, *L.Ed.*2d 321, 326 (2001); *McNeil v. Wisconsin*, 501 *U.S.* 171, 175, 111 *S.Ct.* 2204, 2207, 115 *L.Ed.*2d 158, 166 (1991). Notwithstanding that Rahman had commenced her representation of defendant for the weapons charge against him, the police could have questioned defendant directly about Huggins's disappearance at the time that Dunn and Golden consulted about Dunn writing a letter to him. Defendant's Sixth Amendment right to counsel did not attach to the murder charge merely because he was charged with possessing the weapon used to murder Huggins. As previously noted, at that time, the police

did not know that Harris's gun was the murder weapon; the weapons charge was unrelated to the Huggins murder.

With respect to *Miranda* warnings, defendant acknowledges that he had no present right to such warnings in light of *Illinois v. Perkins,* 496 *U.S.* 292, 110 *S.Ct.* 2394, 110 *L.Ed.*2d 243 (1990). In that case, the defendant, who was incarcerated on unrelated charges, admitted to an undercover officer that he committed murder. *Id.* at 294, 110 *S.Ct.* at 2396, 110 *L.Ed.*2d at 249. In rejecting an argument similar to defendant's, the United States Supreme Court stated that *Miranda* warnings aim to protect defendants from possible compulsion associated with a police-dominated atmosphere. *Id.* at 296, 110 *S.Ct.* at 2397, 110 *L.Ed.*2d at 250. "Coercion is determined from the perspective of the suspect," and when a suspect considers himself speaking to cellmates—or to a friend—there is no concern about coercion that prompts the need to give *Miranda* warnings. *Ibid.*

Nonetheless, conceding *Perkins,* defendant contends that we should hold that he is entitled to greater protection under our State Constitution or the common law. Essentially, defendant asks that we find trial counsel ineffective for not anticipating a change in law—a change which this Court has not indicated that it will adopt. Defendant's posture validates the State's argument that there cannot be a cognizable ineffective assistance claim when there is not yet a recognizable legal basis for the motion that defendant says should have been made.

Defendant is not helped by his reliance on *In re J.D.H.,* 171 *N.J.* 475, 795 *A.*2d 851 (2002). Our decision in *J.D.H.* does not imply that being incarcerated and aware of one's status as a suspect is sufficient to trigger *Miranda* warnings. Rather, we stated that one factor to consider in determining when a suspect is in custody is whether the suspect knew that he was the focus of a police investigation. *Id.* at 480, 795 *A.*2d 851. That guidance is irrelevant here.

Harris was unquestionably in custody when he wrote the letter. He was in jail. The important question is whether, from defendant's perspective, there was a threat of coercion arising from the inherent pressures associated with custodial interrogations. We have no doubt that the letter sent to him by Dunn did not cause any such threat of coercion. Defendant's claim of ineffective assistance in respect of the Dunn letter is denied.

## B. Statements to Probation Officer

Defendant argues that counsel should have moved to suppress statements that he made to a probation officer during a presentence interview concerning an unrelated robbery conviction. As in the prior claim, he contends that the officer violated his rights to counsel and against self-incrimination, and further, that the possibility of those statements being used against him during cross-examination prevented him from testifying at trial. Had those statements been suppressed, he claims he would have testified that Dunn actually killed Huggins. To support his claimed intention to testify, defendant points to his pre-trial affidavit, in which he cited that desire as grounds for bifurcating the trial phases.

### 1. Background

According to a presentence report, on December 20, 1992, three days after Huggins's murder, defendant approached a woman on the street, "jumped in front of her, pulled out a gun, and placed it against her forehead." The victim fell in fear, and Harris threatened to kill her. An acquaintance of the victim approached in a car and yelled out, "Are you alright?" Harris responded that she was, and he took her purse and walked away.

On January 6, 1993, the police, conducting an investigation into an unrelated sexual assault, executed a search warrant for the personal property of Harris. At that time, Harris was in a corrections facility being held on weapons charges. During their search, the police found property belonging to the December 20th robbery victim.

In May, 1994, Harris was convicted of first-degree robbery and other crimes related to that incident. To prepare a pre-sentence report (PSR), Probation Officer Douglas Meckel interviewed defendant. Harris's attorneys at the time, Abatemarco and Hamilton, have submitted affidavits in this PCR stating that they "do not recollect advising Mr. Harris that he could, and ought to, decline any effort by the Probation Department to interview him." They also attest that they were not present during the interview and did not learn of the Probation Department's intention to interview Harris.

According to the PSR, defendant stated to Meckel that "he could never be 'normal' because he was 'a descendant of slaves,' " and is now the victim of a racist society and slavery. He described himself as a "real man," and a "real black man," emphasizing that he "took" and "tak[es] what [he] want[s]." When asked if he had children, defendant responded that he may have "a couple out there," stating that he lets "the women take care of them" and likening himself, in that way, to "a wolf or a bear." [4]

### 2. Analysis and Conclusion

 If defendant cannot show that his statements prejudiced him, then his IAC claim fails. He cites this Court's comment in *Harris I, supra,* 156 *N.J.* at 160, 716 *A.2d* 458, that there "may" have been a reason he did not testify besides his criminal record, and now asserts that the looming presence of the PSR constituted that reason. However, we have no basis to suppose that Harris would have testified but for the PSR. Indeed, although many of his prior crimes would have been sanitized under *State v. Brunson,* 132 *N.J.* 377, 625 *A.2d* 1085 (1993), the jury still would have learned of the number of his convictions and the degrees of those offenses. *Id.* at 391, 625 *A.2d* 1085. We know that among

---

[4] The PSR states that the Mercer County Probation Department Child Support Enforcement Unit did not have any order on file against defendant at that time.

defendant's convictions were "possession of stolen property, larceny, burglary, robbery, attempt to commit robbery, and unlawful possession of a weapon for unlawful purposes." *Harris I, supra,* 156 *N.J.* at 157, 716 *A.*2d 458.

As the State contends, that prior record, along with Harris's conduct during trial, support Scully's testimony describing the Meckel statements as, "perhaps," a "minor impediment" to Harris testifying "when considered with the extraordinary mountain of impediments that existed." Scully's testimony reveals a reasonable strategy, is uncontradicted, and amply supports the conclusion that there was no appreciable prejudice from the PSR in view of the other obstacles to Harris testifying.

> It was ... so abundantly clear I believe to both counsel that it would be an error of immeasurable proportion to put Mr. Harris on the stand based on his ongoing behavior during the course of the trial, based on that would possibly open the door to Mr. Meckel's report. That presentence report pales in comparison to the other concerns I had with respect to impediments placing Mr. Harris on the stand.

Accordingly, we conclude that defendant cannot satisfy the prejudice prong necessary for his ineffective assistance claim. Although we have addressed the prejudice prong first because it so readily disposes of this claim, we add that counsel's performance was not deficient in this respect—it simply is unnecessary to engage in any lengthy discussion on the point. We note only that, in respect of defendant's right to Fifth Amendment protections, *Miranda* aims to protect suspects from "the inherently coercive nature of custodial interrogations." *State v. P.Z.,* 152 *N.J.* 86, 113, 703 *A.*2d 901 (1997). Because a presentence interview, which is conducted by a court officer for sentencing purposes, is not considered inherently coercive, "the majority of courts that have addressed this issue under the federal constitution" have held that *Miranda* warnings are not required. *See State v. Cyr,* 169 *Vt.* 50, 726 *A.*2d 488, 492 (1999) (citing numerous federal circuit courts decisions).

Furthermore, even if Meckel violated defendant's Fifth Amendment rights by not administering *Miranda* warnings to him, the State still could have used the PSI statements for

impeachment purposes. Statements taken in violation of *Miranda* may be used for impeachment when they were given freely and voluntarily. *Harris v. New York,* 401 *U.S.* 222, 91 *S.Ct.* 643, 28 *L.Ed.2d* 1 (1971); *State v. Burris,* 145 *N.J.* 509, 525, 679 *A.2d* 121 (1996). It is doubtful that Harris's will was overborne in likening himself to a "wolf" or a "bear," or in giving his other statements, to Meckel.

Finally, as to the Sixth Amendment right to counsel, that right is triggered at "critical stage[s] of those [adversarial] proceedings where counsel's absence, or lack of advice, might derogate from the accused's right to a fair trial." *Baumann v. United States,* 692 *F.*2d 565, 577–78 (9th Cir.1982); *see Michigan v. Jackson,* 475 *U.S.* 625, 632, 106 *S.Ct.* 1404, 1408–09, 89 *L.Ed.*2d 631, 639–40 (1986). Although we do not reach the question, we note that courts that have considered whether the right attaches during presentence interviews have determined that such interviews do not represent a "critical stage" in adversarial proceedings. *See e.g., United States v. Hicks,* 948 *F.*2d 877, 885 (4th Cir.1991); *United States v. Jackson,* 886 *F.*2d 838, 843–45 (7th Cir.1989); *Brown v. Butler,* 811 *F.*2d 938, 941 (5th Cir.1987); *Baumann, supra,* 692 *F.*2d at 578. Thus, pursuant to that case law, although defendant had a right to have counsel present if he wished during the interview, the Sixth Amendment does not compel that counsel be present. In light of that existing case law, we do not regard counsel's failure to move to suppress, based on the argument defendant now asserts, to constitute deficient assistance.

### C. Cross-examination of Tariq Ayers

Defendant argues that he was prejudiced by counsel's failure to cross-examine Tariq on his statement to defense investigators that police coerced him into implicating defendant.

### 1. Background

Defendant's fourteen-year-old nephew, Tariq, gave a statement to police on January 13, 1993. His mother, Beverly Ayers (Bever-

ly), accompanied him. Tariq told the police that he saw Harris on December 17, 1992, "hanging out," in a red, two-door sports car. Tariq approached Harris, who was alone, and the two went for a ride. Tariq also told the police that later, on December 26, 1992, he asked Harris how he had obtained the car, and defendant "said he hijacked the car from West State Street ... from some white girl." More importantly, Tariq also told the police, "[Harris] told me he 'knocked off some white girl.' " Both Tariq and his mother signed the police statement, agreeing that it was "true, free, and voluntary."

According to the FBI records submitted in the PCR proceeding, on February 5, 1993, Tariq "reviewed and reaffirmed the statement he gave the [Trenton Police Department] on Wednesday, January 13, 1993." Additionally, Tariq told the FBI that he had given Harris a twenty-two caliber magnum pistol three months earlier, and that on the evening of Huggins's disappearance, Harris and two others went through Huggins's wallet in search of credit cards. The transcript of that February 5th interview also reveals that Tariq admitted to regular use of cocaine and to having used it during the previous evening and until 5:00 a.m. that morning. By the interview's conclusion, Tariq was crying and asking for his mother, who had been waiting in another room. Upon her entry into the interview room, Beverly observed that Tariq's nose was bleeding. She asked him if anyone had hit him, to which he replied, "No, No one hit me." When outside her son's presence, Beverly said to the FBI special agent, "I don't understand why this happens [referring to her son's nosebleed], but it has happened before."

On March 31, 1994—fourteen months after his initial police interview and twenty months before his trial testimony—Tariq told Alan Goldstein, an assistant chief investigator for the Public Defender, that his January 1992 statement "was the result of beatings given to him by the police, in particular by an African American officer he knows as 'Rev.' " That same day, Beverly told Goldstein that "[w]hen she got [her son] after the interview he was

bumped and bruised." Another investigator and one of defendant's attorneys (Hamilton) also were present at the interviews with Goldstein.

Goldstein interviewed Beverly again two weeks later. She repeated that Tariq told her that "Rev" had beaten him and that she observed bruises on her son. She said she complained to the detective at the time, "who implied to her that Tariq was being untruthful." She added that she was not present during the earlier part of the interview when the beating allegedly took place.

At defendant's trial, Tariq's testimony was consistent with his original 1993 statements to the police. He stated that he bought a gun in exchange for cash and crack in November 1992 because he was afraid of being a target for violence in the projects where he lived. When his sister, with whom he lived, made him get rid of it, he gave the .22 Magnum and three bullets to Harris.

Tariq also testified that during the evening of December 17, 1992, he encountered Harris alone in a two-seat, red car. At that time, Harris told him that he had hijacked it. Nine days later, on December 26th, Harris came to Tariq's sister's apartment and showed Tariq the .22 Magnum that Tariq had given to him. According to Tariq, Harris told him that he had "knocked off some white girl."

In his PCR petition Harris contends that trial counsel should have used Tariq's statement to Investigator Goldstein during cross-examination and that counsel should have called Beverly to the stand to confirm that the police had beaten Tariq. Defendant states that trial counsel (Scully) failed to provide a credible reason for his ineffective cross-examination and for not calling Goldstein, who was available to testify.

## 2. Analysis and Conclusion

■ Defendant's ineffective assistance claim must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,*

*supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2055, 80 *L.Ed.*2d at 694, and the high deference that reviewing courts give to attorney performance. *Ibid.*

█ With that in mind, we note that, during the guilt phase of defendant's trial, the prosecutor tried to anticipate the defense's cross-examination of Tariq and to weaken that sting by exposing Tariq's pending charges for trespass, resisting arrest, and marijuana possession. He also was charged with receipt of stolen property for riding in Huggins's car. Ultimately he received probation for all of his pending charges. In addition, as a result of other behavior, he was placed in a juvenile facility. Thus, on direct examination the prosecution had Tariq admit that he had not been completely honest at first with police interrogators. He affirmed that during his initial two interviews, including the one on January 13, 1993, he did not reveal that he had given Harris a gun. Indeed, because he was afraid of being "locked up," he also denied giving Harris the gun that the police interviewers showed to him.

Consequently, cross-examination was not lengthy, but it was "devastating." *Harris I, supra,* 156 *N.J* at 183, 716 *A.2d* 458. Scully had Tariq confirm that during January 1993, he still was waiting to see how his pending charges would be resolved, and that after he spoke to the police in 1993, he got into additional difficulties with law enforcement that resulted in the "situation" he was in then (presumably, his confinement to a juvenile facility). Furthermore, Tariq admitted on cross that he smoked marijuana everyday, including on December 17, 1992, and December 26, 1992. Instead of attending school, he would sell and smoke drugs. Defense counsel Scully also attempted to throw doubt on Tariq's identification of the gun. After Tariq stated that he never had seen a gun in his life before that one, Scully questioned his ability to distinguish it from other guns, let alone from other twenty-two caliber Magnums.

During the PCR hearing, Scully testified that he believed he had accomplished his cross-examination goal of damaging Tariq's

credibility. Before Tariq took the stand, Scully had planned not to use the beating allegations on cross, and, at the PCR hearing, Scully testified that as direct examination of Tariq unfolded, he decided to stay with his plan.

Scully further testified that he did investigate Tariq's 1994 claims of being beaten by police. He discussed them with Goldstein and considered whether to use them. In evaluating their potential usefulness, he looked at them in the overall context of Tariq's statements: the different explanations for his nose-bleeding at the end of the first interview, the more-than-one-year delay before the allegation was made, and that the allegation was made only once throughout Tariq's statements to investigators. When asked directly why he did not cross-examine Tariq about the beating allegation, Scully pointed to the lack of corroborating evidence. He expected the State to ask Tariq on redirect whether he had filed any complaints with the police department or in court. Without corroborating evidence, Scully believed that the State would be able to discredit Tariq's single recantation. In Scully's view, it would have been an "error of immeasurable proportion to bring [those statements] up."

As the PCR attorneys contend before us, Scully's explanation is not immune from criticism: If Scully wanted to paint Tariq as a liar, why should it matter if the State, on redirect, sought to show that he lied about being beaten by a police officer? Why not let the State expose Tariq as untruthful? Notwithstanding that criticism, Scully's decision fell within the wide range of strategy available to counsel.

Scully wanted to highlight Tariq's motive to gain favor with the police (his pending charges) to explain why he implicated Harris. Had Scully raised the allegations of a police beating, that would have pitted Tariq's interests against the police, a tactic to be avoided, as Scully confirmed. Further, Scully reasonably had to worry that jurors would have seen two options: either believe that Tariq was beaten into implicating Harris, or believe that Tariq lied about getting beaten. The jurors could have perceived Scully as

attempting to have Tariq admit that he was beaten, and that strategy would overshadow his other efforts to portray Tariq as a cocaine-using, crack-dealing, delinquent, seeking to protect himself. The jurors might conclude that Tariq was a liar, but the defense's fear was that jurors would think Tariq's *real* lie was the beating allegation. Scully reasonably concluded that the better strategy was to attack Tariq's credibility with facts about his character and his pending charges.

Scully's strategic decision is apparent from the impeaching information that the State points out it could have used on redirect. Tariq waited sixteen months to complain of a police beating, his direct testimony matched his 1993 statement, and Tariq and his mother attested to the voluntariness of his 1993 statement. If defense counsel had asked his mother about her claims that Tariq was "bumped and bruised," the State could have confronted her with her previous statements about Tariq's frequent nose bleeds, highlighting his cocaine use. Finally, the State's questioning would have informed jurors that no formal complaint had been made by the Ayers, and that the only evidence of the alleged police beating was contained in Goldstein's brief, two-sentence report. Applying the standard of review that we must, we conclude that Scully's decision was within the range of professional competence and was based on a satisfactory investigation. Accordingly, we conclude that defendant has not established that trial counsel performed deficiently in respect of Tariq's cross-examination.

### D. Decision to Call Ranfone and Castellano

Defendant argues that trial counsel rendered ineffective assistance by calling two witnesses who testified to seeing defendant in Huggins's car within two hours of her disappearance. Defendant emphasizes the significance of that testimony because "the only direct evidence" that defendant was involved in Ms. Huggins's killing was the testimony of Dunn (quoting *Harris I, supra,* 156 *N.J.* at 136, 716 *A.*2d 458). The other evidence establishing

defendant's possession of Huggins's car and ATM card came through testimony of several youths who had criminal records. The defense's theme was that any of those youths, or Dunn herself, could have been the killer.

Defendant now contends that trial counsel deviated from that strategy by calling two "independent" witnesses to testify that defendant was in Huggins's car two hours after her disappearance, and that the supposed benefit of disrupting the State's timeline was far outweighed by the prejudice he suffered from the women's testimonies. They were the "only witnesses without a motive to fabricate," he claims, and they established defendant's possession of Huggins's car at a time earlier than had testimony of any State witness other than Dunn. Indeed, defendant argues, in one respect Carmen Castellano's testimony was consistent with Dunn's testimony that she and defendant drove to Cortlandt Street in Trenton to obtain shovels to bury Huggins. Had counsel consulted with him, defendant says he would have objected to calling Mary Jo Ranfone and Castellano.

### 1. Background

Defense counsel explained that Ranfone and Castellano were called to undermine Gloria Dunn's credibility and her account of the December 17th timeline. Defense counsel wanted the jury to believe that Huggins was seen alive in her car on Cortlandt Street with Harris around 11:15 a.m. that morning. According to Dunn's account, Huggins was never in the cabin of the car on Cortlandt Street, indeed she would not have been alive that late in the morning of December 17th.

Ranfone testified that between December 10th and 18th, 1992, she saw a black man driving with a white woman in a "red shiny car" sometime between 11:15 and 11:30 a.m., tying the time of day to a job-related task. On direct, she described the black male as having a "mustache, with fairly medium to dark complexion, with a long nose." She described the white female as looking "sad or angry, pale." On cross-examination, the prosecutor elicited

through questioning that Ranfone had very little time to look closely at the car's passengers, and that many of the details she "remembered" about features and clothing worn by the people in the red car were really images she perceived through the media and police photographs.

Castellano testified that on December 17, 1992, around 11:00 a.m., she saw her neighbor's son—Ambrose Harris—driving a small red car with a white female passenger. She stated that Harris parked near his mother's house on Cortlandt Street, argued with his passenger, and then exited the car. On direct and on cross, Castellano could not confirm precisely why she knew that December 17 was the date of her observations. She recalled that her father went to Puerto Rico around the 12th or 13th of that December, but alternately stated that her observations were made either before or after her father left. On redirect, she acknowledged that she did not know whether Huggins was the white woman she saw in the car.

## 2. Analysis and Conclusion

 This claim does not require extensive discussion because there is no basis to conclude that counsel's performance fell below an objective standard of reasonableness by calling Ranfone and Castellano. Not only did their testimony conflict with the timeline provided by Dunn, the content of what they purportedly saw conflicted with her testimony.

Dunn never placed Huggins in the car alone with Harris, let alone driving down Cortlandt Street with him. Dunn testified that when Huggins was in the cabin of the car, she was sitting on Dunn's lap. Neither Ranfone nor Castellano observed a blond woman on anyone's lap. Furthermore, Dunn testified that Huggins was in the car's cabin only from the time she was abducted until their first visit to the deserted area under the Southard Street Bridge early that morning, well before 11 a.m.

The prosecutor's arguments to the jury concerning Ranfone and Castellano underscore our determination that defense counsel was

not unreasonable in calling them. The prosecutor found their testimony troublesome to the State's case and argued that jurors should question the reliability of their testimony. In her summation, she asked the jurors not to believe that Ranfone and Castellano saw Huggins. She said these witness were "[n]ot sure of what date" they made their observations, and their descriptions were "not matching." Thus, the prosecutor argued that they conjured their descriptions "after they read of Kristin being missing, saw her photograph and of her car, [and] read this in the newspaper."

Defendant's PCR arguments do not overcome the "strong presumption" of reasonableness to be accorded to counsel's performance. *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2055, 80 *L.Ed.*2d at 694. Indeed, PCR counsel did not question defense counsel about this trial decision at all. Moreover, defendant cannot show prejudice. The State, in fact, argued that the testimony of Ranfone and Castellano conflicted with its theory, and that the jury should discredit their accounts. We conclude, therefore, that this ineffective assistance claim lacks merit.

### E. Cross-examination of Gloria Dunn

Defendant next argues that counsel's cross-examination of Gloria Dunn failed to confront Dunn with his claim that Dunn was the trigger-person. Harris also argues that counsel failed to use effective impeachment material at their disposal in respect of inconsistencies among Dunn's multiple descriptions of the relevant events. For example, defendant contends that Dunn once reported that he kept his gun in his waistband the entire time, but on another occasion, she stated that defendant placed the gun on the car.

### 1. Analysis

As the State argues in its counter to this allegation of ineffective assistance, review of Dunn's testimony and of Scully's guilt-phase summation reveals the weakness of defendant's claim.

Scully launched a cross-examination attack on Dunn's credibility and the reliability of her testimony. He had Dunn repeat that she testified to and reported many critical "facts" that she never told the police in her initial statements. Most notably, she did not mention until September 1994 that a rape had occurred. She also did not repeat Harris's alleged stated intention to kill a white victim, but to spare a black victim, until January 1996. Scully's examination strongly suggested that Dunn was motivated to conjure those and other "facts" in order to gain a favorable plea bargain with the prosecution. Despite not helping Huggins when she had opportunities to do so, Dunn testified that she "cared about" Kristin. Scully's cross-examination mocked the suggestion that she was testifying for any such reason. Moreover, Scully's cross-examination attempted to expose inconsistencies throughout Dunn's evolving narrative about December 17, 1992. For example, he had Dunn tell the jury that she had lied about certain details when she finally did tell police of the rape. (She first reported falsely that she was inside the car at the time). She admitted that she signed her February 1993 statement even though it contained false information about the location of a passerby, with a baby, who heard Huggins banging from inside the trunk. And, Scully's questioning emphasized that one of Dunn's professed reasons for not letting Huggins out of the trunk when Harris was temporarily out of sight, was because the trunk was jammed, despite Harris's subsequent ability to open it to get Huggins out.

Scully also succeeded in making Dunn waver on whether she ever abandoned her robbery intentions. At one point, she testified that she changed her mind on seeing Harris's gun, but later admitted that she was "still in on the robbery" even after Huggins was forced into the trunk. Despite saying she still planned to commit the robbery, she nonetheless depicted herself as Harris's second kidnapping victim.

Scully also attacked Dunn's character. He had her repeat that she was a drug dealer, that she intended to commit robbery in

order to buy more drugs to resell, that she had been convicted of welfare fraud, and that she had minor children who did not live with her, but to whom she owed court-ordered support.

Even the cold trial transcript reveals how difficult a person Dunn could be. When Scully asked her to look at a prior police statement, she responded, "No, I don't want to read it." Dunn also demanded that Scully not say that they went "*back* to Cortlandt Street to get shovels because she had never been to Cortlandt Street, and she instructed Scully at one juncture to "[g]et to the point," which drew comment from the trial court. Thus, in his summation, Scully was able to ask the jurors to consider whether "anybody in the world tells Gloria Dunn what to do or what not to do."

Finally, despite defendant's claim that counsel did not accuse Dunn of being the trigger-person, Scully did make that suggestion through a line of questioning, at the end of which, Scully asked Dunn, "You didn't kill anybody, right?"

Q: And you were interested in them finding Kristin—Kristin, because this was bothering you so bad over these three months that—but you weren't interested in any reward, were you?

A: I don't want no money, no, I just wanted her to get out of the ground.

Q: Mr. Zarling said to you at the conclusion of your direct testimony, you entered into an agreement with the Prosecutor's Office to tell—to tell the truth, correct?

A: It's only right that I tell the truth. No. I didn't enter into an agreement through anything. I'm just here to tell the truth what happened.

Q: So if you never had been involved in this plea agreement, you'd still be here telling us the truth today?

A: Of course I would tell the truth.

Q: And—

A: I'm in jail. I didn't do anything to hurt her. Why wouldn't I tell the truth? The person who did it ain't going to tell. Because he told me he ain't going to talk. He told me, I'll tell them people all nothing.

Q: Everything that you've told us here today is the truth, because you were concerned about Kristin and you wanted the truth to be known, correct?

A: Course, it's the truth. Why wouldn't I be concerned about somebody getting killed in front of my face? I don't have the heart to shoot nobody. I never killed nobody before. I never experienced nothing like I experienced ever before. Why wouldn't I?

Q: You didn't kill anybody, right?

A: I never killed nobody.

Q: You're here today to help Kristin, not to help—

A: I'm here today to tell the truth. I'll leave it like that.

Scully: Nothing further.

Scully's questions were laden with sarcasm. Instead of asking her point blank if she killed Huggins, as defendant now argues legally was required, Scully chose to confront Dunn in a different manner. His approach was not objectively unreasonable. Further, Scully argued in summation that perhaps Dunn was the killer, and that she suspiciously had protested too much to the police suggestion that she pulled the trigger.

Scully's theme in summation was to show that the only evidence of a rape and of Harris being the triggerman came from Dunn, and that (i) Dunn was a liar and (ii) none of the other evidence corroborated her testimony. Counsel recounted her inconsistencies, failure to report crucial details, her reason to please the prosecution, and her involvement with drugs. We previously found that defense counsel "attacked Dunn's credibility ... thoroughly" and "undermined [it] at almost every stage of the guilt-phase trial." *Harris I, supra,* 156 *N.J.* at 180, 716 *A.*2d 458. We reiterate here what we observed in our previous decisions: "Defendant's impeachment of Gloria Dunn was extensive." *Id.* at 182, 716 *A.*2d 458.

## 2. Conclusion

The accusations of deficiency in trial counsel's cross-examination of Dunn are negligible in light of Scully's effective attacks on Dunn's credibility. Not pressing Dunn on other minor inconsistencies—such as exactly where defendant's gun and pants were positioned during the rape—does not push Scully's cross-examination performance "below an objective standard of reasonableness." *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* 2052.

## F. Investigation into Defendant's Competency

Defendant contends that trial counsel was ineffective for failing to investigate his mental competence at the time of the offense and

of trial. Specifically, defendant argues that a competent defendant is able "to participate in an adequate presentation of his defense," citing *N.J.S.A.* 2C:4-4b(g). Defendant says that his long psychiatric history, his irrational behavior at trial, and the hostile relationship that developed between him and counsel cast doubt on whether he met that criterion. Furthermore, he contends that his "waiver of his rights to testify and to allocute are suspect because of [his] dubious competence."

Defendant cites numerous instances of his in-court behavior to show his irrationality:

· On March 14, 1994, during a pre-trial hearing, defendant was "spitting all over the place: At the wall in front of him, at chairs behind him and next to him, on the floor in front of him."

· He said to the pre-trial judge, Judge Schroth, "Now, go on over there, cracker, you white racist bigot. You know what you is. You're just doing the devil's work. You tell me why I spit. You have no laws that I'm honored to respect. My forefathers, you understand, and my ancestors did not sit down and decide any laws. You understand that, you racist?"

· On July 13, 1995, Harris refused to come to court, and instead "crawled back in bed and covered up," supposedly afraid that a corrections officer would harm him.

· During trial, Harris spit on Judge Delehey's desk, and tried to "tweak the Judge a little bit" during *voir dire* by exhibiting his middle finger.

· On February 13, 1996, right after entering the courtroom, the court told Harris to sit down and be quiet. Harris responded, "I got it off already. And my [penis] hurt too. You know, you can see if you can get me a doctor for that."

· While the victim's father testified, Harris mocked his sympathy by dabbing under his own eyes with his handkerchief.

Defendant points out that despite counsel's repeated warnings that his conduct would affect the jury's deliberations, he continued to engage in disruptive behavior.

In addition, defendant relies on his long psychiatric history. As a youth, defendant was diagnosed as schizophrenic and psychotic. He was committed at age thirteen to the State Psychiatric Hospital as "insane." Dr. Edward Dougherty, retained by trial counsel, examined Harris and concluded that there was a possibility of an organic impairment of his thought processes. Despite those facts, defense counsel failed to ask for additional testing regarding his competence.

Finally, defendant argues that trial counsels' attitude toward him affected the decision not to order further examinations. Defendant claims that Call "despised [him] and doubted that his behavior was the result of some pathology with legal significance."

The State disputes the characterization of defendant's behavior as bizarre in the sense that would call into question his competency. According to the State, defendant's behavior was intentional, and served to express his disdain for the court, the prosecutors, and the Huggins family. Furthermore, neither trial counsel nor Dr. Dougherty provided any indication that defendant was incompetent. *See State v. Lucas,* 30 *N.J.* 37, 73–74, 152 *A.*2d 50 (1959) (stating that defense counsel are in a better position than trial court to gauge their client's competency). Finally, the State distinguishes defendant's behavior from other behavior that raised legitimate questions about a defendant's competency. For example, in *Drope v. Missouri,* 420 *U.S.* 162, 95 *S.Ct.* 896, 43 *L.Ed.*2d 103 (1975), the defendant attempted suicide during trial; in *Pate v. Robinson,* 383 *U.S.* 375, 86 *S.Ct.* 836, 15 *L.Ed.*2d 815 (1966), the defendant heard voices. In *State v. Spivey,* 65 *N.J.* 21, 319 *A.*2d 461 (1974), the defendant brayed like a donkey and grunted like a pig in court. Here, the State argues, Harris understood the role of the judge and the nature of the charges. He was able to assist Call and Scully, and, albeit offensive in his conduct, he was competent.

### 1. Analysis

*N.J.S.A.* 2C:4–4a prohibits the trying, convicting, and sentencing of a defendant who "lacks [the] capacity to understand the proceedings against him or to assist in his own defense . . . so long as such incapacity endures." *See also State v. Sinclair,* 49 *N.J.* 525, 549, 231 *A.*2d 565 (1967) (competency requires understanding of one's position and ability to consult intelligently with counsel). *N.J.S.A.* 2C:4–4b states that a defendant is fit to stand trial if the proofs establish:

(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and

(2) That his elementary mental processes are such that he comprehends:

(a) That he is in a court of justice charged with a criminal offense;

(b) That there is a judge on the bench;

(c) That there is a prosecutor present who will try to convict him of a criminal charge;

(d) That he has a lawyer who will undertake to defend him against that charge;

(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;

(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and

(g) That he has the ability to participate in an adequate presentation of his defense.

■■■ Defendant's statement to the trial court, before being sentenced on the non-capital convictions, demonstrates that he met each of the criteria outlined in subsections 4b(1) through 4b(2)(f), which pertain to a defendant's awareness of where he is and the nature of the proceedings against him. Specifically, the record reveals that:

· Harris addressed his comments to the judge. ("Number one, Judge, I find your presence as a judge here a disgrace to the bench."); *see N.J.S.A.* 2C:4–4b(2)(b) (defendant must know there is a judge on the bench).

· He disputed the reliability of the evidence against him. He argued, "Who is to say, you know, that [Dunn] wasn't the person that did it?"; that if Huggins saw him coming, she would have locked her car door; that the evidence of a rape was untrustworthy; and that the evidence did not show he shot Huggins; *see N.J.S.A.* 2C:4–4b(1), –4b(2)(a), –4b(2)(f) (requiring that a defendant know where he is and that there are charges against him).

· He understood that a jury was deciding his fate (arguing that "this here jury system ... is not fair"); *see N.J.S.A.* 2C:4–4b(2)(f) (defendant must know role of jury).

· Defendant knew the prosecutor's goal was to have him convicted (arguing that the Huggins family is naïve to believe the prosecution; and that the prosecutor just "want[ed] to make a name for his f—g self"); *see N.J.S.A.* 2C:4–4b(2)(c) (defendant must know prosecutor is there to convict him).

· In fact, in claiming that the death penalty is administered arbitrarily, he compared the moral blameworthiness of the acts attributed to him to those of Gloria Dunn, Jeffrey Dahmer, and others.

The remaining requirement for competency is that a defendant must be able to "participate in an adequate presentation of his defense." *N.J.S.A.* 2C:4–4b(2)(g). At the PCR hearing, when asked whether Harris knew how Tariq would be cross-examined, Scully stated that defendant "saw the entire file." The direct examination of Scully continued:

Q: Did you ever discuss with [defendant] your decision prior to the cross-examination not to ask—

A: I discussed every decision that we made during the course of the trial at length with both Mr. Harris and with Mr. Call, and with many other individuals in the public defender's office.

Q: Judge Scully, what was your purpose in discussing Tariq Ayers' statement with Mr. Harris?

A: I discussed everything. I discussed the entire discovery packet with Mr. Harris.

Q: And I'm asking you with respect to those particular statements, what was your purpose in discussing them with Mr. Harris?

A: Discussing what we could expect to be the proffered testimony during the state's case, and the manner in which we would approach our, our cross-examination as to each witness.

Q: Because we're talking about the defendant's nephew now, right?

A: Correct.

Although in this exchange Scully was not being asked about the issue of Harris's competency specifically, it is apparent that Harris communicated with his attorneys and answered questions about the kind of testimony to expect from State witnesses. *Cf. Spivey, supra,* 65 *N.J.* at 43, 319 *A.*2d 461 (describing incompetent as "totally uncommunicative;" even though he "was aware of what was going on, . . . such knowledge is not necessarily conclusive on the question of one's ability to . . . assist in his own defense"). That evidence of intelligent communication between Harris and his attorneys supports Scully's and Call's assertion that there was no reason to doubt defendant's competency.

Moreover, Scully affirmed that he, in fact, did ask Dr. Dougherty to examine Harris "to make sure that, that were no competency

issues that needed to be addressed." [5] Scully said he asked, not because anything about Harris "raised that specter" of incompetency, but because in any type of major prosecution, it is "prudent ... to have the client ... examined to make sure there aren't any issues as to competency or any other issues, mental-health-related issues." As noted, Dr. Dougherty mentioned the possibility of a neurologic impairment or organic problem, but, after consultation with their appellate counsel, Call and Scully decided it was unnecessary to request further competency assessment.

Call's PCR·testimony, like Scully's, indicated that he "really did not" have any doubt about Harris's competency.[6] Call stated that he formed that opinion based on his meetings and conversations with Harris, on the information he read about Harris's entire life, and on defendant's correspondence, including communications to his previous attorneys. He added that Harris's letters to his prior counsel "showed certainly insight into the nature of his problems."

When asked again whether he had questions about Harris's competency, Call stated:

> No, I did not. Mr. Harris, based on our initial meeting with Mr. Harris [on January 11, 1995)], I felt that he was certainly legally competent, and that is not necessarily a high hurdle in the State of New Jersey, but Mr. Harris was clearly legally competent as to his mental status, based upon the information that I had received to date concerning his past criminal history.

Call added that he received letters from Harris that showed his abilities. Two were marked into evidence at the PCR hearing. In one, Harris asked his attorneys to file an injunction against a Trentonian columnist, stating that the relevant columns prejudiced potential jurors. In the same letter, defendant mentioned that he requested that prison officials provide a skilled paralegal for him.

---

[5] The record does not contain a written report from Dr. Dougherty.

[6] That testimony was given in response to PCR counsel's argument that Harris did not understand the implications of the trial court's sanitization of his record. When the PCR court asked counsel, "Was he competent to stand trial?" PCR counsel responded, "We have not raised his competency as an issue, Judge."

Last, we have defendant's contentions in respect of his childhood diagnoses of schizophrenia and psychosis. However, both defense experts who testified during the penalty phase agreed that those diagnoses were wrong. Neither Dr. Gruen nor Dr. Greenfield saw evidence that defendant was psychotic; each diagnosed him with a conduct disorder as a child, based on the records they reviewed. And, even if the diagnoses had been correct, the issue is whether Harris was competent as an adult.

## 2. Conclusion

The record supports trial counsels' conviction that Harris was competent. His soliloquy to the court before being sentenced on the non-capital counts demonstrates that Harris knew his whereabouts, the nature of the proceedings and of the charges, and the role of the different actors. All statutory factors were demonstrated. Therefore, we reject defendant's argument that counsels' performance fell below an objective reasonableness standard because they did not investigate further into defendant's competency.

## G. Alleged Trial Court Error in Respect of Competency

Defendant also asserts that the trial court erred by failing to order a competency hearing on its own motion. Although not technically an IAC claim, for the same reasons that defendant argues defense counsel should have investigated his competency to stand trial, he makes the ancillary argument that the trial court was required to order a competency hearing on its own motion. Defendant notes, in fact, that before the penalty phase commenced and on learning of defendant's prior civil commitments, the trial court speculated that one might infer that defendant was mentally ill at the time of trial.

## 1. Analysis

*N.J.S.A.* 2C:4–5a authorizes a court, on its own motion, to "appoint at least one qualified psychiatrist to examine and report

upon the mental condition of the defendant" whenever a defendant's fitness to proceed appears questionable. *See also Spivey, supra,* 65 *N.J.* at 37, 319 *A.*2d 461 (noting that trial court "has power to order a competency hearing *sua sponte* ").

The standard for reviewing a court's decision not to order such a hearing "is a strict one." *Ibid.* (citing *Lucas, supra,* 30 *N.J.* at 37, 152 *A.*2d 50).

> [W]hile the court has the power to order an inquiry in the defendant's mental qualifications to stand trial, failure to exercise the powers will not be reviewed on appeal, unless it *clearly and convincingly* appears that the defendant was incapable of standing trial.
>
> [*Lucas, supra,* 30 *N.J.* at 73–74, 152 *A.*2d 50 (emphasis added).]

To meet the clear and convincing standard on appeal, a defendant must show a " 'bona fide doubt' as to [his] competence to stand trial." *Spivey, supra,* 65 *N.J.* at 37, 319 *A.*2d 461 (citing *Pate, supra,* 383 *U.S.* at 385, 86 *S.Ct.* at 842, 15 *L.Ed.*2d at 822).

The "clear and convincing" standard for reviewing a court's failure to order a competency hearing is consistent with the view that defense attorneys are in a better position to assess a defendant's competency; it is they who should bring such matters to the court's attention.

> It is to be ordinarily expected that defense counsel, who is in a far better position than the trial judge to assay the salient facts concerning the defendant's ability to stand trial and assist in his own defense, would originate the request that such an inquiry be conducted.
>
> [*Lucas, supra,* 30 *N.J.* at 74, 152 *A.*2d 50.]

The United States Supreme Court approaches the question similarly, stating that "judges must depend to some extent on counsel to bring [these] issues into focus." *Drope, supra,* 420 *U.S.* at 176–77, 95 *S.Ct.* at 906, 43 *L.Ed.*2d at 116.

Thus, because defense attorneys are in a better position than the trial court to question a defendant's competency, *Spivey, supra,* 65 *N.J.* at 37, 319 *A.*2d 461 (citing *Lucas, supra,* 30 *N.J.* at 73–73, 152 *A.*2d 50), the fact that Call and Scully found no reason to question Harris's competency must be given substantial weight here. Moreover, we agree with the State when it says that the

trial court never questioned defendant's competency. The trial court merely asked defense counsel if the childhood mitigating circumstances implicated Harris's current mental status, and defense counsel replied that they did not. At the time, the court was deciding whether to allow the State's psychiatric expert to conduct an examination of defendant's current mental status in order to assess the defense's childhood mitigating factor. The court found no reason to allow the State to examine Harris because there was no nexus between the childhood mitigating factor and his current mental status.

Defendant does not provide "clear and convincing evidence" that raises a "bona fide doubt" that he failed to meet the competency standards set forth by *N.J.S.A.* 2C:4–4a. PCR counsel never stated specifically how Harris failed to meet any of the statutory criteria for competency and we view Harris's written correspondence and pre-sentencing soliloquy to the court as undermining defendant's claim. We reject, therefore, the argument that there was error in the trial court's failure to *sua sponte* order a competency hearing.

## V.

### IAC claims: Penalty Phase

We now turn to the alleged errors in the performance of counsel during the penalty phase. Defendant asserts that each error "cast[s] doubt on the integrity of the resultant death sentence," and that the cumulative effect of the errors nullified his entitlement to "true advocacy of a life sentence."

### A. Adequacy of Mitigation Investigation

Defendant makes several broad-based arguments in respect of the adequacy of the investigation of mitigating evidence related to his difficult childhood. He also points to specific deficiencies in the investigation performed. In respect of the latter, PCR counsel enlisted Lois Nardone, a social worker and mitigation special-

ist, to investigate the availability of mitigating evidence not found for trial. Nardone interviewed Sheila Fairchild, as well as persons who could have been called as penalty-trial witnesses, including defendant's father, stepfather, mother, brother, one of defendant's grammar school teachers, and Dr. Dougherty. Although the claims are addressed in turn, we note at the outset the State's repeated counter to each: the performance of penalty phase counsel Call was reasonable, and defendant has not produced any evidence that would have affected substantially the jury's deliberations.

It bears repeating that we are considering defendant's claims *de novo*. In respect of each, although we must consider the testimony of Call and others at the PCR hearing, we note at the outset that we do not base our conclusion in respect of any claim on an assessment of Call's credibility. Defendant's ineffective assistance case does not hinge on an assertion that Call's PCR testimony was untruthful; defendant's ineffective assistance claims uniformly assert that Call's performance was objectively reasonable. The PCR record allows us to make that assessment.

### 1. The Broad Based Challenges:

#### a. Call's feelings towards Harris

We first dispense with PCR counsels' suggestion that Call's personal feelings about Harris interfered with his ability to fulfill his investigative duties. Despite PCR counsels' assertion that Call "didn't trust Mr. Harris [from] the day [he] met him," and that Call described Harris as "anti-social to the nth degree," we find this argument meritless. The reasonableness of counsel's assistance does not depend on his personal feelings about defendant. *See Strickland, supra,* 466 *U.S.* at 688–89, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693–94. (reviewing court must "evaluate the *conduct*" of counsel, in light of "an objective standard of reasonableness") (emphasis added). Our attention is, and must be, fixed on evaluating counsels in respect of their performance,

strategy, and investigation. The objective standard in *Strickland* guides our analysis.

### b. Time for preparation

As further support for his claim that counsel provided ineffective assistance, defendant points to Call's having had only ten months to prepare, during which time he was overburdened with another capital trial and a complex criminal case.

There is no dispute that Call and Scully took over the case in the fall of 1994,[7] at which point prior counsel had not conducted an investigation. Jury selection began in October 1995, and the trial commenced in January 1996. According to Call, Fairchild never asked for more time for preparation of a social history for defendant, although she later told Nardone that "there wasn't much time before trial was to begin" and that she "already had a full case load" when assigned to Harris's case. Citing her workload, a serious health problem, and lack of assistance, Fairchild told Nardone that she "definitely could have used more time."

At the PCR hearing, Scully testified to being unimpressed with work done by Harris's previous attorneys when he received the file, but asserted that he and Call had adequate time. Call similarly testified that the defense team did have adequate time to prepare. In addition, the record reveals that Call did ask for an extension of time because of his other cases. However, Call's other burdens were lifted when one matter ended in a plea and he was removed from representation in the other because of a conflict.

As noted, we must determine whether defendant received representation that was objectively reasonable. If Call's representation of defendant fell below objectively reasonable standards, then his inadequate time to prepare might be an explanation. However,

---

[7] Scully testified that Abatemarco and Hamilton, Harris's original attorneys, were removed from the case because Harris expressed great displeasure with them, causing a breakdown in their relationship.

that Call had only ten months to prepare is not outcome determi-native in this application. The argument is analogous to defen-dant's previous argument. Defendant contends that Call's efforts were minimal *because* of his attitude towards defendant and inadequate time. However, the actual question that we must consider is *whether* Call's efforts, in fact, were so minimal that his performance fell below objective reasonableness. Accordingly, we turn to the alleged specific deficiencies in the penalty phase.

### 2. Efforts to secure mother's participation

Defendant's mother, Mattie, did not testify for him, not even to plead for his life. Harris notes that Call met only once with his mother, and blames Call for "ruin[ing] any chance for [her] cooperation by immediately confronting her with accusations of abuse." The State points to the fact that Call did meet with defendant's mother, and that she, as well as defendant's brother, refused to testify for defendant. The State also notes that Mattie similarly was uncooperative with Sheila Fairchild.

### a. Background

Call testified that when he met Mattie, her demeanor was "hostile." She immediately "announced her intention of not coop-erating." Although she eventually did cooperate by providing biographical information, she refused to testify on defendant's behalf. Call stated that "she had great concern about her church friends finding out about it, her name appearing in the paper," and eventually she "terminated her cooperation with us." According to Call, Mattie stated, "I know what you're going to do, you're going to paint me as the terrible mother," and she was intent on not letting that happen. Call tried to convince her otherwise, telling her that his goal at trial would be to emphasize defendant's problems and the family's lack of resources, but his argument met with no success. As Call stated, based on his experience, many "mothers are willing to throw themselves on the sword and say, yes, I was a terrible mother" in order to save their child; however

in this instance, Mattie simply was unwilling to do so. As an alternative tactic, Call asked Mattie to submit to psychological testing, hoping to introduce those results at trial, and he retained both Dr. Sadoff and Dr. Cooke for that purpose. She refused that request as well.

Further, when asked why he met personally with Mattie only once, Call stated that she made it "abundantly clear that she had no intention of helping her son." His testimony revealed the shocking explicitness with which he put to Mattie defendant's need for her testimony (telling her, "you might as well stick a needle in your son's arm right now if you're not going to help us").

### b. Analysis and Conclusion

This record contains abundant evidence that objectively demonstrates Mattie's difficult nature and steadfast refusal to assist in her son's defense of his life. In her penalty-phase testimony, Sheila Fairchild stated that Mattie became uncooperative after two interviews, refusing a third with Fairchild and refusing to meet with her son's attorneys. When asked if Mattie gave her a specific reason, Fairchild responded: "No. She wouldn't tell me why. I asked her why. And when I pressed her, she got rather nasty on the phone." To the extent she was able to interview Mattie, Fairchild described her as "very resistant during those [interviews], very reluctant to disclose, share herself with me."

In Lois Nardone's certification, she states that she "interviewed" defendant's mother. However, although she details the content of her other interviews, she does not state what, if anything, Mattie told her, or that she even was successful in speaking with Mattie. We note that PCR counsel did contact defendant's biological father to see if he would have testified had trial counsel asked him. We presume that a similar inquiry would have been made of defendant's mother. Nonetheless, although PCR counsel asked the PCR court to hear testimony from numer-

ous witnesses, there was no request that the court hear testimony from Mattie.

Given Call's testimony about Mattie's refusals to help in the case, the corroboration of that refusal and her general lack of cooperation, we conclude that trial counsel did not provide deficient assistance in his efforts to secure testimony or other assistance from Mattie Williams.

### 3. Failure to secure brother's participation

Defendant submits evidence, through Lois Nardone, that his brother, Jerry Williams (a.k.a. James Harris) (hereinafter "Jerry") was willing to testify on his behalf.

### a. Background

According to Nardone, Jerry (in prison)[8] told her that "he would have been happy" to testify on his brother's behalf during the penalty phase to tell the jury about defendant's zombie-like state when confined at the psychiatric hospital, about aspects of defendant's terrible childhood, and about how he loved his brother. Defendant's proofs in support of this claim are countered by Fairchild's testimony at the penalty phase, which was consistent with Call's PCR testimony, that Jerry had refused to help his brother's case. Fairchild testified that defendant's brother said, "my mother and I will not testify for Ambrose." According to Fairchild, Jerry's explanation was that he did not want defendant to "take the family down," an explanation that coincided with Call's testimony about Jerry's refusal to help in the defense.

---

[8] According to the website of the New Jersey Department of Corrections, defendant's brother has been in prison since 1991 on four counts of second-degree robbery and two weapons-related offenses. He is eligible for parole in 2013. New Jersey Department of Corrections, at http://www.state.nj.us/corrections (offender search of "Jerry Williams," a.k.a. "James Arthur Harris"). .

### b. Analysis and Conclusion

In evaluating the worth of Jerry's potential testimony, as contained in Nardone's report, we note that its overall effect would have been cumulative because he previously had made similar statements to Fairchild and she conveyed them to the jury. Specifically, Jerry told Nardone that (i) their father was an "embarrassing drunk;" (ii) that when he visited his brother Ambrose in the psychiatric hospital, it was disturbing because he was with the adults and was in a "zombie-like state" from the medication; and (iii) that Ambrose experienced intense rejection from his peers. Fairchild conveyed all that information to the jury during defendant's penalty trial.

The two things that Jerry told Nardone specifically that were not part of Fairchild's testimony were that Ambrose protected him against physical attacks when they were young, and that he very much loves his brother and desires to continue their relationship even in prison. We recognize the importance of such statements when made to a jury. They could convey that defendant has redeeming qualities in that he enjoys his brother's love and desire to continue a relationship. *See State v. Loftin,* 146 *N.J.* 295, 432, 680 *A.*2d 677 (1996) (Handler, J., dissenting) (*Loftin I* ) (the impact of potential execution on defendant's family is relevant to the "uniqueness of defendant as an individual" and "[t]he contribution and connection the . . . defendant makes to his or her family is . . . indicative of his or her character and relevant in mitigation."); *accord* King & Norgard, *What About Our Families? Using the Impact on Death Row Defendants' Family Members as a Mitigating Factor in Death Penalty Sentencing Hearings,* 26 *Fla. St. U.L.Rev.* 1119, 1146 (1999) ("If . . . mitigation evidence is to allow the jury to get a complete picture of the defendant, surely the way that he has impacted the people in his life is a relevant consideration to whether he deserves to live or die.").

Even assuming that potential testimony from a brother would be helpful to a defendant, the question remains as to his willingness at the time of trial to provide such testimony. His present

statement to Nardone aside, the record shows that at the time of trial Jerry declined to provide testimony for defendant. Besides Call's recollection of Jerry's unwillingness, Fairchild testified at the time of the penalty phase that Jerry refused to testify. It is difficult to import to Fairchild motivation to lie about Jerry's willingness to testify at the time of trial: she was there to help prepare the case for a life sentence for defendant.

Defendant submits Nardone's report to show that Jerry would have testified at defendant's sentencing trial had he been asked. But, we regard Nardone's report as insufficient to undermine the 1996 testimony of Fairchild that Jerry was resistant to participating in the case. Call's present testimony is fully consistent with that recollection. Defendant has not shown that counsel were unreasonable in their efforts to mount a mitigation defense.

### 4. Failure to Call Defendant's Father

Defendant argues that neither defense counsel nor Fairchild interviewed his father, James Peter Harris, (Mr. Harris) in person. His father only received one brief phone call from the defense team. Defendant asserts that trial counsels' minimal efforts to obtain testimony from his father rendered their assistance ineffective.

### a. Background

PCR counsel have submitted an affidavit from Mr. Harris, which contains what he told Lois Nardone. Mr. Harris now attests that he would have testified if asked. Specifically, he says he would have informed the jury that he and Mattie had a "very troubled marriage," that she would leave her young children alone during the day, and that he "had reason to believe that [she] was prostituting herself to make up gambling losses." He attests that his son complained to family members about abuse he received from his stepfather. And, defendant's father states that he "would have asked the jury to spare [his] son's life because [he] love[s] his son and [doesn't] think he ever had a chance at a

normal life." Defendant thus argues that that his father's testimony "would have engendered sympathy for [defendant], revealed him to be a person loved by his family and likely 'substantially affected the jury's deliberations.'"

On this issue, the State relies primarily on testimony by Call, whose recollection was refreshed by his notes. Call essentially read from his notes. They indicated that he spoke with Mr. Harris in March and April 1995, and that Mr. Harris informed Call that he suspected his son was abused, but that he had no first-hand knowledge of it. Mr. Harris also told Call that his doctor had advised him not to get involved in the case because of his heart problems, and that, essentially, he did not want to testify.

### b. Analysis and Conclusion

#### (1) Deficiency prong

■ Accepting Call's testimony at the PCR hearing, defendant's claim fails. Call testified:

A: ... Peter Harris was the defendant's natural father who left the home at age—when [defendant] was three, and had little to no significant contact with him after that. During a conference with [defendant] on February 26, 1995, he indicated that his father, James Peter Harris. Was in town, so to speak, and that he was—could be contacted through his sister, Christine Hellams.

. . .

I spoke to Mr. Harris [defendant's father] on that date, this was March 9th, and when I asked him how he was, and he indicated not so good. I have heart problems, gout, diabetes, about every problem in the world, and he would have been about 63 as of our conversation.

When asked, Mr. Harris indicated to Call that he did not have first-hand knowledge of abuse. Call's testimony continued:

And during [a] telephone conference on April 19 of 1995, [defendant's father] indicated that he really didn't wish to be involved in the case. He indicated he had a bad heart, and had been advised by his doctor that he shouldn't get involved since it would be too upsetting.

And it was abundantly clear at that point, that ... [defendant's father] simply did not wish to testify.

Furthermore, Call testified that Mr. Harris did not show up for any day of defendant's almost fifty-day trial, bolstering Call's opinion of Mr. Harris's lack of interest.

We note that the PCR court found Call credible, but even without granting the PCR court's finding any deference, we reach the same conclusion because defendant provides no reason to doubt Call's testimony. Call clearly is reading from his notes during the PCR hearing, and there is no suggestion being advanced that Call fabricated those notes.

Call's decision not to pursue Mr. Harris any further was reasonable given what he knew about the relationship between defendant and his father. Contrary to defendant's argument, Mr. Harris would not have been able to "engender sympathy for [defendant]" and "reveal[ ] him to be a person loved by his family." Mr. Harris would have been subject to cross-examination about abandoning his family when defendant was three, and his lack of relationship with defendant. Numerous records, as well as Fairchild's interviews with Mattie, defendant, and defendant's brother portray Mr. Harris as an alcoholic who did not care about his family, and the documents submitted by defendant confirm that depiction.

In addition, Call had other reasons to doubt the potential worth of testimony from Mr. Harris. If Mr. Harris testified that he loved his son, trying to "reveal [defendant] to be a person loved by his family," the State could have cross-examined Mr. Harris about his absence from defendant's life, and thus, brought out that his feelings for his son do not themselves reveal anything positive about defendant given the absence of a relationship between them. *See Loftin I, supra,* 146 *N.J.* at 432, 680 *A.*2d 677 (Handler, J., dissenting) (noting that family testimony is helpful if it demonstrates defendant's bond with family members); *accord State v. Stevens,* 319 *Or.* 573, 879 *P.*2d 162, 168 (1994) (impact of execution on family shows "that defendant has the capacity to be of emotional value to others. In that inference, a juror could find an aspect of defendant's character or background that could justify a sentence of less than death."); King & Norgard, *supra,* 26 *Fla. St.*

*U.L.Rev.* at 1146 ("If ... mitigation is to allow the jury to get a complete picture of the defendant, surely the way that he has impacted the people in his life is a relevant consideration to whether he deserves to live or die.").

Further, the records submitted by the defense in this PCR proceeding, albeit not known to Call at the time, objectively demonstrate that Mr. Harris would not have been able to provide compelling testimony. Institutional records convey that defendant and his mother did not know the whereabouts of defendant's father at least through 1969. Also, Mr. Harris's neglect of his family and defendant undermine the argument that Mr. Harris's testimony had the potential to be effective. He could not have shown that defendant had a positive impact on his life.

Finally, we find it of little import that the defense did not talk to Mr. Harris in person. Mr. Harris communicated to Call his strong desire not to be involved. That he did so during a telephone call that Call placed to him does not transform Call's interaction with him into ineffective assistance. Moreover, defendant cannot show prejudice for the same reasons counsel had to doubt the value of Mr. Harris's testimony: Mr. Harris had no significant relationship with defendant. In conclusion, defendant has failed to satisfy either prong of *Strickland* in respect of counsels' decision not to pursue further the involvement of his father.

### 5. Efforts to secure testimony of defendant's stepfather, Walter Williams

 Defendant faults defense counsel for not contacting his stepfather (Walter) simply because counsel anticipated a denial of abuse allegations.

#### a. Background

Harris told Fairchild during preparation for the penalty phase that he was afraid of his stepfather, who frequently engaged in fights with his wife, Mattie. Harris said that he and Walter never

really talked, but "he knew that Walter didn't like him." He added that his mother had instructed his stepfather to beat defendant daily, thus Walter too was responsible for defendant's childhood abuse. Mattie, on the other hand, told Fairchild that Walter was not really involved with the boys.

### b. Analysis and Conclusion

At the PCR hearing, Call was asked why he never spoke with Walter. Call's explanation focused on defendant's accusation that his stepfather was involved in the abuse defendant received as a child. Call stated that by the time he learned from the institutional records of the possible abuse defendant suffered when growing up, "Mattie had already told us, you know that—in fact, I think she actually spoke with the press at one point and said that Ambrose was not abused, something along that line." He continued: "But neither Mattie Williams, nor do I suspect that Walter Williams would have, either one of them, would they have substantiated a history of abuse."

At the penalty phase, on cross-examination, the prosecutor asked Fairchild about whether she interviewed Walter:

Q: You also interviewed Walter Williams, did you not?

A: No, I did not.

Q: You never spoke to him?

A: No. I asked to speak with him.

Q: Did he refuse?

A: No, he didn't refuse. I asked Mattie if I could speak with her husband, and she said, he doesn't want to talk to you.

Q: Now, Miss Fairchild, how old was Mr. Williams at the time that you wanted to talk to him?

. . .

A: I don't know his age. I would imagine he's close to Mattie's age, which would be sixty.

. . .

Q: And you thought that in a matter of this importance that you needed Mattie Williams' permission to speak to Walter Williams about a matter that involved his stepson's life?

A: Yes.

Q: So you never made an attempt to speak to Walter Williams yourself?

A: No.

On redirect, defense counsel tried to elicit from Fairchild why she did not make any visit to the Williams household to talk with Walter despite Mattie's refusal to allow her to do so. The prosecutor objected because he believed that defense counsel wanted Fairchild to admit believing Mattie could be violent, knowing of her conviction for murder in the late 1970's. Such testimony would have circumvented the trial court's ruling prohibiting the jury from being informed of that conviction without opening up the time limitation the defense had imposed on itself for its mitigation strategy. That aside, Mattie's past is relevant to judging her propensity for violence in assessing whether Fairchild, or defense counsel, should have shown up, unwelcome, at Mattie and Jerry's door.

Call also testified that Jerry told Fairchild that Walter did not abuse his stepsons. In fairness, the role that Walter played in punishing his stepsons is unclear. A 1964 report by a school psychologist, obtained by PCR counsel, indicates that Harris called Walter a harsh disciplinarian and that Mattie confirmed that Walter participated in punishing defendant. On the other hand, Mattie conveyed pride during an interview with Fairchild that she was the one who disciplined her children, and that Walter had very little to do with them.

For our purposes, it is most significant that defendant has failed to submit any evidence to show what Walter was willing to say on the stand so we could assess whether it would have substantially affected jury deliberations. Nardone's report of her interview with Walter is uninformative. It says only that Walter "would have been happy to have spoken with either or both Mr. Call/Mr. Scully and Ms. Fairchild." Finally, as in the case of defendant's mother, PCR counsel did not ask the PCR court to hear testimony from Walter Williams, according to counsels' brief.

In sum, there is no evidence that trial counsel acted unreasonably in not pursuing Walter after their discussion with Mattie.

Furthermore, defendant has not provided any information to the Court about how Walter's participation in the case would have substantially affected jury deliberations.

### 6. Interactions with defense experts

In the last of this series of issues raised, defendant alleges various deficiencies in Call's interactions with defense experts that limited the usefulness of those experts.

#### a. Background

Defendant complains that Call did not meet with his experts in person and, moreover, that he did not permit the mitigation expert, Sheila Fairchild, to meet alone with Harris because he feared defendant's dangerousness.

The State responds that Call did meet with the penalty phase experts prior to their testimony and that he recorded the dates on which he spoke with Dr. Greenfield. Scully testified about Fairchild attending meetings that occurred with counsel. Indeed, that Fairchild interviewed Harris only with counsel present is further evidence of counsels' meetings with Fairchild. Finally, the State contends that there was good reason for counsels' decision not to allow a one-on-one meeting between Fairchild and Harris: defendant is a violent, unpredictable person, even when incarcerated. During one meeting with Fairchild (with Call present), defendant pulled his pants down to show her a scar, allegedly because he wanted to see if Fairchild was "cool."

#### b. Analysis and Conclusion

PCR counsel emphasized at the PCR hearing that trial counsel did not meet *in person* with their retained experts, citing Dr. Greenfield as an example. The record reflects that Call documented his numerous communications with experts, which include conference calls and written correspondence. Defendant never explains why we should conclude that trial counsels' method of communication with the experts rendered counsels' perform-

ance deficient. Moreover, defendant does not show how the jury's deliberations would have been substantially affected had Call and Scully met in person with Dr. Greenfield and Dr. Gruen, thus falling short also on the prejudice prong of *Strickland.*

█ Furthermore, trial counsels' performance was not deficient because they did not have Fairchild meet alone with Harris. Call testified that he found Harris especially dangerous to women. Defendant had a significant criminal history, and only ten days after the Huggins murder, he was arrested for four separate incidents of aggravated sexual assault and kidnapping. Given his violent character and the incident in which he "tested" Fairchild, counsels' decision does not render their defense unreasonable.

### 7. Newly discovered documents

█ Defendant claims ineffective assistance as a result of counsels' failure to obtain records that were later discovered by PCR counsel. He contends that the newly discovered records would have assisted in his mitigation presentation.

### a. Background

At defense counsel's request, Fairchild undertook to find all that she could in respect of defendant's formative years. She compiled 115 pages of documents, overcoming numerous obstacles in securing and identifying records from long ago. Defendant now criticizes the defense team investigation because PCR counsel has secured a complete set of records from Trenton State Hospital that were not obtained by Fairchild. PCR counsel argue that those records indicate that defendant was "civilly committed as 'insane' when he was twelve years old." In addition, another newly found childhood record documents scars on defendant's body, corroborating the defense contention that Harris was abused as a child. And finally, PCR counsel found documentation that Mattie was diagnosed with scabies a week before defendant's birth, indicating the filthy conditions in which defendant's family lived. Additional records found reflect that Mattie had been

arrested during Harris's childhood for "drunk, disorderly, and assaultive conduct."

In response, the State notes that many of the documents were dated after the defense's self-imposed cut-off date for its mitigation case. Beyond that, the State argues that the documents would not have enhanced substantially the mitigation presentation. Many records are illegible or irrelevant, and regardless, the documents found by Call and Scully adequately depicted Harris's home life without the newly-found documents. They would be simply cumulative.

### b. Analysis

#### (1) Deficiency prong

We turn first to the question of deficient performance: does counsels' failure to discover the complete set of documents imply that their investigation was objectively unreasonable. *Wiggins v. Smith,* 539 *U.S.* 510, 521, 123 *S.Ct.* 2527, 2535, 156 *L.Ed.*2d 471, 485 (2003) (" '[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' ") (quoting *Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2052, 80 *L.Ed.*2d 674).

As noted, trial counsel told Fairchild "to find everything" she could. It is not surprising that Fairchild experienced difficulty finding records about defendant from 1952 through 1965. Mattie pointed Fairchild in the direction of the Child Guidance Clinic, which Fairchild learned is now the Family Guidance Clinic in Princeton. Also, there were gaps in the record-keeping. According to Fairchild, some records at Mercer County Hospital were either gone, on microfilm, or on small cards. She testified that she asked Mercer Hospital for records of medical treatment, but was told that there were none. As for the Trenton Psychiatric Hospital records that feature in PCR counsels' argument, the PCR transcript reflects that Call had a letter from that institution stating that the records forwarded were the ones it had of Ambrose Harris. Although that letter, dated May 18, 1995, is not

part of the record, Call testified that he had reason to believe he had all of defendant's records from that hospital.

PCR counsel disputed the reasonableness of that belief by Call. When Call was asked, "Why did you think you had the complete hospital records ... if there were no physician orders in there, nurses' notes, medication records, anything," he responded that he relied on Fairchild and assumed those were the records that were available, given the lapse in time.

We find it significant that Call showed Drs. Gruen and Greenfield the file from the State Hospital. Neither mentioned that there appeared to be records missing, a point not lost on Call, who testified: "I believe if either Dr. Gruen or Dr. Greenfield had indicated there might be additional records, ... I would have probably sent Ms. Fairchild and one of the public defender's investigators to determine whether or not there were any additional records." Indeed, Gruen testified that the notes from the Guidance Center were "very exhaustive."

We find two other points noteworthy. First, Nardone's report does not criticize at all Fairchild's attempts to locate relevant records. Second, the certification submitted on behalf of defendant by David Glazer, offered as an expert on death penalty defense, does not criticize Fairchild or trial counsel for failing to obtain the documents. In fact, before PCR counsel found the documents, Glazer certified that he reviewed the institutional records submitted to the jury, and he did not indicate that he found the reports lacking in completeness. Later Glazer submitted another certification, after PCR counsel uncovered more documents. In that second certification, Glazer refrained from criticizing trial counsel for not finding them, stating instead that counsel "overlooked" that evidence and discussed the impact he believed such evidence would have had.

We are not informed why defendant's PCR attorneys were able to find these documents when Fairchild could not. Other than the fact that the documents were found, there is no evidence that Call or Fairchild made any unreasonable decisions. Fairchild was not

permitted to testify at the PCR hearing because PCR counsel did not provide an affidavit attesting to the content of her testimony. Our decision does not hinge on that ruling, however, because Fairchild was interviewed by Nardone and Nardone's report does not criticize Fairchild's investigation into the documents nor does it offer any insight into the need for Fairchild's testimony. On the present record, we conclude that defendant has failed to show deficient performance by Call for his failure to uncover all of the documents now submitted by PCR counsel.

### (2) Prejudice prong

Because we have concluded that defendant has not satisfied his responsibility to demonstrate deficient performance by counsel, we need not reach *Strickland's* prejudice prong. We comment on the documents worth only for purposes of completeness in this *de novo* review. We address them by category.

First, many of the "new" documents have no relevance to defendant's mitigation case. In this category, we include countless uninformative correspondence and requests for records, basic forms, unreadable photocopies, permission slips to exit the hospital, drug and treatment records, and medical records about defendant's hammer toe that needed surgery. The evidence that Mattie had scabies before giving birth to defendant is not dispositive of defendant's assertion about growing up in squalor and filth. Indeed, other of the newly found documents are reports from health care providers recording that defendant had a clean appearance and habits.

Second, the jury knew much of the information contained in other documents. A February 1965 letter from a doctor at the State Hospital indicates that Harris engaged in many fights, choked one boy and stabbed another with scissors, but like information was conveyed to the jury by Dr. Gruen and by Fairchild. An April 1964 document reports the opinion of Dr. Litkey, a Guidance Center psychiatrist, that Harris was a "severely ill child mentally" and needed institutionalization. But Dr.

Gruen testified to recalling a document very much like this one. In May 1964, the director of the Child Guidance Center wrote that defendant's mother realized her son had problems, but would not take an active role in helping; she hoped her son would just "outgrow" his problems. Fairchild similarly testified that reports indicated Mattie's passivity towards defendant and her resistance to being involved with him.

In general, many of the new documents note Mattie's failures as a mother. But Gruen testified that the documents at trial were "very complete" about Mattie's poor mothering. The defense had ample evidence portraying Mattie's failure as a mother. Finally, reports from the State Hospital, dated April and June 1965, state that defendant had no psychosis, no delusions, and no hallucinations, but did have a "sociopathic personality disturbance." Drs. Gruen and Greenfield disagreed with other diagnoses in the records, but their assessments of Harris as a child agreed with those evaluations.

Last, PCR counsel emphasizes two "Certificates of Insanity" dating from October 1964. Presented with them, Call testified that he was not sure whether he would have submitted them to the jury. Because the certificates reveal that Harris was sniffing glue and had sexual relations with a ten-year old girl, Call said he would have considered adjusting the cut-off date of the defense presentation to have the certificates fall outside the range. PCR counsel faults Call's present day evaluation by pointing out that the jury knew about the glue sniffing and about Harris's relations with the young girl, but that argument is an acknowledgment that the jury already knew of those behaviors.

The Certificates of Insanity are not compelling in and of themselves as the prosecutor undoubtedly would have informed the jury that the documents did not mean that defendant literally was insane. The defense experts testified that defendant was not psychotic, and other documents found by PCR counsel stated that defendant did not suffer from psychosis, delusions, or hallucinations. The most the Certificates of Insanity convey was the

signator's belief that others needed protection from defendant's aggressive behavior because the basis given for the finding of insanity was defendant's bad behavior, about which the jury was told.

As for the other new documents pertaining to physical abuse suffered by defendant as a child, we note Fairchild's testimony that Harris received beatings from his mother and stepfather. Also the jury learned that one social worker described Mattie in 1962 as very punitive with defendant. However, the prosecutor was effective at calling into doubt the allegations of abuse by exposing Fairchild's lack of basis for concluding that Harris had any "tremendous scars." The medical records produced at trial showed no evidence of scars except on defendant's arms, which could have come from fights. Yet, on this question multiple medical records discovered by PCR counsel document many scars in many other parts of his body.

PCR counsel also highlight another document that supports the abuse allegations. In 1964, a school psychologist reported Harris's "attitudes of resentment and revenge against those in the home who beat him," and his "feel[ing] that he might like to get even with them when he was older." When the psychologist confronted Mattie with defendant's claim that his father was a harsh disciplinarian, Mattie said that Ambrose must have been referring to his stepfather. That last document is not newly discovered, as it is from the Trenton Public Schools and recounts the same choking and scissor-stabbing incidents previously presented to the jury during the testimony of Dr. Gruen and Fairchild.

In sum, the only documents that contained any new information were those that supported the abuse allegations by providing evidence of extensive scarring, which the prosecutor said was lacking. On this record, with the extensive mitigation case presented by defendant, it is not likely that the failure to present the additional evidence constituted prejudice sufficient to overturn this verdict. However, as noted, because defendant has not proven

deficient performance, we do not reach and determine prejudice. Indeed, aside from producing the documents, defendant has not offered an affidavit from Gruen, Greenfield, or any other expert about how the new documents could have changed their testimony to the jury.

### c. Conclusion

Because defendant has not shown that counsel or Fairchild were unreasonable in their investigations, we conclude that defendant has not demonstrated the first prong necessary to his allegation of ineffective assistance of counsel.

## B. Other Evidence That Counsel Failed to Present in Mitigation

### 1. Background

Defendant asserts that he informed his trial counsel that he was raped when he was twelve years old by an adult patient at the Trenton State Psychiatric Hospital, but that trial counsel never relayed that information to his mitigation consultant, Fairchild, and therefore the jury never learned about it. Similarly, he says he informed counsel that his mother asked his uncle to drown him while on a fishing trip, and the jury never learned of that allegation either.

### 2. Analysis

### a. Evidence of rape

At the PCR hearing, PCR counsel asked Call whether he submitted a mitigating factor based on Harris's allegation of being raped in Trenton State Hospital. Call said he did not, and he testified about a meeting he had with Harris:

> [Defendant] recounted his exposure, experience with anal intercourse, you know, extensively [during that meeting] making no reference to the fact that he had been a victim himself, characterizing himself as, each and every time, as the aggressor. [The next day], I think it was a phone call, and I did an internal memo indicating that he called and said that he had been raped when he was in the hospital, and at

that point, ... I provided that memo to Ms. Fairchild. Mr. Harris never brought it up with Ms. Fairchild when she spoke with him. Again, I know in her affidavit, she remembers—I think she says that she thinks she was told at some point, but she would have received all of those internal memos.

That testimony is disputed in Nardone's report. Nardone reports that Fairchild did not know about Harris's rape allegation when the two social workers spoke. Fairchild surmised to Nardone that perhaps Harris would have talked about being raped if she had interviewed him alone.

If the defense could have shown that defendant had been raped, perhaps it could have evoked more sympathy from jurors. However, the lack of corroboration was a problem for the defense. The State undoubtedly would have pointed out the absence of documentation of a rape in the institutional records and would have stressed the self-serving motivation Harris would have had to tell such a story. A bare allegation of being raped from this defendant, without documentation, could be received with great skepticism and, perhaps, itself cause negative juror feelings towards defendant. Defense counsels' decision not to present that bare allegation did not render their assistance objectively unreasonable.

### b. Claim that mother wanted him drowned

PCR counsel did not question Call about Harris's allegation that his mother asked his uncle to drown him but did ask Scully about the allegation the day after Call testified. Scully could not remember the allegation, although he remembered Call asking Harris questions about going to the lake with his uncle:

I know that [Call] questioned him about going to the lake with his uncle. I'm not certain, I don't recall whether it was to drown him. I don't, I don't recall that....

I say, John, Mr. Call conducted this interview. This was the portion of the trial that he was preparing. This was follow-up discussions he had had with or meetings that he had had with Ambrose. So, you know, that is a question better asked of Mr. Call than I.

Nardone reports that Fairchild did not interview defendant's uncle, Walter Gross, to discuss with him defendant's allegation.

Fairchild told Nardone that she possibly heard defendant's story, but did not recall from whom.

The purpose of such evidence would have been to show that Mattie rejected defendant—that she even wanted him to die. From any objective standpoint, the trial transcript reveals that defense counsel clearly achieved that goal. Their performance was not deficient for failing to put on one uncorroborated allegation made by defendant about his mother wanting him drowned.

Furthermore, defendant cannot demonstrate prejudice from this alleged deficiency. The jury had ample evidence of Mattie's strong negative feelings towards her son. The defense submitted 180 mitigating circumstances to the jury, and at least eighty-four of them directly described some kind of significant failing of Mattie as a mother, including numerous claims about her disdain for defendant. The defense supported those mitigating circumstances with the recorded observations of professionals who witnessed the relationship between defendant and his mother, as well as with the interviews conducted by Sheila Fairchild.

### 3. Conclusion

We conclude that defendant has not demonstrated ineffective assistance of counsel in respect of either of these claims.

### C. Allocution: Counsel's Assistance

As an additional claim of IAC, Harris asserts that his counsel neither explained to him the allocution process nor assisted him in preparing a statement, and that his borderline IQ heightened the importance of receiving counsels' assistance. He contends that that deficiency constitutes ineffective assistance because prejudice, he says, surely befell him as a result. He now claims that "even a simple statement of sorrow at the death of Ms. Huggins would have 'substantially affected' the penalty jury's deliberations."

The State's first response to this claim is that Harris has no remorse, and his behavior during trial evidenced his lack of compunction, something that our Court recognized during propor-

tionality review. *See Harris II, supra*, 165 *N.J.* at 313, 757 *A.*2d 221. Defendant went so far as to insult Huggins's family during his tirade. In any event, the State submits that Call did confer with Harris regarding allocution. Call stated on the record that he reviewed the judge's notice about allocution with defendant, and that they discussed the matter on prior occasions. Moreover, defendant was aware of his right: The trial court advised him and explained the scope of an allocution statement. The judge offered to read a draft of his statement and, when asked by the court if he had questions about allocution, defendant replied, "no."

### 1. Analysis

There is no question about the importance of an allocution. The right of allocution "reflects our commonly-held belief that our civilization should afford every defendant an opportunity to ask for mercy." *State v. DiFrisco*, 137 *N.J.* 434, 478, 645 *A.*2d 734 (1994) (*DiFrisco* II). In *State v. Zola*, the common law right of allocution was extended to capital defendants so they too could address their jury directly. 112 *N.J.* 384, 429–30, 548 *A.*2d 1022 (1988). Exercising that right "would allow the jury to hear from the defendant's voice that he is 'an individual capable of feeling and expressing remorse and of demonstrating some measure of hope for the future.'" *Id.* at 430, 548 *A.*2d 1022 (quoting J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation*, 15 N.M.L.Rev. 41, 41 (1985)).

The decision whether to make an allocution belongs to the defendant. *Bey, supra*, 161 *N.J.* at 277, 736 *A.*2d 469 (describing right to allocute as personal to defendant). However, as we specified in *Bey:*

> as with the right to testify, defense counsel should consult with their clients so the clients can make their own informed decisions. It follows that defense counsel should inform the defendant of the right of allocution or ensure that the trial court apprises the defendant of this right. Moreover, ... counsel must advise the defendant on the issue whether to submit a statement of allocution to the jury

and to explain the tactical advantages or disadvantages of doing so or not doing so. Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it.... Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.

[*Id.* at 278, 736 *A.*2d 469 (quoting *State v. Savage,* 120 *N.J.* 594, 630–31, 577 *A.*2d 455 (1990)).]

In this matter there appears to be no doubt that defendant was informed of his right to allocute, the only question is whether counsel left the ultimate determination to defendant. *Bey, supra,* 161 *N.J.* at 277, 736 *A.*2d 469 ("Defense counsel should not make an independent strategic decision whether defendant should exercise that right."). Indeed, the trial court specifically addressed him about his right to allocute. On the second day of the penalty-phase hearings, the court stated:

Before the Court adjourns for today, it should inform Mr. Harris of his right of allocution, that is, a right, in effect, to ask the jury to spare his life. The rules regarding allocution are set forth in a two-page document which the Court will provide to counsel and to Mr. Harris.

In short, what Mr. Harris will be permitted to do, if he wishes to do so, is to ask the jury to spare his life. And he may explain, if it is true, his remorse, and he may express his hope for rehabilitating himself if his life is spared. He will be permitted to speak briefly, but he will not be given a prolonged period of time to speak....

Mr. Harris, if you wish to do so, you may write out in advance what it is you wish to say, and the Court will read it and tell you if it is approved. You are not required to do that. The choice is yours. But if you speak beyond the rules, the Court may interrupt and explain to the jury the rules, and the fact that you are speaking beyond the confines of what is permitted.

The next day, the following colloquy took place:

COURT: The Court has spoken with counsel for the defense. It has advised Mr. Harris yesterday that he has a right of allocution. It has handed to counsel for the defense a notice of right of allocution, setting forth, again, the very rules which the Court enunciated yesterday.

Mr. Call, is Mr. Harris going to exercise his right of allocution?

CALL: Your Honor, I've had an opportunity to review with Mr. Harris the notice of right of allocution which the Court provided. I've also had an occasion to discuss it with him on prior occasions. Mr. Harris just executed in open court the notice of right of allocution, and it would be Mr. Harris' decision at this point that he does not wish to exercise that right, fully understanding the nature and the limitations that would be placed upon him.

> COURT: Mr. Harris, do you have any questions about your right of allocution? You have to give me a verbal response for the record.
> DEFENDANT: No.

Thus, separate and apart from defendant's discussions with counsel about allocution, the above exchange demonstrates that the trial court asked defendant whether he wished to allocute and whether he had any questions in respect of that right.

■ Even if we assume that trial counsel did not leave to defendant the ultimate decision about allocution, defendant must show prejudice to succeed in his ineffective assistance claim. The mere "denial of the right of allocution does not result in fundamental injustice." *Bey, supra,* 161 *N.J.* at 276, 736 *A.*2d 469. Both prongs of *Strickland/Fritz* must be satisfied.

Despite defendant's assertions that he "would have given an allocution" that would have substantially affected jury deliberations, his actions and words at the time of trial betray his claims. *See id.* at 277, 736 *A.*2d 469 ("[W]e do not review the denial of the right of allocution in a vacuum[,] ... [but] 'in the context of the entire trial record and of the grave offenses of which defendant was convicted.' ") (quoting *State v. Marshall,* 148 *N.J.* 89, 252, 690 *A.*2d 1 (1997)). As we noted in our review of defendant's capital conviction, we recall again the painful image of Harris mocking the pain endured by Huggins's father in open court. Call testified that when Mr. Huggins was testifying about the last time his daughter left home, he started to cry. In the jury's presence, Harris "withdrew his handkerchief from his pocket, leaned forward and dabbed under both eyes." Call continued, "[L]ooking over at the jurors at that time, I mean, Mr. Harris may very well have signed his own death warrant," and, "the dabbing of the eyes was the most reprehensible thing I've ever seen a defendant do in a courtroom."

When Harris did exercise his right to make a statement before being sentenced on the non-murder counts, he did not remotely express remorse. Harris exhibited a tirade that included arguments why he could not have been the one who committed those

crimes, and why this crime paled in comparison to those committed by others, such as Jeffrey Dahmer. He continued with other remarks of a similar ilk:

· "I'm saying this to the Huggins family, that I did not kidnap your daughter, nor did I rape your daughter, nor did I shoot your daughter in the head."

· "I want the Huggins family to be man enough and woman enough to come up in my face and apologize to me. It will be proven beyond a reasonable doubt that Ambrose Harris did not rape or kidnap and kill that girl."

· "You ain't found shit because Ambrose Harris didn't kill that woman. I might take something from a woman. I might rape a mother-f——g woman, but I will be goddamned if I would kill a woman."

Call stated that during discussions with defendant, Harris expressed "delight in some of the great tragedies of mankind. The Oklahoma City bombing delighted him. The Holocaust, he thought that was a good thing." Harris's behavior and statements give credence to Call's belief that Harris was incapable of expressing either sincere or feigned remorse.

Nor did PCR counsel try to rebut the character portrait of Harris painted during the PCR hearing. They did not ask to put defendant on the stand to testify about his remorse or the kind of remorse he would have conveyed during an allocution. The PCR record does reveal, however, that Harris's DOC records report an incident during which defendant became angered when a prison guard stepped on his shoe and he stated words to the effect that, "you are the one with the family, not me, and when I get back to GP ... I'll kill you like that white bitch Kristin Huggins."

Further, Call explained that he "knew [Harris] was ... incapable of not using that opportunity to be at center stage in the courtroom to say something that would undo everything that we tried to do during the penalty phase." As evidenced by defendant's statement to the court prior to his non-capital sentencing, Call's concerns appear justified. Thus, there was a significant danger that Harris would have been reprimanded in front of the jury for going beyond the permissible scope of an allocution. *See Bey, supra,* 161 *N.J.* at 275–76, 736 *A.*2d 469 (citing *Zola, supra,* 112 *N.J.* at 430, 548 *A.*2d 1022.)("A defendant, however, may not use allocation to rebut facts in evidence or to deny his guilt," and

if he does, "the court may strike the offending portions, allow the State to respond, or permit limited cross-examination of the defendant").

## 2. Conclusion

Given defendant's outbursts against the court and even towards the victim's family, it was not objectively unreasonable for counsel to conclude that defendant was incapable of exhibiting honest or feigned remorse. Furthermore, the trial court informed Harris of his right and asked him in open court if he had any questions. Harris affirmed that he did not and never asked to make an allocution. PCR counsel provided no evidence that defendant could have or would have expressed an allocution that would have substantially affected the jury's deliberations. Moreover, all evidence was to the contrary, supporting Call's opinion that defendant was incapable of expressing real or feigned remorse, particularly in respect of the crimes committed against Huggins. Assuming for purposes of defendant's argument that defendant did not make the ultimate decision about whether to make an allocution, we conclude that defendant has not satisfied *Strickland's* requirement that he demonstrate that he was prejudiced.

## D. Failure to Present 5a and 5d

Defendant contends that his trial counsel rendered ineffective assistance because they did not submit two statutory mitigating factors, found at *N.J.S.A.* 2C:11–3c(5)(a) and *N.J.S.A.* 2C:11–3c(5)(d) (5a and 5d, respectively). Mitigating factor 5a states that the jury may consider whether the "defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." Factor 5d states that the jury may consider whether the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of

mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution."

## 1. Background

Defendant's trial counsel submitted to the jury 180 mitigating circumstances under the "catch all" factor at *N.J.S.A.* 2C:11–3c(5)(h), many of which concerned his emotional and mental problems as a child but defendant now argues that jurors probably would have given substantial weight to 5a and 5d, particularly because those factors are set forth explicitly by the Legislature as mitigating. In support of his claim, defendant highlights the mitigating circumstances that trial counsel did submit and that reference his childhood mental and emotional problems. He contends that the effects of those problems certainly still linger, and by submitting 5a and 5d as mitigating factors, his counsel could have insured a jury discussion about his mental and emotional state on December 17, 1992. Therefore, because counsel did not submit those statutorily-prescribed factors, defendant's "resultant death sentence [is] suspect."

The State counters that submitting those mitigating factors would have been inconsistent with the defense strategy of excluding all evidence related to the defendant's life between the ages of thirteen and forty-two. The State emphasizes that "[d]efendant's horrific record of convictions and DOC infractions had to be kept from the jury at all costs," including the cost of not submitting 5a and 5d. If defendant introduced testimony about his emotional and mental disturbance in December 1992, the State would have been able to impeach that evidence with other examples of his dangerous conduct.

## 2. Analysis

The focus of 5a and 5d clearly is the mental and emotional state of a capital defendant at the time of his crime. To provide evidence in support of those factors, defendant's trial counsel would have had to seek an examination of defendant by mental

health experts who would have had to develop a psychological profile of him as he was in 1992, at forty years of age. Therefore, defendant's argument implies the claim that it was constitutionally unreasonable for his trial counsel to limit their investigation and defendant's mitigation case to evidence of his childhood before October 1965.

 We disagree. Once again,

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

[*Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.]

Defendant's counsel fulfilled their duty. Their strategy, in limiting the scope of the mitigation case, was based on a proper investigation and was a professionally reasonable approach to take in persuading the jury to sentence defendant to life imprisonment. Call specifically stated that he chose the strategy because he thought it was defendant's best chance for a life sentence. Defendants have a right to a reasonable strategy based on reasonable investigation; they may not claim ineffective assistance merely because the strategy did not produce the result counsel sought. *Bey, supra,* 161 *N.J.* at 251, 736 *A.*2d 469 (1999) (citing *Davis, supra,* 116 *N.J.* at 357, 561 *A.*2d 1082.) ("Merely because a trial strategy fails does not mean that counsel was ineffective.").

If trial counsel had enlisted mental health experts to develop a psychological profile of defendant at the time of his crime in the hope that such testimony would support 5a and/or 5d, they would have created an opportunity for the State to inform the jury of defendant's atrocious adult record and prison conduct. The State would have had a right to use its own psychologist to interview defendant, and would have been entitled to provide its expert with defendant's records. *See N.J.S.A.* 2C:11–3c(2)(d) ("The State and the defendant shall be permitted to rebut any evidence presented by the other party at the sentencing proceeding and to present

argument as to the adequacy of the evidence to establish the existence of any aggravating or mitigating factor."). The prosecutor also would have been able to cross-examine a defense expert with questions about defendant's records and their relevance to any diagnosis.

Call's decision to limit the mitigation case was based on a reasonable investigation. He testified that before limiting psychological expert testimony to defendant's early years, he reviewed "approximately thirty-five files, two or three crates of materials which represented [defendant's] history in the correctional system" and on parole. Defendant's prison records indicate 100–plus infractions, including assaulting inmates, threatening to kill guards, sexually assaulting an inmate, and stabbing another prisoner in the neck with a fork. In describing the content of those records, Call stated, "To say that his behavior was abyssal [sic] would be like saying the Titanic was stopping for ice." Call continued:

> [W]e felt that by limiting our presentation to his formative years, as was done successfully by Judge Scully in [*State v.*]*Biegenwald*[, 106 *N.J.* 13, 524 *A.*2d 130 (1987)] and myself in *State v. Williams*, we would be able to preclude the prosecutor's office from coming forth with all of this information which would have been, in my opinion, and Judge Scully's opinion, and again, we consulted with Dale Jones who was then head of the capital litigation section, still is, Steven Kirsch who was the appellate counsel assigned to the matter, it was, it was not a tough question to decide that if those DOC records were available to the state and used during the penalty phase, the result would have been a foregone conclusion.

Call reasonably opined that information in defendant's DOC records "would have been insurmountable to overcome." For example, defendant told a prison guard, who stepped on his foot, something to the effect of, "you are the one with the family, not me, and when I get back to GP ... I'll kill you like that white bitch Kristin Huggins."

According to his testimony, Call did consider the possible counterweighing benefits of having defendant interviewed by a mental health expert. In response to questioning by PCR counsel, Call stated that he did confer with Dr. Greenfield about any possible mitigating explanation for Harris's records in prison. Call testi-

fied that Dr. Greenfield did not suspect that a psychological examination of defendant would yield beneficial diagnoses. After learning of defendant's correctional and other records, Dr. Greenfield "was fairly certain as to what his findings would be with regard to Mr. Harris in terms of antisocial personality disorder...." Call's testimony conveys that Dr. Greenfield, in his professional judgment, did not anticipate finding that defendant, on December 17, 1992, "was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11-3c(5)(a), or had an impaired "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law," *N.J.S.A.* 2C:11-3c(5)(d).

Call also considered the potential harm of calling Dr. Greenfield and Dr. Gruen to testify only about defendant's childhood. He knew it was a "problem from a cross-examination perspective" to allow the State to elicit from the experts that the defense instructed them not to form opinions about defendant's mental condition after the age of thirteen. But Call and Scully reasoned that limiting the scope of the mitigation case nevertheless represented their best strategy. In Call's words, to allow the State to cross-examine a mental health expert about defendant's records, "which were simply fraught with violence and racism and every ... other God awful thing," the verdict would have been a "fiat [sic] accompli." Trial counsel reasonably feared that if the State cross-examined psychologists with defendant's records, they would be unable to convince the jury that defendant could live a productive or even a non-destructive life in prison: "Unfortunately, Mr. Harris' record reflected that whether he was on the street or in a maximum security facility, he represented an ever present danger to everyone around him, be they inmates or correctional staff...."

Trial counsels' decision to limit psychological evidence to defendant's childhood and, consequently, their non-submission of the 5a and 5d mitigating factors, was based on "reasoned strategic judgment." *Wiggins, supra,* 539 *U.S.* at 526, 123 *S.Ct.* at 2537, 156 *L.Ed.*2d at 487 (2003). Call's PCR testimony demonstrated

that he did balance the pros and cons of his penalty phase strategy, and in his words, "it wasn't even a close issue" as to whether the defense should risk informing the jury of defendant's past conduct. And even if defendant's correctional records had presented counsel with a close question, their tactical decision was unquestionably reasonable. *See DiFrisco III,* 174 *N.J.* at 232, 804 *A.*2d 507 ("Counsel also made decisions, understandable at the time, to avoid the presentation of evidence that may have led to the revelation of damaging information about defendant."). "[T]he mere existence of alternative—even preferable or more effective—strategies does not satisfy the requirements of demonstrating ineffectiveness under *Strickland." Marshall VI, supra,* 307 *F.*3d at 86.

## 3. Conclusion

In our view, trial counsels' strategy appears more than reasonable when the following is considered: jurors very well may have supposed that Harris's severe mental and emotional disturbances stayed with him throughout life, past adolescence. Although counsel restricted the evidence to defendant's life before October 1965, given the extent of his childhood problems and his courtroom behavior, counsels' strategy allowed jurors to conjecture that Harris's problems continued. Defendant's PCR brief, in fact, acknowledges that, "[b]ased on his inappropriate conduct during the trial, it is a fair inference that he ha[d] not spontaneously recovered from those maladies and, if he murdered Ms. Huggins, was so afflicted at the time of the crime." [9] We agree; but that

---

[9] The trial court was concerned that Call would argue to jurors that they could infer that Harris was a schizophrenic in 1992 because he was diagnosed as such in the sixties. Call responded:

> There will be no ... insinuation that the mental state of Mr. Harris and his home environment, et cetera, prior to October 14, 1965 is offered any way as an excuse to condone, to explain the behavior of December 17 of 1992. That would be clearly improper, clearly open up the time frame from birth until present.

acknowledgement undercuts defendant's argument that he was prejudiced by trial counsels' failure to submit the 5a and 5d mitigating factors. Counsels' strategy allowed jurors to have some insight into defendant's adult character and disturbances, and helped to humanize him, *see Marshall VI, supra,* 307 *F.*3d at 86 ("The purpose of [mitigation] investigation is to find witnesses to help humanize the defendant."); it simultaneously kept from the jury evidence demonstrating the danger Harris presented to inmates and correctional guards. *Cf. Darden v. Wainwright,* 477 *U.S.* 168, 186, 106 *S.Ct.* 2464, 2474, 91 *L.Ed.*2d 144, 160 (1986) (stating that there were "several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner" where "[a]ny attempt to portray [him] as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions"). Indeed, defendant's criminal and prison records, including many statements made to officers, depict a man who disdains the legal system and a society that he perceives as racist and without legitimate authority to place restrictions on his behavior, and who expresses his contempt by intentionally flouting our most fundamental moral rules.

Defendant has not "overcome the presumption that, under the circumstances, [not submitting 5a and 5d can] be considered sound trial strategy." *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (internal quotation marks and citation omitted). Therefore, we reject his claim.

### E. Lack of Objections to Prosecutor's Summation

Defendant complains of trial counsels' failure to object to aspects of the State's penalty summation that defendant claims were

---

Call explained that Harris had a right to present evidence that "would make it more likely that [jurors] would extend mercy to him." The trial court properly allowed the defense to employ its proposed strategy. But even though Call did not ask the jury to find a nexus between Harris's terrible childhood and the crime he committed against Kristen Huggins, jurors very well could have made such a connection.

inflammatory and provided an argument in support of non-statutory aggravating factors. Defendant also claims that appellate counsel was ineffective for failing to raise this issue on direct appeal.

## 1. Background

The prosecutor's comments to which defense counsel should have objected, according to Harris, are as follows:

· he said Harris intended to "get that bitch;"

· he stated that Huggins was a virgin before he raped her;

· he described Harris's sodomy of Huggins as "an act of power. An act of cruelty. An act of contempt for Kristin Huggins. It was an act of dominion and control;"

· he argued that Harris, "with cruel deliberation, . . . planned the killing of Kristin;"

· he asked the jury to imagine Kristin in the trunk of the car: "You have all seen the trunk of that car. When you think about why murder in the course of a kidnapping is a powerful aggravating factor in this case, imagine what it must have been like for Kristin Huggins to have been driven around stuffed into that dark, cramped, airless trunk, worrying about what was going to happen to her next."

According to defendant, none of those statements were probative of any aggravating factor and all constituted an attempt to inflame the jury.

The State counters that neither trial counsel nor appellate counsel were ineffective because the prosecutor's summation was proper. The prosecutor was entitled to talk about the terror Huggins experienced because that went to the weight of the (4)(g) aggravating factor (murder while engaged in robbery sexual assault, kidnapping, arson, or burglary). The prosecutor tried to show how Harris "chose and controlled the events on that fateful day" to "balance the mitigating effect of the 'childhood' mitigating factor." Finally, as to prejudice, the State argues that even if defense counsel lodged an objection during the summation, it would have been unavailing.

## 2. Analysis

We note at the outset that, on direct appeal, we rejected defendant's claims that the prosecutor's summation was

improper and "impermissibly ranged beyond the scope of the evidence." *See Harris I, supra,* 156 *N.J.* at 192–95, 716 *A*.2d 458. That said, we do not regard defendant's arguments as procedurally barred by *Rule* 3:22–5 because the alleged grounds of prosecutorial misconduct underlying defendant's IAC claim are different from the grounds of prosecutorial misconduct he put forth on direct appeal. Defendant's IAC claim springs from the assertion that the prosecutor's comments were improper because they aimed to inflame the passions or emotions of the jurors. Appeals to emotion are not disallowed *per se,* but "[i]t is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary," and thus those excesses will not be permitted. *State v. Williams,* 113 *N.J.* 393, 453–54, 550 *A*.2d 1172 (1988). We forbid attempts to "inflame the jury to impose the death penalty based on factors that the law deems to be irrelevant." *State v. Pennington,* 119 *N.J.* 547, 570, 575 *A*.2d 816 (1990), *overruled on other grounds, Brunson, supra,* 132 *N.J.* at 392, 625 *A*.2d 1085.

The inquiry then turns on the proper scope and subject matter of prosecutorial comments. "Prosecutors are expected to make a vigorous and forceful closing argument to the jury . . . and are afforded considerable leeway in that endeavor." *Nelson II, supra,* 173 *N.J.* at 460, 803 *A*.2d 1 (citations omitted). They are, though, "generally limited to commenting on the evidence and drawing reasonable inferences from the proofs presented." *Id.* at 472, 803 *A*.2d 1; *see also State v. Reynolds,* 41 *N.J.* 163, 176, 195 *A*.2d 449 (1963) (stating that comments must remain "within the four corners of the evidence") (citation omitted). Prosecutors may characterize the evidence, unless, of course, they cross into the inflammatory or pejorative. *See Pennington, supra,* 119 *N.J.* at 576–77, 575 *A*.2d 816 (holding that prosecutor's references to defendant as "coward," "liar," and "jackal" in capital case were inappropriate and could not be considered a "characterization of the evidence").

In a penalty-phase summation, the prosecutor's commentary on the evidence "should be confined to the aggravating and mitigating factors that the legislature has specified." *State v. Coyle*, 119 *N.J.* 194, 231, 574 *A.*2d 951 (1990) (citing *State v. Rose, supra*, 112 *N.J.* at 521, 548 *A.*2d 1058). And, in addition to arguing that the evidence establishes the aggravating factors, "[t]he prosecutor is entitled to argue the weight to be accorded an aggravating factor." *Nelson II, supra*, 173 *N.J.* at 474, 803 *A.*2d 1.

Thus, it is proper in a penalty-phase summation for the prosecutor, in characterizing and commenting on the evidence, to argue the weight of an aggravating factor even if such comments arouse jurors' emotions. That amount of latitude is justified, given the kind of moral decision that jurors are asked to make based on the weighing of factors. As the Eleventh Circuit aptly noted, "[t]he gravity of the crime is a crucial factor in the jury's decision, and arguments about the gravity of a murder will always be emotional." *Tucker v. Zant*, 724 *F.*2d 882, 888 (11th Cir.1984); *see also id.* at 886–89 (noting also that appeals to emotion are generally prohibited but are permissible when directed at "circumstances of [the] particular offense" for purposes of assessing penalty) (quoting *Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); *State v. Ramseur*, 106 *N.J.* 123, 179, 524 *A.*2d 188 (1987) (agreeing that capital punishment is, in part, "an expression of society's moral outrage at particularly offensive conduct") (quoting *Gregg, supra*, 428 *U.S.* at 183–84, 96 *S.Ct.* at 2929, 49 *L.Ed.*2d at 880 (opinion of Stewart, Powell, and Stevens, JJ.)).

Thus, we turn to the specific comments made by the prosecutor. " 'To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense.' " *Papasavvas, supra*, 163 *N.J.* at 625, 751 *A.*2d 40 (quoting *State v.*

*Timmendequas*, 161 *N.J.* 515, 625, 737 *A.2d* 55 (1999) (citation omitted)).

### a. "chose to get that bitch"

This claim is readily resolved. Examination of the statement in context reveals that the prosecutor was repeating a statement that Dunn attributed to Harris during her testimony:

> Finally, in the vicinity of the Trenton Club, Kristin Huggins and her little red car had the tragic misfortune to be spotted. "Question: "What happened when you saw the little red car?"
>
> "Answer: As the car was pulling in the driveway, it was this girl in there in the car. It stopped for other cars to go by. And it was pulling in. And we saw the little car coming in. And he said, there's a car, there. *I'm going to get that bitch.* And she was coming in the driveway. She went down and we both seen her come in. He said to wait, wait, wait, I'll be right back. And he drove down there on his bike after the car."
>
> He didn't have to do that. Even then he could have called it off, left Kristin to paint her mural, start her career, get on with her life. But instead, *he chose to get that bitch.* He controlled the gun. He controlled the situation. He controlled Kristin's life.

Not only did the prosecutor, in fact, not step outside the "four corners of the evidence," he specifically referenced Dunn's testimony, which he had just read. In addition, Dunn testified that Harris directly called Huggins a "bitch" and referred to her as a "bitch" several times.

Defense counsel did not have a duty to object to the prosecutor's reference when the prosecutor plainly was staying within the bounds of the evidence, and legitimately could strive to show, as the State argues, "the coldness, the total unconcern for the plight of Kristin Huggins" exhibited by defendant.

### b. Prosecutor's statement about victim's virginity

Defendant claims that counsel should have objected when the prosecutor referred to Huggins's virginity. We note at the outset that the prosecutor never commented on Dunn's testimony that Huggins made pleas to Harris based on her virginity. He simply read Dunn's testimony:

"Question: What happened? . . .

"He told her to take her clothes off. He told me to stand in front of the car. I was turned around, watching Kristin. She didn't take her clothes off right then. She was nervous, was shaking. She was talking, she saying what are you going to do. He just said, shut up, bitch, and take your clothes off. *She said I'm a virgin.*

"Question: What happened when she said that?

"He didn't care. He just—he grabbed her. He grabbed her and she start pulling on her clothes, trying to take them off, nervous and shaking, and he was unfastening his pants.

. . .

"And I heard her crying, and I turned around and *she was telling him she was a virgin* and stuff. And she said, no. I seen him having sex with her."

[ (Emphasis added).]

There was no legal basis for defense counsel to object to the prosecutor's reading this admissible testimony to the jury, and thus there was no ineffective assistance due to a failure to make a baseless objection.

### c. "Act of power . . . and cruelty"

 The prosecutor, during summation, read back Dunn's testimony regarding Harris's actions leading up to the rape. He then commented on that testimony. The prosecutor stated,

Why did he sexually assault Kristin Huggins? Surely nobody believes that standing under the Southard Street Bridge on that rainy, foggy day, Ambrose Harris was suddenly overcome with sexual passion. No, the sodomy here was an act of power. An act of cruelty. An act of contempt for Kristin Huggins. It was an act of dominion and control. . . . And then with cruel deliberation, he planned the killing of Kristin.

Defendant now complains that his counsel should have objected to those comments.

In our assessment, the prosecutor's comments were a fair characterization of the State's evidence and were relevant to the appropriate weight of the (4)(g) aggravating factor (murder in the course of a sexual assault or other specified crime) in the circumstances. The State's evidence depicted a "lengthy terrorization" by defendant, *Harris II, supra,* 165 *N.J.* at 322, 757 *A.*2d 221, of which the sexual assault was a part. The prosecutor's words are not so distinct from our own characterization of the crime:

> The cold-bloodedness and brutality of defendant are evidenced by the fact that defendant specifically asked Dunn to watch him kill Huggins.... Huggins did not provoke defendant to a sudden intemperate act. Nor did he kill her in the midst of violent sexual frenzy. To the contrary, for two hours she was a helpless victim of a cool and deliberate carjacker.... Defendant was aware of how helpless Huggins felt.
>
> [*Ibid.*]

Whether described as cold-blooded and brutal, or as an act of cruelty and power, the words are apt to the evidence and pertinent to the aggravating factor under consideration by the jury. The prosecutor's comments were proper. Because they were relevant to defendant's blameworthiness, the weight of the (4)(g) aggravator, and were a characterization of the evidence, defense counsel did not have grounds to object.

### d. Request to imagine being in that trunk

After reciting Dunn's testimony about Harris forcing Huggins into the car's trunk, the prosecutor asked the jurors to imagine what Huggins's experience was like:

> You have seen the trunk of that car. When you think about why murder in the course of a kidnapping is a powerful aggravating factor in this case, imagine what it must have been like for Kristin Huggins to have been driven around stuffed into that dark, cramped, airless trunk, worrying about what was going to happen to her next.

Defendant claims that defense counsels' performance was deficient because they did not object to these remarks.

Again, although these comments were aimed at invoking some emotion from the jury, they do not exceed proper comment. The prosecutor did not go beyond the parameters of the evidence, and he was "entitled to argue the weight to be accorded an aggravating factor." *Nelson II, supra,* 173 *N.J.* at 474, 803 *A.*2d 1. Kidnappings can be conducted in different ways, some more terrorizing than others. Here, the prosecutor was describing in graphic terms the terrible reality of a cold and sadistic kidnapping. The comments may have invoked emotion, but they were relevant to the determination of the weight of the aggravator and thus within the "considerable leeway" prosecutors are permitted.

*Id.* at 472, 803 *A.*2d 1. *See Pennington, supra,* 119 *N.J.* at 570, 575 *A.*2d 816.

For completeness, we add that there is no merit to defendant's claim that appellate counsel rendered IAC by failing to raise on direct appeal trial counsel's failure to object to the State's summation. Appellate counsel would not have been successful had they raised the issue because the prosecutor's remarks were not " 'clearly improper.' " *Timmendequas, supra,* 161 *N.J.* at 588, 737 *A.*2d 55 (quoting *Williams, supra,* 113 *N.J.* at 452, 550 *A.*2d 1172).

## F. Issues relating to juror contact with newspaper reporter

Defendant presents four arguments based on a mid-trial telephone call made to jurors by a newspaper reporter and possible contact between jurors and an ex-employee of the Public Defender's Office. The telephone calls made by the reporter are relevant only to the penalty phase because they occurred around February 28, 1996, more than a week after the guilt-phase verdicts were read in court. Defendant argues: (1) the PCR court erred by denying defendant's motion to conduct post-verdict interviews of jurors about any possible extraneous influences; (2) the trial court erroneously conducted an *ex parte* investigation of the phone calls, when it was required to conduct an open questioning of the jurors and the reporter; (3) trial counsel rendered IAC in failing to request a hearing regarding the reporter's telephone calls to jurors at their homes; and (4) *Rule* 1:16–1, which prohibits reconvening a jury for interviews absent a showing of good cause, is unconstitutional.

### 1. Factual background

#### a. Inflammatory publicity

The concern associated with the juror contacts by the reporter and ex-assistant public defender is that the contacts provided extraneous, prejudicial information to jurors. We must assess that concern in context, understanding the threat that existed throughout defendant's trial that jury deliberations might be

tainted by inflammatory publicity. Indeed, defendant argues that the Court should assess this issue in light of the "presumptively prejudicial" media coverage of his case.

As this Court recognized, "[t]here can be no doubt that this case was accompanied by widespread, inherently prejudicial pretrial media coverage." *Harris I, supra,* 156 *N.J.* at 145, 716 *A.*2d 458. The trial court understandably accused the *Trentonian* of embarking on a " 'vengeance seeking crusade' against defendant" in publishing a " 'constant,' " " 'prolonged,' " and " 'sensationalized' " " 'stream of invective.' " *Ibid.* "Dramatically prejudicial headlines" referred to Harris as a "monster," a "beast," a "maggot," and "satan in disguise." *Id.* at 145, 151, 716 *A.*2d 458; *id.* at 214, 716 *A.*2d 458 (Handler, J., dissenting). That paper quoted local citizens as stating: "No trial … Just get on with it and fry him;" "Why don't we have a public hanging on Trenton High's Football Field? … I'll pay for the rope!" *Id.* at 214, 716 *A.*2d 458 (Handler, J., dissenting); "Most people figure the jury would think, 'We'll have lunch on the county, and we'll squirt him—this afternoon.' " *Id.* at 151, 716 *A.*2d 458. Other quoted opinions referred to Harris's extensive criminal record and "offered various modes of execution." *Id.* at 216, 716 *A.*2d 458 (Handler, J., dissenting). To protect defendant's rights, the trial court ordered the empanelment of a foreign jury; however, the inflammatory publicity continued throughout the trials.

After the jury convicted defendant, defense counsel moved to sequester the jurors and to conduct an individualized *voir dire.* *Id.* at 150, 716 *A.*2d 458. The court denied both motions, opting instead to conduct a collective *voir dire* in open court. This Court affirmed those denials, *id.* at 150–54, 716 *A.*2d 458, holding that the collective *voir dire* was sufficient to show that no prejudicial exposure had occurred in the particular circumstances. *Id.* at 153, 716 *A.*2d 458. We noted that whenever defense counsel requested a *voir dire* on the prejudicial media coverage, "the court did ask the jurors to acknowledge by a show of hands if they had seen or read any news accounts of the trial and that on each of these

occasions it received no response." *Id.* at 151, 716 *A.*2d 458. "The negative response received on each occasion disclosed that jury exposure [to media coverage] did not occur and supported the court's discretionary decision that individual *voir dire* was unnecessary." *Id.* at 153, 716 *A.*2d 458.

### b. Juror contact with reporter and ex-public defender

On February 29, 1996, before counsels' summations to the jury, the court placed on the record, in the presence of counsel, defendant, and the jury, that the sergeant-at-arms had informed him that some jurors had reported receiving a phone call at home from a newspaper reporter. The court stated:

> Sergeant Petro informs the Court that some of you have informed him that you received a telephone call of inquiry from a newspaper reporter. The Court has spoken with the reporter. You should know this, that the reporter who called you is new to courthouse coverage. She was unaware of the rules that govern. She apologizes for contacting you.
>
> The Court has been informed that no one discussed anything with the reporter. The reporter informed this Court that all of you were polite, that is, all of you who were contacted, and all of you declined to make any comment. Please understand that it was a simple misunderstanding on the reporter's part, and that it just grew out of a lack of experience.
>
> At the conclusion of the trial, the Court will discuss with you media contact, but for the moment I think we've covered what has occurred in the past day or so.

The referenced meeting between the court and the reporter happened *in camera* and not on the record. There is no documentation of the reporter's name or employer. In fact, it is unclear whether counsel was present at the meeting between the court and the reporter. At the PCR hearing, defendant's counsel stated that, according to trial counsels' notes, neither Call nor Scully learned of the reporter's calls until the trial court spoke about it in the presence of the jury. When PCR counsel spoke with trial counsel privately before the PCR hearing, neither Call nor Scully recalled the reporter's contact with jurors.

Michael Priarone, defendant's PCR counsel, submitted an affidavit stating that he tried to ascertain the reporter's identity, but could not. In addition to speaking with Call and Scully, Priarone interviewed Prosecutor Zarling, and contacted the *Trentonian,*

*Trenton Times,* and Channel 12. No one was aware of a reporter who called jurors. There is no record on whether Priarone tried to contact the trial court.

Priarone asked Investigator Dolan from the Public Defender's Office to interview Sergeant Petro. Petro told Dolan that he did not know who the reporter was, but did recall Audrey Bomse, a former staff attorney for the Public Defender, talking with jurors during trial. The record reveals that at the time of defendant's trial, Bomse had a suit pending against the Public Defender regarding her discharge from that office. Petro explained that Bomse used her former Public Defender ID card to enter the Mercer County Jail on the day she was seen talking with jurors. She was attempting to interview inmates regarding Harris's case; however, Sheriff's personnel discovered that Bomse was "working in North Jersey as a legal aide" and not the Public Defender at that time, and removed her from the prison.

The State reports that in March 2002, an assistant prosecutor from Mercer County and a Sergeant Dispoto interviewed Petro about defendant's case. Reportedly, Petro "indicated that he did not witness any ... communication" between Bomse and the jurors during defendant's trial. In fact, Petro denied ever telling Investigator Dolan of such an incident.

Defendant's PCR counsel moved for post-verdict interviews of jurors regarding their contact with the newspaper reporter and Bomse. Counsel requested that the PCR court hear related testimony from the trial court, Bomse, Petro, Dolan, Call, Scully, and the prosecutors. The PCR court denied both the request to hear testimony and to conduct post-verdict interviews of the jurors.

### c. Defendant's request for post-verdict interviews

 Defendant's motion for post-verdict juror interrogation is governed by *Rule* 1:16–1, which states:

Except by leave of court granted on *good cause shown,* no attorney or party shall directly, or through any investigator or other person acting for the attorney

interview, examine, or question any grand or petit juror with respect to any matter relating to the case.

[ (Emphasis added).]

It is a high bar that defendant must hurdle to show good cause: "Calling back jurors for interrogation after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing that a litigant may have been harmed by jury misconduct." *State v. Athorn,* 46 *N.J.* 247, 250, 216 *A.*2d 369 (1966).

We have reaffirmed repeatedly our adherence to that high bar. *See, e.g., DiFrisco III, supra,* 174 *N.J.* at 241, 804 *A.*2d 507; *Harris I, supra,* 156 *N.J.* at 154, 716 *A.*2d 458; *State v. Koedatich,* 112 *N.J.* 225, 289–90, 548 *A.*2d 939 (1988) (citing *Athorn, supra,* 46 *N.J.* at 247, 216 *A.*2d 369). By allowing post-verdict interviews for good cause, a remedy is provided for extraordinary circumstances to prevent an injustice. However, the *Rule* also balances defendant's interests against other crucial concerns. "The requirement that a defendant make such a strong showing is intended to prevent juror harassment and avoid chilling jury deliberations." *DiFrisco III, supra,* 174 *N.J.* at 241, 804 *A.*2d 507 (citing *Harris I, supra,* 156 *N.J.* at 154, 716 *A.*2d 458). "Privacy and secrecy must attach to the process, not only to promote the finality of jury verdicts but also to aid the deliberative process itself, allowing each juror the freedom to discuss his or her thoughts." *Harris I, supra,* 156 *N.J.* at 154, 716 *A.*2d 458. *See also State v. Loftin,* 287 *N.J.Super.* 76, 109, 670 *A.*2d 557 (App.Div.1996) (stating that *Rule* protects "free debate in cases to come," and "prevent[s] the unsettling of verdicts after they have been recorded") (citations omitted).

Thus, "good cause" for post-verdict interviews would exist if a defendant makes a strong showing that a "juror inform[ed] (or misinform[ed] ) his colleagues in the jury room of facts about the case, based on his personal knowledge, which facts were not introduced into evidence." *Athorn, supra,* 46 *N.J.* at 251–52, 216 *A.*2d 369. But defendant in this case has not uncovered any

evidence that jurors considered inappropriate information or that he was "harmed by juror misconduct" in any way. *Id.* at 250, 216 A.2d 369. Similarly, bald accusations in *Koedatich* were held insufficient to generate a basis for juror interviews post-trial. *Supra,* 112 *N.J.* at 289, 548 A.2d 939.

In *Koedatich, supra,* the defendant submitted a newspaper article that "quoted two deliberating jurors and one alternate juror," who indicated that jurors knew that the defendant was linked to another murder, although that information was not in evidence. 112 *N.J.* at 286, 548 A.2d 939. We nonetheless denied Koedatich's motion to conduct post-verdict interviews because "contents of a single newspaper article, indisputably hearsay, cannot be the sole basis for the extraordinary procedure of a post-trial jury interrogation." *Id.* at 289, 548 A.2d 939; *see also State v. Freeman,* 223 *N.J.Super.* 92, 120–21, 538 A.2d 371 (App.Div. 1988) (holding that hearsay "would clearly not provide good cause for post-verdict interrogation of jurors"). In finding no evidence that the defendant "may have been harmed," we noted that Koedatich "never asserted that any juror impermissibly considered [other crimes evidence] in reaching a decision." *Koedatich, supra,* 112 *N.J.* at 290, 548 A.2d 939. The Court added that "no member of the jury ever came forward to the court or counsel for the State or the defense and informed anyone of possible taint." *Ibid. See also DiFrisco III, supra,* 174 *N.J.* at 241, 804 A.2d 507 (denying a motion for post-verdict interviews and highlighting that affidavit submitted by alternate juror did not suggest that jurors actually considered inappropriate evidence during deliberations).

In the present matter, there is evidence that a reporter contacted some of the jurors, as reported to the State and to defendant and his counsel in open court in the presence of the jury members. The trial court's in-court statement signaled his satisfaction that extraneous information had not been conveyed by the reporter to those jurors who had been called in a "contact of inquiry" for comment. Indeed, no juror came forward during or after trial to say that he or she, or any other member of the jury,

considered extraneous information provided by the reporter, or by Audrey Bomse for that matter. As was lacking in *Koedatich,* there is no affidavit indicating that jurors considered improper information. There is not even hearsay evidence of improper jury deliberations.

 Nor do we draw any negative inference from the jurors' reaction to the court's comments. The tenor of the court's comments in open court effectively informed the jurors that the reporter erred in contacting them and that the proceeding would continue. Implicitly reflected in the trial court's address to the jury was that the court was not aware of anything that jeopardized the fairness of defendant's trial. We note the jurors' lack of any response or apparent reaction upon hearing the court's remarks about the reporter's contact. We have no reason to think that they were concerned after hearing the trial court's statement. The trial court apparently saw no reason to dwell further on the subject. Thus, in that context, as hearsay cannot provide the necessary "good cause" under *Rule* 1:16–1, *Koedatich, supra,* 112 *N.J.* at 289, 548 *A.2d* 939, then, certainly, neither can no evidence at all. Calling back jurors for interrogation is an extraordinary step and a compelling reason to do so is necessary. Defendant has not carried his burden.

### 2. Measures taken by the trial court

Defendant argues in this application that his conviction and sentence should be vacated because the trial court failed to interview the contacted jurors and to have an open hearing on the potential harm to his rights caused by the reporter's phone calls. He urges this Court to presume that he was prejudiced by the reporter phone calls, relying on *Remmer v. United States,* in which the United States Supreme Court stated:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not

conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

[347 *U.S.* 227, 229, 74 *S.Ct.* 450, 451, 98 *L.Ed.* 654, 656 (1954).]

*Remmer* created a prophylactic rule whose purpose was to protect the impartiality of the jury. It does not follow that any deviation from its suggested measures constitutes a violation of a defendant's right to an impartial jury. If that right remains protected, the alleged violation is harmless. Thus, notwithstanding the Supreme Court's statement about the steps a trial court should take to preserve a jury from polluting influences, the key here is to determine whether defendant was harmed by either the court's, or counsels', handling of the reporter contact issue at the time it arose. That is the ultimate question. We note, in that respect, that questions have arisen concerning the ongoing viability of the *Remmer* "presumption." *See United States v. Olano,* 507 *U.S.* 725, 739, 113 *S.Ct.* 1770, 1780, 123 *L.Ed.*2d 508, 522 (1993) ("There may be cases where an intrusion should be presumed prejudicial ..., but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?"); *United States v. Williams–Davis,* 90 *F.*3d 490, 496–97 (D.C.Cir. 1996) (noting that the cases no longer treat the presumption "as particularly forceful," and approving the Fourth Circuit's view that " 'while a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked' " (quoting *Stockton v. Commonwealth of Virginia,* 852 *F.*2d 740, 745 (4th Cir.1988))).

 In our view, the trial court should have interrogated the reporter on the record in the presence of trial counsel. Although the trial court's handling of the juror contact by the reporter was not appropriate, it does not constitute grounds for reversal. It does make review more difficult. We have "consistently required trial courts to protect both jurors and their deliberations from illegitimate influences that threaten to taint the verdict." *Bey, supra,* 112 *N.J.* at 75, 548 *A.*2d 846. Trial courts

must "seek out and expose outside factors impinging upon the jury's freedom of action and its impartiality and essential integrity." *In re Kozlov,* 79 *N.J.* 232, 239, 398 *A.*2d 882 (1979). Moreover, "an adequate inquiry on the record is necessary for the purposes of appellate review." *State v. Scherzer,* 301 *N.J.Super.* 363, 488, 694 *A.*2d 196 (App.Div.1997) (citations omitted).

The context in which this juror-contact issue arose is very important. The court and counsel were highly sensitized about the possible contaminating effect of juror exposure to noxious trial publicity. The jurors who were subjected to extensive screening about newspaper contact, were keenly aware of the intense press interest. Indeed, the out-of-county jurors received extraordinary transportation to and from the courthouse to minimize the risk of exposure to media coverage of the trial. Regular showings of hands were taken of jurors each time counsel were concerned about a particularly egregious "news account" that had entered the public domain. The court's and counsels' concerns thus were made known to jurors through numerous interactions between the court and the jurors in this multiple-week-long trial, then in its second segment (penalty). Against that backdrop, we find it significant that it was the jurors who volunteered promptly the information about the reporter's phone calls. Several of them approached Sergeant Petro to report the contact.

In these circumstances, it is reasonable to infer that a juror would have told Sergeant Petro if the contact was more than simply that—a contact, or inquiry, as the court phrased it, seeking unsuccessfully a juror comment. Although we do not approve the way the trial court handled the matter, we can make use of the measures the court did take in our assessment of whether defendant suffered any harm. The trial court spoke with the reporter in camera. On the record, before the jury and parties, the court did not convey any concern that juror taint occurred. The trial court described the reporter's contact merely as a "telephone call *of inquiry,*" and no juror raised any further issue. Moreover, its characterization of the phone call as merely one "of inquiry" was

echoed in the notes of the defense investigator, Tim Dolan, who wrote that the reporter called jurors "to solicit comments." We are not moved by unsupported suggestions that jurors would have felt "intimidated" by the reporter or "unprotected" by the court, regardless of what the reporter said. Under these circumstances, we are satisfied that no harm befell the defendant as a result of the trial court's handling of this contact by a reporter new to the courtroom.

### 3. Defendant's claim of ineffective assistance of counsel

As mentioned, PCR counsel represented that trial counsel learned of the juror contact when the trial court directly addressed the jurors in court about the reporter's phone calls. Defendant argues that his trial counsel failed to provide reasonable assistance because they did not request a hearing once they learned of the phone calls.

The PCR court did not allow PCR defense counsel to question Call and Scully on the circumstances surrounding the juror contact, and it did not permit testimony from other related witnesses, such as the trial judge, who presided over defendant's trials. Nevertheless, defendant's PCR counsel represented that he spoke with Call and Scully privately. Neither recalled that the trial court addressed in court the occurrence of the reporter's phone calls.

Again, this claim of deficiency must be examined in context. We do not divorce our evaluation of counsels' performance from the overall conduct of this trial. Specifically, we are mindful of the atmosphere created by the tremendous amount of publicity focused on the trial's progress, as well as the overall efforts and strategies of defendant's trial counsel, including their vigilance in asking the court to protect the jury from the press coverage. Call and Scully were very aware of the threat to defendant's right to a fair trial posed by the media. They repeatedly asked the court to ask jurors whether they were exposed to any of it.

Furthermore, Call and Scully were in the courtroom and witnessed the jurors' reactions to the court's statements about the phone calls. They would have been able to perceive whether any jurors appeared surprised or dismayed in any way by the court's statements about and characterizations of the phone calls, or its determination as to how to proceed based on the information it had disclosed. We often have interpreted a counsel's lack of objection to reflect a judgment that the complained-of error was not significant "in the context," *State v. Macon,* 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971); here, given trial counsels' efforts to keep out extraneous influences, we find reason to assume they did not find the reporter phone calls "significant in the context." In light of all that counsel and the court had done to preserve defendant's right to a fair trial and an impartial jury, we will not presume prejudicial contact in hindsight. Viewed in its context at the time, it was but a harmless blemish on the broad landscape of this tumultuous proceeding that involved numerous, overt efforts by counsel and the court to protect the jury from extraneous influences. *See Koskovich, supra,* 168 *N.J.* at 540–41, 776 *A.*2d 144. We conclude that defendant has not demonstrated that defense counsel's performance, in light of all the circumstances of the case, was outside the wide range of professionally competent performance because a more extensive proceeding was not requested on the juror contact issue.

### 4. Constitutionality of *Rule* 1:16–1

For completeness, we address defendant's argument that *Rule* 1:16–1 is unconstitutional because, in requiring "good cause" for juror interviews, it leaves the exposure of prejudicial influence on jurors to chance. That is, defendant argues that his ability to show good cause is impermissibly "made to depend on the sheer luck, that the wrongful event [during jury deliberations] somehow comes to light." *State v. LaFera,* 42 *N.J.* 97, 107, 199 *A.*2d 630 (1964). Defendant also argues that by interpreting *Rule* 1:16–1 as setting a high burden for defendants, this Court has not given appropriate weight to a defendant's rights. He claims the rule

violates his rights to free speech, to a fair and public trial, to conduct a defense, and to a reliable capital sentence.

In 1996, this Court addressed similar constitutional attacks on *Rule* 1:16–1, and held that they were "without merit." *Loftin I, supra,* 146 *N.J.* at 382, 680 *A.2d* 677 (citing *Loftin, supra,* 287 *N.J.Super.* at 108–09, 670 *A.2d* 557). We adhere to our holding in *Loftin,* and add only that we already have discussed the sound reasons justifying the rule and its application to motions for post-verdict interrogations of jurors. *See supra* at 502–03, 859 *A.2d* at 430.

## VI.

### Additional Claims

#### A. Recusal of PCR Judge

Defendant claims that the PCR judge erred by denying defendant's motion that he recuse himself. In light of our determination to nullify the PCR court's findings and conclusions, and to decide this matter *de novo,* we find it unnecessary to dwell on this aspect of defendant's application. We address it briefly only to eliminate any question about our determination to utilize the record created in this matter.

#### 1. Background

Approximately two months after the conclusion of the PCR hearing, but before the court issued its decision, PCR counsel moved to recuse the PCR court from consideration of this application. The motion was based on an indictment, filed January 7, 1975, against defendant and his brother, alleging that they committed atrocious assault and battery and robbery. The indictment contains a signature for the then Acting County Prosecutor (now the PCR judge); however, three initials appear after the signature. Additionally, a motion for dismissal dated July 3, 1975, bears a signature of the then Acting County Prosecutor. That motion indicates that "defendant has pled and been sentenced on

other charges. No useful purpose would be served by further prosecution of this matter." The motion to dismiss was granted by a Judge of the Superior Court, although the judge's signature is illegible.

The PCR court denied the motion to recuse. The court stated that it did not have any personal recollection of the prosecution or supervision of the unrelated indictment that issued twenty-five years earlier. The court also noted that someone else's initials after his signature demonstrates that he did not sign the indictment or personally prosecute the matter.

## 2. Analysis and Conclusion

Given the PCR court's marginal, if any, participation in the unrelated indictment, and its remoteness to the present matter, we conclude that defendant has not established that reason existed that "might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so," in violation of *Rule* 1:12–1. The "evidence" presented in support of this motion depicts, at most, mere ministerial involvement by the "Acting County Prosecutor." That is not the sort of personal involvement that compels disqualification. Nor does that remote, unrelated indictment establish reason for questioning the judge's impartiality pursuant to *Canon* 3(c)(1). Finally, although an Administrative Directive, issued September 19, 1983, instructed trial judges to disqualify themselves from hearing a criminal matter involving a defendant "who the judge, in his or her previous capacity, had personally prosecuted," that directive did not require the PCR judge to disqualify itself in this matter. The PCR judge stated that he had no personal recollection of such personal involvement and the indictment supports the judge's assertion that he did not sign the document; someone signed the document in his name. In these circumstances, we find no reasonable basis for defendant, counsel, or the public to question the PCR court's impartiality due to the indictment from a quarter century ago.

## B. PCR Court's Exclusion of Witnesses

Defendant seeks a remand on his PCR claims because he was denied the opportunity to present certain witnesses during the PCR proceeding. He was not permitted to present testimony from his capital defense expert, David Glazer, Esq., or from Nardone, Probation Officer Meckel, Gloria Dunn, Detective Golden, Tariq Ayers, Sheila Fairchild, P.D. Investigator Goldstein, and defendant's original counsel, Abatemarco and Hamilton.

### 1. Background

In respect of Glazer's testimony, defendant submitted two certifications. In addition to attesting to credentials, Glazer's first certification, dated February 21, 2001, stated that he reviewed in connection with this matter the penalty phase transcripts, Call's memos, Fairchild's report, our opinion affirming defendant's sentence, Nardone's report, the affidavit of defendant's biological father, defendant's psychiatric and school records, expert reports admitted into evidence, and defendant's PCR petition. In a subsequent June 2002 certification, he stated that he also reviewed the additional materials found by defendant's PCR counsel in preparation of this PCR petition, specifically the Trenton State Hospital records, defendant's hospital birth records, and Mattie's criminal history.

In the earlier certification, Glazer concluded that defendant's trial counsel committed seven trial errors that, "standing alone and cumulatively were below the standard of representation usually accorded capital defendants in this State and prejudiced Mr. Harris in the presentation of his penalty phase." In his second certification, Glazer stated that trial counsel "overlooked" the newly discovered institutional records, which "would have affected the jury's deliberations at the penalty phase." The PCR court reviewed the certifications but declined to hear Glazer's testimony and "accorded [the certifications] no weight." The court characterized Glazer's certifications as essentially "reiterat[ing] the legal

points raised in the PCR petition," and remarked that Glazer had significantly less capital experience than Call and Scully.

## 2. Analysis

Having reviewed this record, we agree with the State that most of the proposed witnesses were not relevant to establishing defendant's IAC claims. Dunn, Golden, Ayers and Fairchild were not relevant because their trial testimony was on record. The attorneys, Abatemarco and Hamilton, did not need to testify about the file they left Call and Scully because the latter trial counsel could, and did, speak to that. Furthermore, we reject the asserted need for Probation Officer Meckel to testify. We earlier determined that there was no legal basis for defendant's claim that his presentence interview was illegal. Defendant does not specify how testimony from any of these witnesses would have helped the PCR court assess his claims. As for Nardone, the PCR Court did accept and consider her report, as do we. It was not error to deny the request for her live testimony, and we decline to require a remand for that purpose based on our *de novo* review of this record. The most important witnesses to defendant's claim of ineffective assistance of counsel were Call and Scully, and they testified.

In respect of Glazer, the capital defense expert, defendant's argument is based entirely on our discussion of a similar claim in an earlier matter. In *DiFrisco III*, we said:

"Ordinarily, the necessity for and admissibility of expert testimony are matters to be determined within the sound exercise of discretion by the trial court." *State v. Berry,* 140 *N.J.* 280, 293 [658 *A.*2d 702] (1995) (citation omitted). Generally, a trial court will admit expert testimony if the subject matter at issue, or its specific application, is one with which an average fact finder might not be sufficiently familiar, or if the trial court determines that the expert testimony would assist it in understanding the evidence and determining facts in issue.

[*Supra,* 174 *N.J.* at 237, 804 *A.*2d 507 (parallel citations omitted).]

In addressing whether DiFrisco's PCR court abused its discretion in declining to consider the written submission and hear the testimony of the defendant's capital litigation expert, David Bruck, we took the view that the "field of capital defense litigation is a

constantly evolving, specialized area of the law." *Id.* at 239, 804 A.2d 507. Accordingly, we stated our belief that "[a]ll judges, irrespective of their experience level, can be informed by such information. Thus, when PCR counsel offers that form of testimony in a capital case, the court should hear it or at least consider it in written form." *Ibid.*

Although we identified the refusal to consider such expert evidence a deficiency, that does not render the proceeding below automatically flawed. A practical approach is in order, as was employed in *DiFrisco III* where such expert evidence was lacking and we had to determine what impact, if any, that had on the evaluation of the defendant's IAC claims. Here, we discern no basis for requiring the live testimony of Glazer in order to evaluate properly defendant's IAC claims. Harris's IAC claims do not suggest the need for an expert witness. His claims are not complicated. PCR counsel have presented clearly the reasoning and basis for contending that the alleged trial errors prejudiced defendant.

Given the straightforward nature of Harris's claims, it is not surprising that Glazer's certification consists of mere assertions and is short on developing the reasoning for those assertions. For example, Glazer faulted trial counsel for failing to meet with defendant's natural father and to call him to the stand. That statement was made before Call testified at the PCR hearing, where he stated that defendant's father refused to participate or help in defendant's case. Glazer's criticism adds nothing that is beyond the ken of the court after hearing Call's testimony during the evidentiary hearing.

Glazer also stated that it was unreasonable for trial counsel not to offer the (5)(a) and (5)(d) mitigating factors to the jury. However, in listing the documents he reviewed, Glazer did not indicate any consideration of Harris's criminal or DOC records. Call, on the other hand, set forth very clearly his rationale for not presenting an adult psychological profile of Harris (and, thus, for not submitting the (5)(a) and (5)(d) factors). Without an idea of

defendant's criminal and DOC records, Glazer was in no position to assess the reasonableness of Call's strategy.

In addition, we are acutely aware of the capital experience of Call and Scully. Scully had been assigned to more than eight capital cases and had tried five to conclusion. As a regional supervisor in the Office of the Public Defender, he oversaw all capital litigation in his region. He also managed the capital litigation for individual regional offices and assisted the supervisor of the OPD's capital litigation unit. Call had represented fifteen capital defendants, eleven of whom received life. That considerable experience is apparent from our review of the instant claims of ineffective assistance.

### 3. Conclusion

We reject defendant's argument in support of his request for a remand.

### C. "White Victim" Statement

The issue created by the "white victim" statement springs from Dunn's testimony. Dunn testified that while she was walking with Harris, looking for a car to carjack, she asked him what his plans were for the impending victim: "I said what you going to do with the people. He said if it's a black person, he's going to tie them up and leave them somewhere. If it's a white person, he's going to kill them." Soon after, she repeated that statement: "He said if it was a white person he was going to kill them." Later in her testimony, she explained that she chose not to abandon Huggins during the carjacking "because [defendant] said he was going to kill the person if they [were] white."

Defense counsel moved for a mistrial based in part on the surprise testimony.[10] The court denied the motion, stating that

---

[10] Defense counsel's motion also was based on an outburst made by Dunn while the court and counsel were at sidebar. Audible to the jury, Dunn exclaimed, "Murderer. I hope they kill your ass," or something similar. *Harris*

the white victim statement was an admission of the defendant, and thus admissible. The court expressed no concern about undue prejudice, noting that the "jury was well interviewed with regard to the racial aspects of this case."

Defendant now contends that he was denied a fair trial by the State's pre-trial failure to disclose that Dunn attributed to Harris a stated intention to spare a black victim but to kill a white one, and he further argues that his appellate counsel was ineffective for failing to appeal the trial court's denial of his motion for mistrial based on the discovery rule violation.

## 1. Background

Prosecutor Zarling testified to the difficulty he had in preparing Dunn to testify, due to her inconsistent recitations of the details of her testimony. The general structure of her version of what had occurred remained constant, but details did not. Zarling stated that she was "the most difficult witness that [he has] ever had to deal with." He stated that when he prepared her for trial, Dunn informed him about Harris's "white victim" statement. That was "sometime between January 3rd and January 22, 1996," which was after jury selection was completed but before Dunn's trial testimony. We note that Dunn testified on cross-examination that she had told the prosecutors of the statement before she pled guilty (which was before Harris's trial began; however, her prior statements to police—written and those reduced to writing—do not mention the white victim statement).

Timing aside, the prosecutor admitted that he had an obligation to disclose the statement and felt "professionally chagrined" for failing to fulfill it. He stated candidly that "[i]t never occurred" to him to turn it over. Once jury selection was over, he was not primarily concerned with racial issues because the State did not

---

*I, supra,* 156 *N.J.* at 174, 716 *A.*2d 458. The court took several curative steps that this Court found sufficiently limited the impact of Dunn's outburst. *Id.* at 176, 716 *A.*2d 458.

present the crime as racially motivated. And, he explained that with Dunn's continually changing recitations he had no idea what she would include in her testimony. Zarling also stated that he did not elicit deliberately the white victim statement.

## 2. Analysis

*Rule* 3:13–3(c)(2) obligates the State to provide in discovery all "records of statements or confessions ... by the defendant ...", and a summary of any admissions or declarations against penal interest made by the defendant that are known to the prosecution but not recorded." PCR counsel argues that the State violated that rule and the effect was "devastating" because Dunn's statement turned an interracial crime into a bias crime. As a result, defendant was denied a fair trial.

The State primarily contends that defendant was not prejudiced by the discovery violation. Defense counsel was on notice before trial that there was evidence in the State's case of defendant's racial bias. That knowledge provoked the extensive *voir dire,* which we reviewed and found satisfactory on direct appeal. *Harris I, supra,* 156 *N.J.* at 165–68, 716 *A.*2d 458. Indeed, Call testified at the PCR hearing that knowledge of the white victim statement would not have changed his *voir dire* questioning because the defense had "delved into the racial issues over and over again."

According to the State, if the statement was "devastating," it was only because it showed intent to kill. However, that intent was not debatable because Harris shot Huggins twice. Further, the State emphasizes that the case was not prosecuted as a racial crime. Defendant's goal was to rob and kidnap; there was no evidence that he chose Huggins because he wanted to kill a white person. Thus, the State argues that he killed to avoid apprehension for the kidnapping, carjacking, and rape. Lastly, the State contends that the white victim statement could not have "sandbagged" the defense because it did not interfere with the primary

518

defense strategy of attacking Dunn's credibility, or hurt the defense theory that Dunn pulled the trigger.

As noted, trial counsel moved for a mistrial based on Dunn's statement, but defendant did not appeal denial of the motion. *Rule* 3:22-4 procedurally bars defendant's claim that he was denied a fair trial unless enforcement of the bar would result in a fundamental injustice or would be contrary to the State or Federal Constitution. *R.* 3:22-4(b), -4(c). Nonetheless, the substantive merit of defendant's claim requires that we determine whether appellate counsel was ineffective for failing to appeal the trial court's denial of his mistrial motion. The *Strickland/Fritz* test governs claims that appellate counsel rendered ineffective assistance. *State v. Morrison*, 215 *N.J.Super.* 540, 546, 522 *A.2d* 473 (App.Div.1987), *certif. denied*, 107 *N.J.* 642, 527 *A.2d* 463 (1987); *see also State v. Moore*, 273 *N.J.Super.* 118, 125, 641 *A.2d* 268 (App.Div.1994) (stating that "ineffective assistance of counsel claims, particularly ineffective assistance of appellate counsel, are congruous with the exceptions to the procedural bar of *R.* 3:22-4 because they ... (2) involve infringement of constitutional rights; or (3) present exceptional circumstances involving a showing of fundamental injustice").

As to the reasonableness of not taking the appeal, we note that a mistrial should be granted "only in those situations which would otherwise result in manifest injustice." *State v. DiRienzo*, 53 *N.J.* 360, 383, 251 *A.2d* 99 (1969); *see also R.* 3:20-1 ("The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice."). Furthermore, "[t]he granting of a mistrial is within the sound discretion of the trial judge." *DiRienzo, supra*, 53 *N.J.* at 383, 251 *A.2d* 99. Thus, we would not have disturbed the trial court's denial of a mistrial "unless there [was] a clear showing of mistaken use of discretion by the trial court," *Greenberg v. Stanley*, 30 *N.J.* 485, 503, 153 *A.2d* 833 (1959), or unless "manifest injustice would ... result." *State v. LaBrutto*, 114 *N.J.* 187, 207, 553 *A.2d* 335 (1989).

The question is whether defendant can demonstrate manifest injustice due to the State's discovery violation. Denials of mistrial motions have been overturned where "a different trial strategy would have been employed" but for the discovery violation. *State v. Blake,* 234 *N.J.Super.* 166, 175, 560 *A.*2d 702 (App.Div.1989) (quoting *State v. Mitchell,* 412 *So.*2d 1042, 1044–45 (La.1982)); *see also, United States v. Lewis,* 511 *F.*2d 798 (D.C.Cir.1975); *United States v. Padrone,* 406 *F.*2d 560 (2d. Cir.1969). Here we must determine whether defense strategy might have differed significantly.

PCR counsel spent considerable time asking trial counsel how knowledge of the white victim statement would have affected their questioning of potential jurors during *voir dire.* However, if Zarling did not learn of the statement until jury selection was completed, then that line of questioning was irrelevant. In any event, Call testified at the PCR hearing that had he known about the white victim statement before Dunn's testimony, it would not have affected the defense strategy at all. He stated that defense counsel treated the case as racially charged from the beginning and that testimony is supported by the trial record. Dunn was the witness who attributed the white victim statement to Harris, and the essence of the defense strategy was to undermine her credibility. We are not persuaded that her attribution of the white victim statement to Harris had an appreciable effect on that strategy.

Furthermore, the defense never was forced to contend with the theory that Harris committed a hate or bias crime. The State never referred to the white victim statement in arguing to the jury about Harris's motives. Instead, it argued that Harris murdered Huggins to escape detection for the kidnapping and rape. One could have argued that Harris raped and tortured Huggins because he already had formed the intention to kill a white person; however, the State did not advance that argument. The State's summation, in particular, demonstrates the lack of significance given the "white victim" statement in this prosecution.

Thus, although Dunn three times stated that Harris intended to kill a white victim, the statement did not introduce a shocking new element that trial counsel had to defend. Harris's animosity towards white people was made known to the jury through others' testimony. For example, in addition to Dunn, both Tariq and Brian Goss testified that Harris had referred to Huggins as a "white bitch." We add also that we already have determined that the *voir dire* on potential jurors' racial attitudes was "sufficiently probing to meet constitutional standards." *Harris I, supra,* 156 *N.J.* at 164, 716 *A.*2d 458. The jurors filled out a questionnaire covering their racial attitudes and the court asked them individually about specific answers given on the questionnaire, noting that "[t]he court discharged every juror who responded 'unsure' on the questionnaire concerning whether the race of defendant and the victim would affect his or her judgment." *Ibid.*

### 3. Conclusion

In conclusion, we do not regard the white victim statement as having had the potential to force the defense to change its strategy. Defendant has not made the requisite showing that the State's discovery violation resulted in a manifest injustice. *La-Brutto, supra,* 114 *N.J.* at 207, 553 *A.*2d 335. Accordingly, appellate counsel would not have had a successful appeal on the mistrial denial. We neither regard appellate counsel as unreasonable for not including this issue in the appeal, nor do we find that defendant was prejudiced by the failure to appeal.

### D. Claim of Mental Retardation

### 1. Background

In 2002, the United States Supreme Court reversed its earlier decision in *Penry v. Lynaugh,* 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989), and held that the Eighth Amendment, given its meaning through "evolving standards of decency," prohibits the execution of offenders with mental retardation. *Atkins, supra,* 536 *U.S.* at 307, 122 *S.Ct.* at 2245, 153 *L.Ed.*2d at 341. Approxi-

mately two months after the United States Supreme Court decided *Atkins,* on the day before defendant's PCR evidentiary hearing, he notified the court of his intention to ask permission to amend his petition to argue that his mental retardation precluded his execution. The PCR court granted that motion, but denied defendant's request for a mental examination.

Further, the PCR court refused to engage in a "battle of the experts," and limited the *Atkins* hearing to one court-appointed psychologist, Dr. Marc Friedman. Friedman, employed by the State Division of Developmental Disabilities and experienced in assessing individuals for mental retardation, reviewed defendant's childhood IQ scores and letters written by defendant, but did not interview him.

Based on the IQ scores alone, Friedman concluded that defendant could not have mental retardation. He also testified that the planning involved in his crime and attempted cover-up of Huggins's murder, suggested intelligence "at least [at the] low-average" level, "well beyond" mental retardation. Finally, Friedman concluded that the letters he examined were "clearly" produced by someone with an IQ in the eighty-to-ninety, or low-average intelligence, range.

Defendant complains that the PCR court's exclusive reliance on a court-appointed expert violated his due process rights associated with the adversarial process, and that the expert's testimony should be accorded no weight because it relied on old records, as opposed to a contemporary psychological examination. Before us, defendant seeks a remand for a hearing on whether his execution is barred due to his alleged mental retardation.

## 2. Analysis

In finding in *Atkins* that the Eighth Amendment forbids the execution of persons with mental retardation, the Supreme Court recognized the increasing agreement among "the American public, legislators, scholars, and judges," *ibid.,* endorsing the view that "mentally retarded offenders [are] categorically less culpable than

the average criminal." *Id.* at 316, 122 *S.Ct.* at 2249, 153 *L.Ed.*2d at 347. In addition, the Court found that "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards." *Id.* at 317, 122 *S.Ct.* at 2250, 153 *L.Ed.*2d at 348. "Because of their impairments ... by definition [the mentally retarded] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318, 122 *S.Ct.* at 2250, 153 *L.Ed.*2d at 345 (citing J. McGee & F. Menolascino, *The Evaluation of Defendants with Mental Retardation in the Criminal Justice System, in The Criminal Justice System and Mental Retardation* 55, 58–60 (R. Conley, R. Luckasson, & G. Bouthilet eds.1992); Appelbaum & Appelbaum, *Criminal–Justice Related Competencies in Defendants with Mental Retardation,* 14 *J. of Psychiatry & L.* 483, 487–89 (Winter 1994)).

The Court recognized a growing consensus against executing the mentally retarded, but allowed discretion to states in implementing its mandate:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.... As was our approach in *Ford v. Wainwright,* with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."

> [*Id.* at 317, 122 *S.Ct.* 2242 (internal citations omitted).]

The New Jersey State Legislature has yet to accept that invitation to enact statutes implementing the *Atkins* mandate.[11]

---

[11] Currently, there are bills in the State Assembly and Senate, which have been introduced and referred to their respective Judiciary Committees, that address the *Atkins* mandate. Senate Bill No. 147; Assembly Bill No. 1797. The bills differ in certain respects. Except for the constitutional requirements recognized in this opinion, we express no views in respect of the various proposed methodologies; indeed there would appear to be a breadth of legislative prerogative permitted by *Atkins.*

### a. Due Process

We turn first to the question of whether it is proper for a trial court—either before sentencing or on post-conviction review—to appoint its own expert, without input from the parties, to adjudicate a capital defendant's claim of mental retardation. Defendant asserts that he was denied a fair hearing because he was not permitted to present expert testimony on his claim of mental retardation. On the other hand, the State asks us to endorse the PCR court's procedure for use in future evidentiary hearings.

Three factors apply in our due process analysis:

> The first [factor] is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.
>
> [*Ake v. Oklahoma*, 470 *U.S.* 68, 77, 105 *S.Ct.* 1087, 1093, 84 *L.Ed.*2d 53, 62 (1985).]

The first factor favors permitting a capital defendant to present his own evidence to establish a claim of mental retardation and to counter unfavorable evidence provided by the State or a court-appointed expert. Whether a defendant is adjudicated mentally retarded can mean the difference between life and death. "The private interest in the accuracy of criminal proceedings that places an individual's life or liberty at risk is almost uniquely compelling." *Id.* at 78, 105 *S.Ct.* at 1093, 84 *L.Ed.*2d at 63.

Conversely, we must search to find any governmental interest in prohibiting a capital defendant from putting on his own case, including testimony from his own expert. Indeed, "it is difficult to identify any interest of the State, other than that in its economy," *id.* at 79, 105 *S.Ct.* at 1094, 84 *L.Ed.*2d at 63, with respect to the time and cost of capital trials. Furthermore, the State has a strong countervailing interest in the "fair and accurate adjudication of criminal cases." *Ibid.* Because we conclude, *infra*, that the adversarial process is an important safeguard in adjudicating claims of mental retardation, we must regard the governmental interest at stake as "not substantial, in light of the compelling

interest of both the State and the individual in accurate dispositions." *Id.* at 79, 105 *S.Ct.* at 1094, 84 *L.Ed.*2d at 63–64.

Turning to the third and last factor in our due process analysis, we assess the probable value of the adversarial process in this context, and the risk of error in such proceedings should court-appointed experts be used exclusively. To begin that analysis, we note that two experts examining the same individual or same records often disagree on whether that person has mental retardation. *See, e.g., Atkins, supra,* 536 *U.S.* at 309, 122 *S.Ct.* at 2246, 153 *L.Ed.*2d at 343; *Smith v. Cockrell,* 311 *F.*3d 661, 681–82 (5th Cir.2002); *United States v. Frank,* 933 *F.*2d 1491, 1493 (9th Cir.1991), *amended and superseded on other grounds by United States v. Frank,* 956 *F.*2d 872 (9th Cir.1991); *People v. Smithey,* 20 *Cal.*4th 936, 86 *Cal.Rptr.*2d 243, 978 *P.*2d 1171, 1222 (1999); *Baqleh v. Superior Court,* 100 *Cal.App.*4th 478, 483, 122 *Cal. Rptr.*2d 673 (2002); *State v. White,* 85 *Ohio St.*3d 433, 709 *N.E.*2d 140, 160 (1999); *Corley v. State,* 582 *S.W.*2d 815, 819 (Tex.Crim. App.1979). *See also Esposito v. Barber,* 74 *N.J.Super.* 289, 291, 181 *A.*2d 201 (Law Div.1962) (in case deciding degree to which infant had retardation, court states that "[a]s usual, there was disagreement between" the experts). Experts may even disagree about what is an individual's IQ, especially when they must determine which result of multiple tests best represents a person's IQ. *See, e.g., Sanford v. State,* 342 *Ark.* 22, 25 *S.W.*3d 414, 419 (2000); *Mason v. Office of Administrative Hearings,* 89 *Cal. App.*4th 1119, 1132, 108 *Cal.Rptr.*2d 102 (2001); *State v. Brooks,* 541 *So.*2d 801, 817 (La.1989).

The weakness of relying on only one court-appointed, impartial expert is precisely that experts do disagree, and with some frequency. That procedure provides an "illusion of certainty." John M. West, *Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of Ake v. Oklahoma,* 84 *Mich. L.Rev.* 1326, 1348 (1986). "Considerable empirical evidence on the use of court-appointed 'impartial' experts, and particularly psychiatrists, has shown that the trier of fact, whether judge or jury,

almost invariably accepts the expert's opinion." *Id.* at 1350 (citing one study finding that Swedish judges followed expert opinion in 99% of cases; another study in U.S. finding that juries accepted court-appointed expert's opinion in 995 of 1000 cases; and similar study finding juror acceptance in 499 of 500 cases); *see also United States v. Addison,* 498 *F.*2d 741, 744 (D.C.Cir.1974) (observing that scientific expert testimony may have "posture of mythic infallibility" in eyes of laymen, and therefore "the ability to produce rebuttal experts, equally conversant with [the subject matter], may prove to be essential"); *United States v. Weston,* 36 *F.Supp.*2d 7, 12 (D.D.C.1999) (granting leave for government to conduct own psychiatric exam of defendant's competency, even though court-appointed expert testified).

We have no doubt that the adversarial process is essential to settling claims of mental retardation. Our conclusion is reinforced by our concern with capital proceedings in which the "factfinding procedures [must] aspire to a heightened standard of reliability." *Ford v. Wainwright,* 477 *U.S.* 399, 411, 106 *S.Ct.* 2595, 2602, 91 *L.Ed.*2d 335, 347 (1986).

> [I]f the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding. Indeed, a particularly acute need for guarding against error inheres in a determination that "in the present state of the mental sciences is at best a hazardous guess however conscientious."
>
> [*Id.* at 411–12, 106 *S.Ct.* at 2602–03, 91 *L.Ed.*2d at 347–48 (quoting *Solesbee v. Balkcom,* 339 *U.S.* 9, 23, 70 *S.Ct.* 457, 464, 94 *L.Ed.* 604, 612 (1950) (Frankfurter, J., dissenting)).]

The Constitution renders an execution contingent on a defendant not being mentally retarded, and for that reason, there is a "particularly acute need for guarding against error" in assessing a legitimate claim of retardation. *Ibid.*

A defendant's access to his own psychological expert on this matter is also important in preparation for cross-examination of the State's or the court-appointed witness. Mental health experts "know the probative questions to ask of the opposing party's [or

the court-appointed] psychiatrists and how to interpret their answers." *Ake, supra*, 470 *U.S.* at 80, 105 *S.Ct.* at 1095, 84 *L.Ed.*2d at 64. A defendant would be disadvantaged in exposing shortcomings in a court-appointed expert's testimony without expert consultation. *West, supra*, 84 *Mich. L.Rev.* at 1353; *see also United States v. Sloan*, 776 *F.*2d 926, 929 (10th Cir.1985) (finding defendant was denied due process where "the benefit sought was not only the testimony of a psychiatrist to present the defendant's side of the case, but also the assistance of an expert to interpret the findings of an expert witness and to aid in the preparation of his cross-examination").

The grave private interests at stake, along with the value of adversarial testing, particularly in this context, compel the conclusion that it would be violative of due process to deprive a capital defendant of the opportunity to present evidence, including expert testimony, to support a *bona fide* claim of mental retardation. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 *U.S.* 385, 394, 34 *S.Ct.* 779, 783, 58 *L.Ed.* 1363, 1369 (1914). A trial is fundamentally unfair if a defendant does not have "access to the raw materials integral to the building of an effective defense." *Ake, supra*, 470 *U.S.* at 77, 105 *S.Ct.* at 1093, 84 *L.Ed.*2d at 62. The Supreme Court's statement regarding a defendant's claim of insanity is no less relevant to a claim of retardation, as both bear directly on his eligibility for death:

> [C]onsistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate.
>
> [*Ford, supra*, 477 *U.S.* at 414, 106 *S.Ct.* at 2604, 91 *L.Ed.*2d at 349.]

We emphasize that our holding does not imply that every capital defendant who raises a claim of mental retardation has the right to a hearing in which to present expert testimony on that claim. The private interests at stake, along with the probable value of an adversarial hearing, are themselves insufficient to warrant a hearing and psychological testimony when a defendant's claim is

facially unreasonable. Our holding places the burden on a defendant to make some showing that he has mental retardation. That limitation is consistent with federal and state jurisprudence.

In *Ake*, the United States Supreme Court held that a state is required to provide an indigent defendant who is claiming insanity with a psychiatrist only if he "is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Ake, supra,* 470 *U.S.* at 82–83, 105 *S.Ct.* at 1096, 84 *L.Ed.*2d at 66. Similarly, this Court has held that "if defense counsel has *reasonable ground* to believe defendant is insane[ ] ... and the defendant is indigent," the defendant should be provided with an examining psychiatrist." [12] *State v. Whitlow,* 45 *N.J.* 3, 10–11, 210 *A.2d* 763 (1965) (emphasis added); *see also State v. Pugh,* 117 *N.J.Super.* 26, 31, 283 *A.2d* 537 (App.Div.1971) (holding that due process does not require hearing on defendant's competency unless "evidence raises a *bona fide* doubt as to such competency"). The Criminal Code reflects a similar judgment on behalf of the Legislature: "Whenever there is *reason to doubt* the defendant's fitness to proceed, the court may on motion by the prosecutor, the defendant or on its own motion, appoint at least one qualified psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant." *N.J.S.A.* 2C:4–5a (emphasis added).[13] *See also, State v.*

---

[12] The bill before the State Assembly currently provides: "At any time prior to trial or upon conviction of a person for murder, the court shall, upon oral or written motion of the defendant based upon a showing that there is reasonable cause to believe that the defendant is mentally retarded, promptly conduct a hearing without a jury to determine whether the defendant is mentally retarded." Assembly Bill No. 1797.

[13] The State points to the statute concerning competency as support for the procedure used by the PCR court to adjudicate a claim of mental retardation. The State argues that the PCR court's appointment of a neutral expert is "similar to the Code's provision on dealing with a defendant's incompetency to stand trial." We disagree. *N.J.S.A.* 2C:4–5 supports our holding. According to the statute, the court may appoint a qualified psychiatrist to examine a defendant, but that psychiatrist shall be either agreed to by the court, the prosecutor, and the defendant, or from a list agreed to by the court and the parties. *N.J.S.A.*

*Williams,* 831 *So.*2d 835, 857 (La.2002) (holding that defendant's entitlement to post-*Atkins* hearing will be made on case-by-case basis, and that while waiting for legislative direction, courts should treat matter procedurally just as pre-trial competency hearings).

Finally, we are not requiring that a defendant on post-conviction review make a *prima facie* showing of mental retardation to warrant a psychological examination and a hearing; we are fully aware that cases arising on post-conviction review will vary in respect of the records developed in prior proceedings. However, we will require that defendant present a reasonable basis to be permitted a hearing to explore further the possibility of mental retardation.

### b. Application to Harris

Although defendant claims that he is entitled to be heard on his claim of mental retardation, defendant does not provide grounds to order a remand. If defendant submitted a reasonable basis for believing that he might have mental retardation, our opinion would not foreclose a PCR court from ordering a psychological examination of defendant to assess his claim of retardation. However, the current record contains sufficient evidence to refute defendant's mere assertion of mental retardation.

Definitions of "mental retardation" include three components: "(1) substantial intellectual impairment; (2) impact of that impairment on the individual's everyday life; and (3) appearance of the disability at birth or during the person's childhood." James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues,* 27 *Mental & Physical Disability L. Rep.* 11, 13 (Jan./Feb.2003). The American Association on Mental Retardation's (AAMR) most recently published definition states:

---

2C:4–5a. The statute also states that a "qualified psychiatrist or licensed psychologist retained by the defendant or by the prosecution *shall,* if requested, be permitted to examine the defendant." *N.J.S.A.* 2C:4–5a(2) (emphasis added). In other words, the statute does not replace the adversarial process with the exclusive use of a court-appointed expert.

"Mental Retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The disability originates before age eighteen." AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (Ruth Luckasson ed., 10th ed.2002) (hereafter AAMR, *Mental Retardation*). Definitions adopted by states that have passed *Atkins* legislation "are not identical, but generally conform to the clinical definitions" set forth by the AAMR and the American Psychiatric Association. *Atkins, supra*, 536 *U.S.* at 317 n. 22, 122 *S.Ct.* at 2250 n. 22, 153 *L.Ed.*2d at 348 n. 22.

The important components for our purposes are the limited intellectual functioning of persons with mental retardation, and evidence of the disability during childhood. As measured by standard IQ tests, limited intellectual functioning "requires an individual's measured intelligence to be two standard deviations below the statistical mean. That, in turn, indicates that he or she scores in approximately the bottom 2 ½ percent of the population." Ellis, *supra*, 27 *Mental & Physical Disability L. Rep.* at 13; *see also Atkins, supra*, 536 *U.S.* at 309 n. 5, 122 *S.Ct.* at 2245 n. 5, 153 *L.Ed.*2d at 342, n. 5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.") (citing 2 Kaplan & Sadock's *Comprehensive Textbook of Psychiatry* 2952 (B. Sadock & V. Sadock eds. 7th ed.2000)). If the IQ score is valid, significant subaverage intellectual functioning "will generally result in a score of approximately 70 to 75 or below." AAMR, *Mental Retardation, supra*, at 14. "This upper boundary of IQs for use in classification of mental retardation is flexible to reflect the statistical variance inherent in all intelligence tests and the need for clinical judgment by a qualified psychological examiner." *Id.* at 11; *see also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41–42 (4th ed. Text Revision, 2000) (hereafter *DSM–IV–TR*) ("Thus it is possible to

diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.").

In accordance with the mental health literature, some states have built into their statutes an IQ score as a threshold or as creating a rebuttable presumption of mental retardation. *See, e.g.,* 725 ILL. COMP. STAT. 5/114–15(d) (2003) ("An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation."); KY. REV. STAT. ANN. § 532.130(2) (Banks–Baldwin 2003) (" 'Significant subaverage general intellectual functioning' is defined as an intelligent quotient of 70 or below."); MD. CODE ANN., Criminal law § 2–202(b)(1) (2002) (requisite intellectual deficits "shown by an intelligence quotient of 70 or below on an individually administered intelligence quotient test"); NEB. REV. STAT. § 28–105.01 (2003) (IQ of seventy or below "shall be presumptive evidence of mental retardation"); N.M. STAT. ANN. § 31–20A–2.1 (West 2004) (same); S.D. CODIFIED LAWS § 23A–27A–26.2 (2004) (an IQ above seventy is presumptive evidence of not having mental retardation).

Defendant took several IQ tests as a child, and the results are in this record. The scores are relevant because the intellectual and adaptive deficits associated with mental retardation " 'manifest[ ] before age 18.' " *Atkins, supra,* 536 *U.S.* at 309 n. 3, 122 *S.Ct.* at 2245 n. 3, 153 *L.Ed.*2d at 342, n. 3 (citing AAMR, *Mental Retardation, supra,* at 5). Defendant's childhood records formed the bases of the opinions of not only Dr. Friedman, but also of Dr. Gruen, who testified for the defendant at the penalty phase. Review of defendant's childhood records lead to the conclusion that he has not presented a *bona fide* claim of mental retardation.

That said, two test results are emphasized by defendant. According to a probation report, defendant took an IQ test, noted as the "Cal. M.M. Elementary" test, when he was nine years old and achieved a score of seventy-two. Also, in 1969, when defendant was about seventeen years old, a psychological screening test at the State Home for Boys indicated an IQ of seventy-five. As noted, although significantly subaverage intellectual functioning is

generally considered to reflect an IQ of seventy or below, "there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument.... Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." *DSM–IV–TR, supra,* at 41–42; *Weatherspoon v. Massanari,* 228 *F.Supp.*2d 1041, 1047 (E.D.Mo.2002) (quoting *DSM–IV–TR* ).

However, defendant's record includes many other IQ test results. Defendant's scores strongly suggest that if his results of seventy-two and seventy-five do not reflect his intellectual capacities, it is because they underestimated his abilities; the other results and comments from examiners reflect greater intellectual abilities. In February 1961, defendant was administered the "Cal. M.M." instrument and obtained a score of eighty-eight. In April 1962, when defendant was about ten years old, he took the Wechsler Intelligence Scale of Children (WISC) test and achieved the following scores: eighty-one on the verbal scale, ninety-three on the performance scale, and eighty-five on the full scale. In an accompanying report, the examining psychologist wrote: "Ambrose is functioning in the average range. Two of the five subtest scores are in the dull normal range and two are in the average range. The vocabulary subtest is in the defective range. This test gauges language development which is influenced by cultural opportunities." The report concludes: "Ambrose is functioning in the average range and is retarded a year below mental maturity.... It would seem that though Ambrose's intelligence is low he is not anywhere near educable class placement."

Another school record (date illegible) reports that a psychologist administered an IQ test to defendant and found defendant's functioning to be declining. He received a seventy-nine for verbal, eighty-two for performance, and a seventy-eight on the full scale. Those scores are also above the range of mental retardation. Moreover, the examining psychologist wrote that "the quality of [defendant's] responses on a Rorshach would indicate that the

previous [higher] test results are closer to his intellectual potential." Based on his discussions with defendant, the psychologist concluded, "Ambrose's poor test results may be tied in with his feeling more threatened and anxious during the testing procedure."

A June 1962 letter from a school social worker indicates that defendant had been previously placed in an educable class "because he was a disturbing influence in the regular fourth grade and unable to function on the same level as the others." The letter does not justify defendant's placement based on retardation. In fact, the social worker, after conducting a psychological examination, concluded that Harris could "function at a low average level."

In January 1964, just before defendant turned twelve years old, the WISC test was again administered to him, and he obtained a full-scale IQ score of eighty. Six months later, another school psychologist administered the WISC test, and defendant obtained the following results: eighty on the verbal scale, eighty on the performance scale, and seventy-eight on the full scale. Finally, the State Home for Boys administered another WISC test to defendant in 1966, and his performance indicated an IQ of eighty-three, which was deemed "probably dull normal" by the evaluator.

Even more compelling is the assessment of defendant's institutional records by his own mental health expert testifying at the penalty phase of defendant's trial. Dr. Gruen, a child psychologist testifying for defendant, strongly disagreed with any diagnosis of "mildly mentally retarded" made of defendant when he was a child. Gruen testified that he could not "fathom" such a diagnosis "because the [IQ] scores that [he] saw were not mildly mentally retarded." He testified, "I believe in historical perspective, the mentally retarded classes in the early '60's were dumping grounds for every kind of behavior and underachievement problem that faced the public schools." Gruen testified that placing defendant in classes with mentally retarded children would cause conflict and anger within him.

We realize that records attached to cases on post-conviction review will vary, depending on the issues raised at trial and at the penalty phase. In the present matter, we combed the record for some evidence to support defendant's bare assertion that a psychological evaluation is needed to determine whether he has mental retardation. The record, including the opinion of defendant's own expert at the penalty phase, provides no support for his claim that a psychological examination is necessary; indeed, the record speaks against his claim. *Cf. State v. Grell*, 205 *Ariz.* 57, 66 *P.*3d 1234, 1238–41 (2003) (ordering remand for trial court to conduct hearing where childhood records showed IQ scores of 72, 67, 69, 70, 57, and 65, and defense experts at penalty phase testified that defendant had retardation); *Goodin v. State*, 856 *So.*2d 267, 277–78 (Miss.2003) (allowing PCR defendant to proceed on *Atkins* issue where pre-trial IQ scores ranged from fifty to sixty-five). Indeed, defendant has not provided any affidavit from a qualified psychologist who reviewed defendant's childhood records and his letters and who concluded that it is even an open question as to whether defendant has mental retardation. Without a reasonable basis for defendant's request for a psychological examination, we conclude that he is not entitled to a hearing on his claim of mental retardation.

### 3. Conclusion

In sum, based on the record presented by defendant, he was not entitled to a hearing on his mental retardation claim. The use of a neutral court-appointed expert would have violated defendant's due process rights had he presented a *bona fide* claim of mental retardation. We hold that where a defendant raises a legitimate claim of mental retardation, the procedure used by the trial court would not satisfy the demands of due process.

### E. *Ring*

Defendant raises in the PCR application that his death sentence must be vacated because the indictment failed to include the

aggravating factors alleged by the State. He seeks to have the Court to reconsider its holding in *State v. Martini*, 131 *N.J.* 176, 619 *A.2d* 1208 (1993), in light of *Apprendi v. New Jersey*, 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.2d* 435 (2000), and *Ring, supra*, 536 *U.S.* at 584, 122 *S.Ct.* 2428, 153 *L.Ed.2d* 556.

In *State v. Fortin*, 178 *N.J.* 540, 843 *A.2d* 974 (2004) (*Fortin II* ), we did reexamine our holding in *Martini* in light of *Apprendi* and *Ring,* and concluded that a new rule should obtain. *Id.* at 645–46, 843 *A.2d* 974. We held that aggravating factors must be submitted to the grand jury in all capital cases that had not yet reached the penalty phase. *Id.* at 649–50, 843 *A.2d* 974. But we also made the new rule of law purely prospective. *Id.* at 649, 843 *A.2d* 974 (noting State's reliance on prior holding in *Martini,* and that defendants' were protected sufficiently by opportunity for *McCrary* hearing).

*Fortin's* ruling on prospectivity controls in this matter. Only if defendant's convictions were reversed or his death sentence vacated, would the State be required to submit the aggravating factors to the grand jury. In its present posture, defendant's indictment fully comported with *Martini's* interpretation of the State Constitution. The failure of the indictment to allege the aggravating factors does not require vacating his death sentence.

## VII.

Defendant's application for post-conviction relief is denied.

Justice LONG concurring in part and dissenting in part.

I am in full agreement with the Court's determination to deny defendant's post-conviction relief petition based on his claim of ineffective assistance of counsel. I write separately to reiterate my previously expressed view that inflammatory pretrial publicity, recounted in *State v. Harris*, 156 *N.J.* 122, 202–10, 212–18, 716 *A.2d* 458 (1998) (Handler, J., dissenting), coupled with the trial court's wholly inadequate efforts to contain it, created a realistic

likelihood that defendant did not receive a fair trial. *State v. Harris* 165 *N.J.* 303, 757 *A.*2d 221 (2000), Long, J., dissenting.

*For denial*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN and WALLACE—5.

*For concurrence in part/dissent in part*—Justice LONG—1.